IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

MIGUEL MEDINA,

                        Plaintiff,          Civil Action No.
                                            9:16-CV-1284 (TJM/DEP)

        v.

SGT. SHEEHAN, Albany County
Correctional Facility,

                        Defendant.

_____

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

Miguel Medina, *Pro Se*
381 South Main Street
Mechanicville, NY 12118

FOR DEFENDANT:

HON. DANIEL LYNCH                   SIA Z. GOOGAS, ESQ.
Albany County Attorney              Assistant County Attorney
112 State Street
Albany, NY 12207

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

        Plaintiff Miguel Medina, a former inmate of the Albany County

Correctional Facility ("ACCF"), who is proceeding in this matter *pro se* and

*in forma pauperis*, has commenced this action pursuant to 42 U.S.C. §
1983, alleging that defendant Sergeant Darrell Sheehan was deliberately
indifferent to plaintiff's serious medical needs, in violation of the Eighth
Amendment to the United States Constitution.[1]  Plaintiff contends that
during his confinement at that facility, defendant Sheehan refused to
arrange for medical treatment for Medina's finger, which was injured
during the course of an altercation with a fellow inmate.

Now that discovery is complete, defendant has moved for the entry
of summary judgment dismissing plaintiff's remaining claims against him,
arguing that plaintiff cannot establish both that his medical condition was
sufficiently serious to be of constitutional significance and that defendant
Sheehan acted with deliberate indifference to plaintiff's medical needs.
Alternatively, defendant asserts that he is entitled to qualified immunity
from suit, contending that his actions were objectively reasonable and no
reasonable corrections officer would believe that defendant's conduct
violated clearly established law. Having carefully considered the
arguments asserted in defendant's motion, which plaintiff has failed to
oppose, I recommend that it be granted and that plaintiff's remaining

---

[1]    While plaintiff has identified defendant Sheehan as a sergeant, it appears that at
the relevant times he served as a corrections lieutenant. *See* Dkt. No. 36-11 at 1-2.

claims in the action be dismissed.

I.    BACKGROUND[2]

Plaintiff's claims arise of his confinement in the ACCF from October 11, 2013 until December 9, 2013. Dkt. No. 36-2 at 5. On December 3, 2013, while awaiting transfer into state custody as a convicted felon, plaintiff was housed in the A-Building dormitory of the ACCF. Dkt. No. 36-11 at 2. At that time, defendant Sheehan, a corrections lieutenant, was assigned as the Unit Supervisor for the Dorms and Medical Unit, where he was responsible for the supervision and management of other corrections officers in the same dormitory that plaintiff was housed. Dkt. No. 36-11 at 2-3.

At approximately 7:30 p.m. on that date, plaintiff was involved in a brief altercation with a fellow inmate, Jason Depace. Dkt No. 36-2 at 14-

---

[2]    In light of the procedural posture of this case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). In addition, because plaintiff has not opposed defendant's summary judgment motion, I have also drawn the background from the facts set forth in defendant's statement of material facts, submitted pursuant to the Northern District of New York Local Rule 7.1(a)(3), which are deemed admitted by plaintiff for purposes of the pending motion. *See* N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."); *see also Ketchuck v. Boyer*, 2011 WL 5080404, at *2 (N.D.N.Y. Oct. 25, 2011) (McAvoy, J.) ("The responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly." (listing cases)).

15, 20, 80; Dkt. No. 36-3 at 16-17. During the incident, Depace allegedly charged at plaintiff, and in response, plaintiff struck Depace two or three times in the face or head with his right hand. *Id.* at 15, 17, 20-21, 23, 80-81; Dkt. No. 36-3 at 17-18. Following the incident, plaintiff retreated back to his cell. Dkt. No. 36-2 at 21-22; Dkt. No. 36-3 at 19-20.

At the time plaintiff struck inmate Depace, he felt no pain in his hand. Dkt. No. 36-3 at 18. After returning to his cell, however, plaintiff began to feel pain in his right hand. Dkt. No. 36-2 at 23-24, 81; Dkt. No. 36-3 at 21. Plaintiff described his right hand as "hot and pulsating," and as it began to swell, plaintiff believed that he had broken something in his hand. *Id.* at 24; Dkt. No. 36-3 at 21-22.

Within two or three minutes of the altercation, defendant Sheehan responded to plaintiff's cell to investigate the incident. Dkt. No. 36-2 at 23; Dkt. No. 36-3 at 18-19. When asked who he had gotten into a fight with, plaintiff responded that he "was not going to disclose that information because of [his] safety." Dkt. No. 36-3 at 30. Defendant Sheehan then asked plaintiff to write a statement, but plaintiff refused due to the pain in his hand. Dkt. No. 36-2 at 81-82; Dkt. No. 36-3 at 28, 78-79. Plaintiff believed that defendant Sheehan perceived him as being uncooperative with the investigation. Dkt. No. 36-2 at 81-82.

4

Defendant Sheehan informed plaintiff that he was being taken to administrative segregation as a result of the altercation. Dkt. No. 36-3 at 30-31; *see also* Dkt. No. 36-4 at 1. Although defendant Sheehan does not recall plaintiff mentioning that he injured his right hand,[3] *see* Dkt. No. 36-11 at 4-5, plaintiff alleges that he showed his hand to defendant Sheehan, who stated "that from his observation [plaintiff's] hand was not broken and that [he] should report to sick call" the following day. Dkt. No. 36-3 at 34-36; *see also* Dkt. No. 36-2 at 25, 76-77, 82-83; Dkt. No. 36-4 at 1.

At approximately 8:00 a.m. on the following day, plaintiff was seen at sick call complaining of pain and swelling in his right hand. Dkt. No. 36-2 at 31, 76, 84. Upon examination, plaintiff was able to move his fingers with some difficulty. Dkt. No. 36-8 at 30. On December 5, 2013, an x-ray revealed "[f]indings most consistent with [an] old injury to the fifth metacarpal" and "no evidence of [a] recent fracture of dislocation." Dkt. No. 36-8 at 35; *see also* Dkt. No. 36-8 at 30 (indicating that plaintiff "state[d] he broke [his right] hand [two times] before"); Dkt. No. at 36-3 at 42-43.

---

[3]    While plaintiff asserts that he was escorted to administrative segregation by defendant Sheehan, the lieutenant does not recall doing so, and states that the usual practice would have been for a hallway supervisor to escort plaintiff. *Compare* Dkt. No. 36-2 at 29 *with* Dkt. No. 36-11 at 4-5.

On December 9, 2013, plaintiff was transferred into state custody. Dkt. No. 36-2 at 40-41. A new x-ray, taken on December 12, 2013, revealed a "recent fracture neck right 4th metacarpal in satisfactory position with overlying soft tissue swelling" as well as a "healed fifth metacarpal base fracture." Dkt. No. 36-9 at 1; *see also* Dkt. No. 36-2 at 44-45, 48-49. Plaintiff's hand was placed in a splint, and then a hard cast. Dkt. No. 36-2 at 44-50.

In early 2014, plaintiff re-injured his right hand while in state custody. Dkt. No. 36-2 at 54-57, 63; Dkt. No. 36-3 at 57; Dkt. No. 36-9 at 2-11. According to plaintiff, his right hand healed incorrectly, and he needed to undergo surgery to correct the issue. Dkt. No. 36-3 at 57, 59-60.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on or about October 27, 2016, by the filing of a complaint accompanied by an application for leave to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1-3. Although plaintiff's IFP application was initially denied by Senior District Judge Thomas J. McAvoy as incomplete, Dkt. No. 4, following plaintiff's submission of a completed form, his application was granted and plaintiff's complaint was reviewed pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. Nos. 5, 9. In a decision and order dated December 1, 2016, based upon that review, Judge McAvoy

dismissed plaintiff's complaint, with leave to amend, as failing to state a plausible claim against any of the named defendants, Dkt. No. 9. Plaintiff subsequently availed himself of the opportunity to file a first amended complaint ("FAC"). Dkt. Nos. 13, 15. In his FAC, plaintiff named defendant Sheehan, Jane Doe (Nurse) I, John Doe (Radiologist), and Jane Doe (Nurse) II as defendants, and claimed that those defendants were deliberately indifferent to his serious medical needs, in violation of his rights under the Eighth Amendment. *Id.*

By decision and order dated February 9, 2017, Judge McAvoy undertook a review of plaintiff's FAC, pursuant to sections 1915(e) and 1915A, and concluded that it should be accepted only to the extent that it asserted claims against defendants Sheehan and Jane Doe (Nurse) II. Dkt. No. 14. On February 5, 2018, after the deadline for the completion of discovery, the court issued an order directing plaintiff to show cause why the claims asserted against defendant Jane Doe (Nurse) II should not be dismissed in light of the fact that plaintiff had yet to identify, join, and serve that individual in the action. Dkt. No. 34. When plaintiff failed to respond, I issued a report on March 23, 2018, in which I recommended that the claims against that defendant be dismissed. Dkt. No. 35. That report and

recommendation was adopted on June 1, 2018 by Senior Judge McAvoy. Dkt No. 44.

On March 31, 2018, defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking dismissal of plaintiff's remaining claims, both on the merits and based upon qualified immunity. Dkt. Nos. 36, 42. Plaintiff has not responded to the pending motion, which is now ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Plaintiff's Failure to Oppose Defendant's Motion

Before turning to the merits of defendant's motion the court must first address, as a threshold issue, the legal significance of plaintiff's failure to oppose defendant's motion, and specifically whether that failure should be construed as a consent to the dismissal of his complaint.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose defendant's motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

Where a properly filed motion is unopposed and the

8

Court determines that the moving party has met its
burden to demonstrate entitlement to the relief
requested therein, the non-moving party's failure to
file or serve any papers as this Rule requires shall
be deemed as consent to the granting or denial of
the motion, as the case may be, unless good cause
is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express*, 766 F.3d 189,

194 (2d Cir. 2014) (holding that the district courts may enter summary

judgment in favor of the moving party where the non-moving party fails to

respond in opposition, but not without first "ensur[ing] that each statement

of material fact is support by record evidence sufficient to satisfy the

movant's burden of production" and "determin[ing] whether the legal theory

of the motion is sound").

In this case, plaintiff has not responded to defendant's properly filed

motion. *See* Dkt. No. 42. I note that under these circumstances, when

considering the question of whether defendant Sheehan has met his

burden on the motion, the "burden of persuasion is lightened such that, in

order to succeed, his motion need only be 'facially meritorious.' " *See*

*Rodriguez v. Goord*, No. 04-CV-0358, 2007 WL 4246443, at *1 (N.D.N.Y.

Nov. 27, 2007) (Scullin, J., *adopting report and recommendation by* Lowe,

M.J.) (finding that determination of whether a movant has satisfied its

burden to demonstrate entitlement to a dismissal under Local Rule

9

7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)).[4]

Because defendant Sheehan has accurately cited both proper legal authority and evidence in the record supporting the grounds on which his motion for summary judgment is based, and plaintiff has failed to respond in opposition to the motion, I find that the motion is facially meritorious. *Jackson*, 766 F.3d at 194. Accordingly, I recommend that the court grant defendant's motion on this basis.

B.   Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the

---

4   All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

10

nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Empr' s' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

C.   Analysis of Plaintiff's Deliberate Indifference Claim

11

Plaintiff alleges that defendant Sheehan was deliberately indifferent to his serious medical needs because although aware that plaintiff believed his hand was broken, the officer refused to request emergency medical attention on plaintiff's behalf. *See generally* Dkt. No. 15. Plaintiff alleges that as a result, he did not receive medical attention until the following morning. *Id.*; *see also* Dkt. No. 36-8 at 30.

In response to these allegations and in support of his motion, defendant Sheehan argues that plaintiff's broken finger was not a sufficiently serious medical condition to trigger the protections of the Eighth Amendment. Dkt. No. 36-13 at 9-13. Defendant Sheehan further argues that there is no material issue of fact on the question of whether, subjectively, he acted with the requisite deliberate indifference. *Id.* at 13-16.

### 1.   Legal Standard for Deliberate Indifference Claims

The Eighth Amendment prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society[,] or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, . . . neither does it permit inhumane ones[.]" *Farmer*

12

*v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights through deliberate indifference to his serious medical needs must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at

13

280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he

14

official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

2.    <u>Analysis</u>

Applying this framework to the claims in this action, I conclude that there is no disputed issue of material fact and no reasonable factfinder could determine that plaintiff can meet either the objective or subjective requirements associated with such a claim. The undisputed record evidence reveals that during the course of his fight with inmate Depace, plaintiff sustained a fracture to his fourth metacarpal, and potentially aggravated a pre-existing injury to his fifth metacarpal. <u>Dkt. No. 36-9 at 1</u>; *but see* <u>Dkt. No. 36-8 at 35</u>. It is well-established, however, that an injury of that nature is not sufficiently serious to constitute a serious medical condition for purposes of an Eight Amendment claim. *See, e.g.*, *Ocasio v. Deluke*, No. 08-CV-0051, 2010 WL 6001595, at *13 (N.D.N.Y. Sept. 3, 2010) (Homer, M.J), *report and recommendation adopted by* 2011 WL 864898 (N.D.N.Y. Mar. 8, 2011) (Sharpe, J.); *Osacio v. Greene*, 08-CV-0018, 2009 WL 3698382, at *4 (N.D.N.Y. Nov. 2, 2009) (McAvoy, J.)

("Plaintiff's deliberate indifference claim fails because a fractured metacarpal does not rise to the level of a serious medical condition."); *Ruiz v. Homerighouse*, No. 01-CV-266E, 2003 WL 21382896, at *3 (W.D.N.Y. Feb. 13, 2003) (collecting cases); *Rivera v. Johnson*, No. 95-CV-0845E, 1996 WL 549336, at *2 (W.D.N.Y. Sept. 20, 1996).

Moreover, although plaintiff's metcarpal fracture is not a serious medical condition, where, as here, the basis for a prisoner's Eighth Amendment claim is a delay in the provision of medical treatment "it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (emphasis in original); *see also Salahuddin*, 467 F.3d at 280. Plaintiff alleges that although he informed defendant Sheehan that he believed his hand was broken, the officer did not seek emergency medical treatment for him, and as a result plaintiff experienced a twelve-hour delay before he could be examined by a nurse at sick-call. Dkt. No. 36-8 at 30. Even if defendant Sheehan was responsible for the twelve-hour delay in obtaining treatment for plaintiff's hand injury, there is simply no evidence in the record before the court that

plaintiff's condition worsened as a result of that delay.[5] *See, e.g.*, *Hawthorne v. Nurse Sturgeon*, No. 9:17-CV-438, 2018 WL 4290458, at *3 (N.D.N.Y. Aug. 8, 2018); *Bell v. Jendell*, 980 F.Supp.2d 555, 562 (S.D.N.Y. 2013).

Even assuming that the delay in medical treatment for a fractured metacarpal could be considered sufficiently serious, based upon the record now before the court, no reasonable fact-finder could conclude that the twelve-hour delay is sufficient to support a finding that defendant Sheehan acted with deliberate indifference. "Non-medical personnel engage in deliberate indifference where they 'intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel.' " *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. Feb. 5, 1999) (citing *Hodge v. Coughlin*, No. 92-CV-0622, 1994 WL 519902, at * 11 (S.D.N.Y. Sept. 22, 1994), *aff'd*, 52 F.3d 310 (2d Cir. 1995)). In this context, the Second Circuit has considered a delay in the provision of medical treatment to amount to deliberate indifference where, "for example, officials deliberately delayed

---

[5]     Although plaintiff alleged that he was ultimately required to undergo surgical intervention, presumably to address a displaced fracture, plaintiff has submitted no evidence to clarify whether the displaced fracture was the result of his previous injuries, subsequent injuries, the fight, injuries occurring after the fight, or simply the normal healing process.

care as a form of punishment, . . . ignored a life-threatening and fast-degenerating condition[,]" or where the delay in medical treatment is so lengthy as to be "egregious." *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233, *2 (2d Cir. 1999) (table). No such circumstances are present in this case.

Although plaintiff believed that prison personnel, including defendant Sheehan, perceived him as being uncooperative in their investigation, there is no allegation nor evidence that defendant Sheehan's failure to seek emergency medical care was done as a form of punishment for plaintiff's lack of cooperation. Rather, plaintiff conceded that when he expressed his belief that his hand was broken, defendant Sheehan stated "that from his observation [plaintiff's] hand was not broken and that [he] should report to sick call" the following day."[6] Dkt. No. 36-3 at 34-36. In addition, while plaintiff allegedly expressed that he was in pain, there is no indication that the pain he was experiencing in the aftermath of the altercation was either "life-threatening" or "fast-degenerating.", 198 F.3d 233 at *2. In any event, a twelve-hour delay is far from "egregious," and does not rise to the level of deliberate indifference. *Ramos v. New York*

---

[6]     In his affidavit, defendant Sheehan states that he does not recall that during his investigation into the matter he observed swelling or heard plaintiff complain of an injury to his hand. Dkt. No. 36-11 at 4.

*State*, 9:17-CV-337, 2017 WL 4326521, at *3 (N.D.N.Y. Sept. 28, 2017)

(Kahn, J.); *Beaman v. Unger*, 838 F. Supp. 2d 108, 110 (W.D.N.Y. 2011)

(ten-week delay in between injury and treatment of a broken wrist and

finger insufficient to state an Eighth Amendment claim); *Aho v. Hughes*,

No. 03-CV-1552, 2005 WL 2452573, at *7 (D. Conn. Sept. 30, 2005) (two-

month delay in between injury and treatment of broken hand insufficient to

state an Eighth Amendment claim). At most, the record before the court

suggests that defendant Sheehan, who is not a trained medical

professional, merely failed to recognize that plaintiff had sustained a

fracture.

Based on the record now before the court, I recommend that

plaintiff's Eighth Amendment deliberate medical indifference claim be

dismissed in its entirety, based upon plaintiff's failure to adduce evidence

from which a reasonable factfinder could conclude that plaintiff can both

meet both objective and subjective requirements of a cognizable medical

indifference claim.[7]

IV.   SUMMARY AND RECOMMENDATION

---

[7]     In light of the foregoing recommendation, which is dispositive of this action, I have not addressed defendant Sheehan's alternative contention with respect to qualified immunity. *See* Dkt. No. 36-13 at 16-18.

Plaintiff alleges that although defendant Sheehan was made aware that he believed he broke his hand during an altercation with a fellow inmate, the officer failed to request emergency medical attention, resulting in a twelve-hour delay in obtaining treatment. Although plaintiff has not responded to defendant Sheehan's motion for summary judgment and I recommend that his motion be granted on this basis alone. I further recommend that, in the alternative, plaintiff's amended complaint be dismissed on the basis that there is no material issue of fact and no reasonable factfinder could conclude that plaintiff can satisfy either the objective or the subjective prong of the governing Eighth Amendment test. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 36) be GRANTED, and that the remaining claim in plaintiff's amended complaint (Dkt. No. 15) be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[8]  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

---

8      If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:       December 21, 2018
             Syracuse, New York

---

recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2005 WL 2452573
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

James R. AHO
v.
Sheila HUGHES, R.N., et al.

No. 3:03CV1552(SRU)(WIG).
|
Sept. 30, 2005.

**Attorneys and Law Firms**

James R. Aho, Suffield, CT, pro se.

Richard T. Couture, Attorney General's Office, Hartford, CT, for Sheila Hughes, R.N., et al.

*RULING ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT*

UNDERHILL, J.

**\*1** James Aho filed this civil rights action *pro se* and *in forma pauperis* pursuant to 28 U.S.C. § 1915, naming Dr. Carson Wright, Sheila Hughes, R.N., Correctional Hospital Nursing Supervisor Patricia Wollenhaupt and Commissioner Theresa Lantz as defendants. He alleges *inter alia* that the defendants failed to provide him with adequate medical care for a fracture of his left hand. The defendants have moved for summary judgment. For the reasons that follow, the motion for summary judgment is granted.

*I. Standard of Review*
In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir.2000). A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact...." *Miner v. Glen Falls,* 999 F.2d 655, 661 (2d Cir.1993) (citation omitted).

A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson,* 477 U.S. at 248), *cert. denied,* 506 U.S. 965 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present significant probative evidence to create a genuine issue of material fact. A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992). A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements. *See Securities & Exchange Comm'n v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). Nor may he rest on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). *See also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible).

**\*2** Where one party is proceeding *pro se,* the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Despite this liberal interpretation, however, a "bald assertion" unsupported by evidence, cannot overcome a

Aho v. Hughes, Not Reported in F.Supp.2d (2005)
Case 9:16-cv-01284-TJM-DEP    Document 46    Filed 12/21/18    Page 23 of 91
2005 WL 2452573

properly supported motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

II. *Facts* [1]

On June 23, 2003, at Northern Correctional Institution ("Northern"), the plaintiff was involved in an a fight with his cellmate. In defending himself, the plaintiff injured his left hand. The plaintiff experienced pain and swelling in his left hand. A nurse examined the plaintiff's hand and observed swelling and redness in the outer portion of the left hand and an open wound near the thumb. The nurse provided the plaintiff with ice and defendant Wright, a staff physician at Northern, prescribed an antibiotic and pain medication and referred the plaintiff for an x-ray. The plaintiff underwent an x-ray of his left hand on June 24, 2003. On June 27, 2003, the radiologist reported that the plaintiff had fractured his distal left fifth metacarpal. A nurse applied a splint to the fourth and fifth digits of the plaintiff's left hand to stabilize them until the plaintiff could be seen by a doctor on June 30, 2003.

On June 28, 2003, the plaintiff refused to accept another cellmate and prison officials placed him on in-cell restraint status. The restraints were applied to plaintiff's ankles and wrists. The medical staff checked the plaintiff's restraints periodically to make sure they were not too tight. The medical staff reported no complaints from plaintiff regarding his left hand during his confinement in in-cell restraints. Prison staff removed the plaintiff from restraints on June 30, 2003.

The plaintiff saw defendant Wright later that afternoon. Defendant Wright reported that he could not have seen the plaintiff earlier because the facility was on lockdown status that morning. After consulting with an orthopedist at University of Connecticut Health Center ("UCONN") and Dr. Blanchette, defendant Wright ordered prison officials to transport plaintiff to the emergency room of the UCONN.

At UCONN, plaintiff underwent another x-ray of his left hand which confirmed the fracture of the distal left fifth metacarpal. The medical staff attempted a reduction of the fracture, but it was not successful. Medical staff then applied a fiberglass ulnar gutter splint to the plaintiff's left hand and discharged the plaintiff to the Department of Correction.

On July 2, 2003, defendant Wright examined the plaintiff's left hand, ordered an x-ray and increased the plaintiff's pain medication. On July 6, 2003, defendant Wollenhaupt received a request for another x-ray from the plaintiff. Defendant Wollenhaupt responded that an x-ray would be scheduled in the near future. On July 8, 2003, after examining plaintiff's left hand, defendant Wright ordered an x-ray and indicated that he would discuss the plaintiff's complaints with the medical staff at the Orthopedic Clinic. On July 15, 2003, the plaintiff underwent another x-ray. The x-ray revealed the same fracture of the fifth distal metacarpal bone. On August 6, 2003, in response to an inmate request from the plaintiff defendant Wright informed the plaintiff that the July 15, 2003 x-rays revealed the same fracture of his left hand and that he had submitted a request to the Utilization Review Committee ("URC") for an orthopedic consultation.

**\*3** On August 7, 2003, defendant Wright spoke with Ms. Livingston in the Orthopedic Clinic at UCONN regarding the plaintiff's fracture and she recommended that the plaintiff be seen in the Clinic. Later that day, defendant Wright submitted a request to the URC for an orthopedic consultation. On August 14, 2003, defendant Wright examined the plaintiff's left hand, changed the bandage and dressing on the hand and noted that he was waiting for the URC's decision. On August 19, 2003, the URC recommended that defendant Wright order more x-rays of the plaintiff's left hand to assess healing, instruct the plaintiff in range of motion exercises and restrict the plaintiff from working or playing sports.

On August 22, 2003, defendant Hughes received a Level 1 grievance from the plaintiff. That same day, defendant Hughes responded to the grievance indicating that the plaintiff had seen defendant Wright on August 19, 2003, and had discussed the URC's report at that time. On August 21, 2003, the plaintiff filed an Level 2 grievance form. On September 3, 2003, the Health Services Administrator denied the grievance because defendant Wright had addressed the plaintiff's concerns when he met with the plaintiff on August 19, 2003. The Health Services Administrator indicated that the decision could not be appealed to Level 3.

On August 27, 2003, the plaintiff underwent another x-ray of his left hand. The x-ray revealed that the fracture was healing and there was no change in the position or alignment of the bones since the previous x-ray. On

September 4, 2003, defendant Wollenhaupt faxed the x-ray report to the URC and put a copy of the x-ray report in defendant Wright's box.

Sometime in August 2003, a major or captain at Northern asked Lieutenant Salius to check the status of the plaintiff's injury to his left hand. Lieutenant Salius understood that the plaintiff's father had contacted someone from the central office of the Department of Correction or the office of the warden at Northern concerning the adequacy of the treatment the plaintiff had received for his hand injury. Lieutenant Salius spoke to one of the nurses who reviewed the plaintiff's medical file. Lieutenant Salius then informed the plaintiff that the medical staff had been monitoring his progress.

On September 9, 2003, defendant Wright examined the plaintiff and noted that the fracture was healing and ordered that an x-ray be taken with the cast/splint off. On September 11, 2003, the plaintiff underwent another x-ray of his left hand. The x-ray revealed a healed fracture of the fifth metacarpal bone. On September 15, 2003, defendant Wright spoke to a Ms. Pacelia at the Orthopedic Clinic and she recommended that the plaintiff be seen in the Clinic if he continued to complain of pain in the left hand.

On September 18, 2003, defendant Wright met with the plaintiff and informed him of the results of the x-rays. Defendant Wright opined that the splint should be removed and provided the plaintiff with an Ace bandage to use after removal of the splint. Defendant Wright reported that the plaintiff was very resistant to removing the splint. Defendant Wright recommended that the plaintiff begin range of motion exercises and ordered that the plaintiff undergo an x-ray without the splint.

**\*4** On September 23, 2003, defendant Wright informed the plaintiff that he must continue to perform range of motion exercises and noted that an x-ray had been taken without the splint.

On September 25, 2003, defendant Wright discussed results of recent x-rays with the plaintiff. The x-rays showed that the fracture was healed, but there was some demineralization of the bone. Defendant Wright told plaintiff he must remove the splint and perform range of motion exercises to prevent demineralization of the bone. Later that day, Defendant Wright submitted another request to the URC for an orthopedic consultation.

On September 26, 2003, the plaintiff signed the complaint and presumably handed his complaint and in forma pauperis application to prison officials for mailing. The court received the complaint on October 10, 2003.

On October 1, 2003, defendant Wright discussed the September x-rays with the plaintiff and again informed the plaintiff that he must take off the splint and perform the range of motion exercises. The plaintiff refused to remove the splint. Defendant Wright consulted with the Orthopedic Clinic regarding the demineralization of the bone in plaintiff's hand. The medical staff at the Clinic recommended that the plaintiff take Calcium Carbonate. Defendant Wright prescribed Calcium Carbonate tablets and pain medication.

On October 15, 2003, the URC concluded that the x-rays showed adequate healing and that the plaintiff must begin to move his hand and perform exercises to avoid long-term pain and disability. The URC recommended that the splint be taken from the plaintiff. That same day, defendant Wright discussed URC's decision with the plaintiff, encouraged the plaintiff to exercise his hand and took the splint away from plaintiff.

On October 20, 2003, defendant Wright spoke with Dr. Mazzocca in the Orthopedic Clinic. Dr. Mazzocca recommended that the plaintiff continue to perform range of motion exercises and that he need not be examined in the orthopedic clinic. Dr. Mazzocca also indicated that the plaintiff might develop a bump on his hand at the site of the fracture and might have occasional tenderness in the area.

On October 22, 2003, defendant Wright noted that the plaintiff had made progress and was able to flex and extend his fourth and fifths digits on his left hand. On January 14, 2004, the plaintiff reported that he was able to move his hand without a problem and the fracture site was not tender or painful.

## III. *Discussion*

The defendants raise three grounds in support of their motion for summary judgment. The defendants argue that: (1) the Eleventh Amendment bars any official capacity claims for monetary damages, (2) the complaint fails to state a claim under the Eighth Amendment and (3) they are protected by qualified immunity.

2005 WL 2452573

As a preliminary matter, the court considers the plaintiff's requests to strike some or all of the affidavits submitted by the defendants in support of their motion for summary judgment. The requests are included in his memorandum in opposition to the motion for summary judgment. He contends that the affidavits are false and relies on a Connecticut Supreme Court case in support of his request that the court strike the affidavits.

**\*5** Motions to strike "are not favored." *Schramm v. Kirschell,* 84 F.R.D. 294, 299 (D.Conn.1979). In this case, the plaintiff seeks to strike all or portions of defendants' affidavits. The court has reviewed the affidavits submitted by the defendants and concludes that they were "made on personal knowledge" and the affiants were competent to testify to the facts in the affidavits at trial. Fed.R.Civ.P. 56(e). In addition, the affidavits were not "presented in bad faith." Fed.R.Civ.P. 56(g). [2] Accordingly, the request to strike the defendants' affidavits is denied.

### A. *Eleventh Amendment*

The plaintiff seeks injunctive relief and monetary damages from the defendants in both their official and individual capacities. The defendants contend that the Eleventh Amendment bars a damage award against the defendants in their official capacities.

Generally, a suit for recovery of money may not be maintained against the state itself, or against any agency or department of the state, unless the state has waived its sovereign immunity under the Eleventh Amendment. *See Florida Dep't of State v. Treasure Salvors,* 458 U.S. 670, 684, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982). Section 1983 does not override a state's Eleventh Amendment immunity. *See Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). The Eleventh Amendment immunity which protects the state from suits for monetary relief also protects state officials sued for damages in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). A suit against a defendant in his official capacity is ultimately a suit against the state if any recovery would be expended from the public treasury. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

The plaintiff's claims for monetary damages against the defendants in their official capacities are barred by the Eleventh Amendment. Defendants' motion for summary judgment is granted with respect to all claims for damages against the defendants in their official capacities.

### B. *Eighth Amendment Claim*

The defendants argue that they were not deliberately indifferent to the plaintiff's fractured left hand. The plaintiff argues that there are disputed issues of fact that preclude a finding that the defendants were not deliberately indifferent to his fractured hand.

The Eighth Amendment protects inmates from deliberate indifference by prison officials to their serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To prevail on such a claim, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. A prisoner must show intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel. *See id.* at 104–05. Mere negligence will not support a section 1983 claim. *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988).

**\*6** The civil rights statute was not meant to redress medical malpractice claims that can be adequately resolved under state tort law. *Tomarkin,* 534 F.Supp. at 1230–31. Thus, a claim of misdiagnosis, faulty judgment, or malpractice without more to indicate deliberate indifference, is not cognizable under section 1983. *See McCabe v. Nassau County Medical Center,* 453 F.2d 698, 704 (2d Cir.1971); *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982). In addition, mere disagreement with prison officials about what constitutes appropriate medical care does not state a claim cognizable under the Eighth Amendment. *See Hyde v. Mcinnis,* 429 F.2d 864, 868 (2d Cir.1970); *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972); *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992).

There are both subjective and objective components to the deliberate indifference standard. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). The alleged deprivation must be "sufficiently serious" in objective terms. *Wilson v.*

*Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d. Cir.1998) (citation omitted). In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious. *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000).

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

The defendants do not contest the fact that the fracture to plaintiff's left hand was a serious medical need. The defendants do contend, however, that they were not deliberately indifferent to that serious medical need. Thus, the court addresses only the subjective prong of the Eighth Amendment standard.

The plaintiff's medical records reflect that he sustained an injury to his left hand on June 23, 2003. Dr. Wright prescribed an antibiotic and pain medication and referred the plaintiff for an x-ray. An x-ray taken on June 24, 2003, revealed a fracture to the fifth distal metacarpal of the plaintiff's left hand. On June 27, 2003, a nurse placed the plaintiff's hand in a splint and placed him on the list to see a physician. On June 30, 2003, defendant Wright examined the plaintiff. After conferring with an orthopedist and Dr. Blanchette, defendant Wright issued an order directing prison officials to transport the plaintiff to the emergency room at UCONN for treatment.

*7  At the hospital, the plaintiff underwent additional x-rays which confirmed the fracture of the fifth metacarpal bone in the plaintiff's left hand. A physician attempted to reduce the fracture without success and then issued an order for a fiberglass splint to be applied to plaintiff's left hand. The plaintiff returned to Northern Correctional Institution later that day. From that day until the end of October 2003, defendant Wright examined the plaintiff on numerous occasions, issued orders for follow-up x-rays, prescribed pain medication, urged plaintiff to perform various range of motion exercises for his hand and submitted several requests to the URC for orthopedic consultations. Defendant Wollenhaupt responded to plaintiff's inmate requests for x-rays and forwarded x-rays to the URC for review. Defendant Hughes processed and responded to plaintiff's grievance concerning treatment of his left hand injury. Defendant Lantz's office responded to the inquiry from plaintiff's father concerning plaintiff's injury.

Approximately two months after the plaintiff fractured his hand, x-rays revealed that the fracture had started to heal. Within four months of the date of the fracture, the plaintiff reported that he could extend and bend the fourth and fifth digits on his left hand.

The plaintiff principally complains that he should have been sent to the hospital sooner, should have seen Dr. Wright earlier, and should have had surgery on his broken hand. These are complaints about the appropriateness of the care he received. Inmates do not have a constitutional right to the treatment of their choice. *See Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Thus, mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment. *See Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992).

No reasonable jury could find that the defendants were deliberately indifferent to the fracture of plaintiff's left hand during the period of time encompassed in the complaint.[3] The motion for summary judgment is granted on the ground that the plaintiff has failed to state a claim upon which relief may be granted under the Eighth Amendment.

*C. Grievance Procedure*

The plaintiff includes allegations in his complaint that defendant Hughes, as the Level 1 Grievance Coordinator, violated the Administrative Directive governing grievance procedures by attempting to respond to his Level 2 and Level 3 appeals. The defendants argue that any claim by the plaintiff that defendant Hughes failed to comply with the procedures set forth in Administrative Directive 9.6 is not cognizable.

This district has previously held that failure of a correctional official to comply with the institutional grievance procedures is not cognizable in an action filed pursuant to 42 U.S.C. § 1983, unless the action caused the denial of a constitutionally or federally protected right. *See Fernandez v. Armstrong,* Case No. 3:03–cv–583 (JCH) (D.Conn. Dec. 7, 2004); *Ruocco v. Tung,* No. 3:02cv1443(DJS), 2004 WL 721716, at *14 (D.Conn. Mar. 30, 2004); *Hunnicutt v. Armstrong,* 305 F.Supp.2d 175, 188 (D.Conn.2004) (grievance procedure).

**\*8** The court has determined that the defendants were not deliberately indifferent to plaintiff's hand injury. Thus, the plaintiff has not identified any constitutionally or federally protected right that was violated by defendant Hughes' alleged failure to comply with Department of Correction's grievance procedures.

Any claim that defendant Hughes failed to comply with administrative directives does not demonstrate the denial of a constitutionally or federally protected right. Accordingly, such a claim is not cognizable in this civil rights action. The defendants' motion for summary judgment is granted with respect to any claim for failure to follow institutional grievance procedures.

### D. *Qualified Immunity*
The defendants also argue that they are entitled to qualified immunity. Because the court has granted the motion for summary judgment on another ground, the court need not reach this argument.

### IV. *Conclusion*
The defendants' Motion for Summary Judgment [doc. # 15] is GRANTED. The Clerk is directed to enter judgment in favor of the defendants and close this case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 2452573

### Footnotes

1    The facts are taken from defendants' Local Rule 56(a) 1 Statement [doc. # 15–1] and the Affidavits of Carson Wright, Sheila Hughes, Augustus Mazzocca, Patricia Wollenhaupt, Scott Salius and Theresa Lantz and the exhibits attached to the Affidavits [docs.15–4, 15–5, 15–6, 15–7, 15–8, 15–9, 15–10, 15–11, 15–12, 15–13, 18–1, 18–3], as well as from the Affidavits and Responses of James R. Aho [docs.17–2, 17–3, 17–4, 17–5, 17–6, 17–10] and the exhibits attached thereto [docs.17–7, 17–8, 17–9]. Although the parties' affidavits differ on certain details, the differences do not amount to genuine issues of material fact.

2    The plaintiff contends that defendant Wollenhaupt failed to acknowledge in her first affidavit [doc. # 15–10] that she had been in contact with him after July 2003, regarding his left hand injury. In the first affidavit, defendant Wollenhaupt acknowledged two inmate requests from the plaintiff dated in July 2003. The allegations in the plaintiff's complaint cover a time period from June 2003 through September 26, 2003, the day the plaintiff filed this action. The plaintiff has not submitted any evidence that defendant Wollenhaupt had any contact with him after the end of July 2003. The new documents attached to plaintiff's response to defendant Wollenhaupt's affidavit are dated in October and November 2003. (*See* doc. # 17–10.) Thus, defendant Wollenhaupt's first affidavit appears accurate as it relates to the time period encompassed in the complaint. In addition, defendant Wollenhaupt filed a supplemental affidavit addressing the documents from October and November 2003. (*See* doc. # 18–3.)

3    In plaintiff's response to defendant Wright's affidavit, he raises for the first time, a claim that he broke his wrist as well as his hand on June 23, 2003. In support of this claim he submits an x-ray which in his opinion shows evidence of a fracture of his wrist. There are no allegations in the complaint concerning an injury to his wrist. The plaintiff cannot amend his complaint in his memorandum and or response to defendants' motion for summary judgment. *See Natale v. Town of Darien,* No. CIV. 3:97CV583 (AHN), 1998 WL 91073, at *4 n. 2 (D.Conn. Feb.26, 1998) (holding plaintiff may not amend complaint in memorandum of law) (citing *Daury v. Smith,* 842 F.2d 9, 15–16 (1st Cir.1988)); *Hartford Fire Ins. Co. v.*

Case 9:16-cv-01284-TJM-DEP    Document 46    Filed 12/21/18    Page 28 of 91

2005 WL 2452573

*Federated Dep't Stores, Inc.,* 723 F.Supp. 976, 987 (S.D.N.Y.1989) (same). Thus, the court does not consider the claim that plaintiff broke his wrist.

---

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4290458
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rudolph HAWTHORNE, Plaintiff,
v.
NURSE STURGEON, Defendant.

No. 9:17-CV-438 (LEK/CFH)
|
Signed 08/08/2018

**Attorneys and Law Firms**

Rudolph Hawthorne, 03-A-3348, Bare Hill Correctional
Facility, Caller Box 20, Malone, New York 12953, pro se.

Attorney General for the State of New York, OF
COUNSEL: DENISE P. BUCKLEY, ESQ., Assistant
Attorney General, The Capitol, Albany, New York 12224,
Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

**CHRISTIAN F. HUMMEL**, U.S. MAGISTRATE
JUDGE

**\*1** Plaintiff pro se Rudolph Hawthorne ("plaintiff"),
an inmate who was, at all relevant times, in the
custody of the New York Department of Corrections
and Community Supervision ("DOCCS") brings this
action pursuant to 42 U.S.C. § 1983, alleging that Nurse
Sturgeon – who, at all relevant times, was employed at
Upstate Correctional Facility ("Upstate") [2] – violated
his constitutional rights under the Eighth Amendment.
Dkt. No. 5 ("Am. Compl."). Presently pending before the
Court is defendant's Motion to Dismiss pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R.
Civ. P."). Dkt. No. 16. Plaintiff informed the Court that
he did "not wish to file a response in this matter." Dkt.
No. 18. For the following reasons, it is recommended that
defendant's motion be granted.

**I. Background**

The facts are reviewed in the light most favorable to
plaintiff as the non-moving party. See subsection II

infra. Plaintiff's Eighth Amendment claim centers on
the medical treatment he received at Upstate following
unsuccessful surgery on his left hand in January 2016 to
treat carpal tunnel syndrome. See Am. Compl. at 2-3; Dkt.
No. 16-1 ("Def. Mem. of Law") at 4. Plaintiff contends
that after the surgery, he "continued to experience severe
pain in [his] left hand" and attended sick call. Am. Compl.
at 2. Plaintiff claims that "[t]his went on for several months
before Nurse [Sturgen] finally scheduled an [appointment]
to see non-party Dr. Schroyer in Dec. 2016." Id. "From
the 31[st] of January, [plaintiff] ... complained of the
continued pain and lack of any kind of treatment."
Id. at 3. Nurse Sturgen "repeatedly offered" plaintiff
Motrin, which he believes "exacerbates the problem." Id.
Plaintiff has "a huge problem with Nurse [Sturgen] who
continually refuses to schedule [him] [appointments] to see
a doctor, and by doing so[,] she is denying [him] needed
medical treatment." Id. On May 7, 2017, Nurse Sturgen
informed plaintiff that "the only way [he] [would] receive
treatment for this problem is if [he] got transferred" or
went home. Id. "Because of their actions, [plaintiff] [was]
denied corrective surgery, which has made [his] ability to
function normally painful and unbearable." Id. Plaintiff
alleges that because of the failed surgery and "Nurse
[Sturgen's] unwillingness to provide basic and standard
care," plaintiff lost 90% of mobility in his left hand. Id.;
Def. Mem. of Law at 4. Separately, plaintiff alleges that
the events that gave rise to his claim against Nurse Sturgen
occurred on January 21, 2016. Id. at 2.

**II. Discussion**

Plaintiff contends that Nurse Sturgen was deliberately
indifferent to his serious medical needs in violation of the
Eighth Amendment. See generally Am. Compl. Defendant
argues that plaintiff's amended complaint must be
dismissed because plaintiff has failed to plausibly allege
facts to satisfy the objective and subjective components
of medical indifference. Def. Mem. of Law at 7-12.
Defendant also moves for dismissal on the grounds that
plaintiff failed to exhaust his administrative remedies prior
to commencing his action. Id. at 12-16.

**A. Legal Standard**

**\*2** Under Rule 12 (b)(6), a defendant may move to
dismiss a complaint for a plaintiff's "failure to state a

claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009) ) (internal quotation marks omitted). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is " 'plausible on its face.' " Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." ) ); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible....") (internal citations omitted). Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679, 129 S.Ct. 1937.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff, 537 F.3d at 191-92 ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.") (internal citations omitted).

### B. Eighth Amendment Deliberate Indifference

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on those convicted of crimes, "which includes punishments that involve the unnecessary and wanton infliction of pain." U.S. CONST. amend. VIII; Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citing Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ). The deliberate indifference standard consists of both an objective and subjective component. Hathaway, 37 F.3d at 66. The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious." Id. The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind." Id.

**\*3** As a threshold matter, in order for a prisoner to state a cognizable claim of deliberate indifference, he must make a showing of serious illness or injury. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (citation omitted). A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, 37 F.3d at 66 (quoting Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting) ). As there is no bright-line rule to determine whether a condition is sufficiently serious,

the Second Circuit has identified several factors that are highly relevant to the inquiry, including: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003) (citing Chance, 143 F.3d at 702 (internal citation omitted) ).

"In Jones v. Westchester County Department of Corrections, ... the court held that, on a motion to dismiss, the plaintiff 'adequately pleaded' the objective element by alleging that he experienced chronic pain and that the pain 'would have been alleviated' if he had been given reasonable care.' " Lloyd v. Lee, 570 F.Supp.2d 556, 568 (S.D.N.Y. 2008) (quoting Jones v. Westchester Cnty. Dep't of Corr., 557 F.Supp.2d 408, 415 (S.D.N.Y. 2008) ). Plaintiff alleges that he suffered severe pain in his left hand from an unsuccessful carpal tunnel surgery. See Am. Compl. at 2-3. He contends that Nurse Sturgen continually refused to schedule plaintiff to see a physician, and that he continued to experience significant pain and loss of function in his left hand. See id. Even assuming for the purposes of this motion that plaintiff had a sufficiently serious medical need that satisfied the objective component and warranted protection under the Eighth Amendment, plaintiff fails to plausibly allege that Nurse Sturgen acted with a "sufficiently culpable state of mind." Hathaway, 37 F.3d at 66.

A prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S.Ct. 1970. "Deliberate indifference is a mental state equivalent to subjective recklessness" which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Id. (quotation marks omitted). Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim." Chance, 143 F.3d at 703. Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-

rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a Section 1983 claim." Randle v. Alexander, 960 F.Supp.2d 457, 481 (S.D.N.Y. 2013). The undersigned finds that plaintiff's allegations, as plead, even read in the light most favorable to him, do not indicate that Nurse Sturgen was "actually aware of a substantial risk that serious harm would result." Farmer, 511 U.S. at 837, 114 S.Ct. 1970.

Plaintiff contends that beginning on January 31, 2017, he "complained of the continued pain and lack of any kind of treatment" regarding the pain in his left hand. However, plaintiff does not allege how frequently he lodged these complaints with Nurse Sturgen, or if the complaints were directed to other medical personnel at sick call. Moreover, plaintiff acknowledges that Nurse Sturgen "repeatedly offered" him Motrin. See Am. Compl. at 3. Nurse Sturgen's course of action in providing treatment with Motrin fails to demonstrate culpable reckless, as it establishes that she responded to plaintiff's alleged complaints of pain by providing pain medication. That plaintiff may have "preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation." Wright, 694 F.Supp.2d at 155 (citing Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986) ). Insofar as plaintiff alleges that Nurse Sturgen refused to schedule him an appointment with a physician, plaintiff does not indicate how long the alleged delay was or how his condition worsened as a result of not seeing a doctor. Further, plaintiff does not demonstrate that this alleged delay was intentional. See Estelle, 429 U.S. at 104-05, 97 S.Ct. 285 (holding that, to demonstrate deliberate indifference, a plaintiff must show that defendant intentionally delayed medical care or infringed access to prescribed treatment); Bell v. Jendell, 980 F.Supp.2d 555, 562 (S.D.N.Y. 2013) (noting that dismissal is appropriate "where prisoners merely allege a delay in the provision of medication or treatment, but fail to allege that the delay was either intentional or reckless."); Covington v. Westchester Cnty. Jail, No. 96 Civ. 7551 (SAS), 1998 WL 26190, at *2 n.1 (S.D.N.Y. Jan. 26, 1998) ("Deliberate indifference is properly pleaded by allegations of intentional efforts to delay plaintiff's access to medical care, complete denial of medical treatment, or a reckless or callous indifference to the safety of prisoners."). In fact, plaintiff fails to allege "facts from which an inference regarding [Nurse Sturgen's] state of mind can be made." Munoz v.

Eliezer, No. 16-CV-6049 (NSR), 2018 WL 1626170, at *7 (S.D.N.Y. Mar. 30, 2018) (citing cases).

**\*4** Further, even if Nurse Sturgen's decisions caused plaintiff unintended harm, negligence is not actionable under section 1983. See Burroughs v. Petrone, 138 F.Supp.3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.") (internal quotation marks and citation omitted); see Daniels v. Williams, 474 U.S. 327 (1986) (concluding that negligence is not a cognizable claim under section 1983); Kucharczyk, 95 F.Supp.3d at 537 ("[M]ere negligence is not enough to state a claim for deliberate indifference."). That Nurse Sturgen may have been negligent [3] in "diagnosing or treating" plaintiff's medical condition does not amount to deliberate indifference. Adams v. Rock, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at *7 (N.D.N.Y. Mar. 24, 2015) (citing Farmer, 511 U.S. at 835, 114 S.Ct. 1970) ("Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference.").

Accordingly, as plaintiff fails to plausibly allege that Nurse Sturgen's treatment amounted to deliberate indifference, it is recommended that defendant's motion on this ground be granted.

### C. Exhaustion

Defendant contends that plaintiff's amended complaint must be dismissed on "the additional independent ground of plaintiff's failure to exhaust his administrative remedies." Def. Mem. of Law at 12. The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983.

To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court of the United States has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, — U.S. —, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016). [4]

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Did Plaintiff Exhaust his Administrative Remedies?

**\*5** There is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. [5] "[I]nmates are not required to specially plead

or demonstrate exhaustion in their complaints." Jones, 549 U.S. at 216, 127 S.Ct. 910. Nevertheless, failure to exhaust may be the basis for dismissal on a motion to dismiss for failure to state a claim. See id. It is well-settled that "[i]f non[-]exhaustion is clear from the face of the complaint (and incorporated documents), a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted." Scott v. Gardner, 287 F.Supp.2d 477, 485 (S.D.N.Y. 2003) (internal quotation marks omitted) (quoting McCoy v. Goord, 255 F.Supp.2d 233, 248 (S.D.N.Y. 2003) ).

> If a prisoner chooses to plead facts regarding exhaustion, and those facts show that he failed to exhaust his available administrative remedies, then his complaint may be dismissed for failure to state a claim. Simply stated, if a prisoner says nothing or little about exhaustion in his *pro se* civil rights complaint, he is likely protected from a [Rule] 12(b)(6) motion to dismiss premised on failure to exhaust. However, if he says too much about exhaustion in that complaint so that his non-exhaustion is readily apparent, he may "plead himself out of court," as the saying goes.

Trapani v. Pullen, No. 9:14-CV-00556 (TJM/TWD), 2016 WL 1295137, at *6 (N.D.N.Y. Feb. 18, 2016) (internal quotation marks and citations omitted). In his amended complaint, plaintiff contends that he filed a grievance at Upstate, and that he "appealed to the Superintendent, and then to Albany," but received "no response." Am. Compl. at 4. Thus, as plaintiff has chosen to plead facts regarding exhaustion in his amended complaint, the undersigned will address the issue of exhaustion.

Plaintiff attached a copy of his grievance, and the subsequent appeals to his complaint. On October 20, 2016, plaintiff filed a grievance – UST-59465-16 – alleging that an unnamed doctor "would not discuss any concerns that [he] had with [his] left hand and changed the subject avoiding the issue totally." Am. Compl. at 8. He requested that his medical concerns be addressed, and that he receive proper medical attention for the pain and discomfort in his

left hand. Id. The Upstate Inmate Grievance Resolution Committee ("IGRC") denied plaintiff's grievance, noting that he had "made no mention of any problems with his left hand since June of 2016," and "no mention of any issues with his left hand were documented." Id. at 9. Plaintiff appealed this determination to the Superintendent. See id. On December 7, 2016, the Superintendent found no evidence of staff malfeasance, and directed plaintiff to address his medical concerns with the medical staff. Id. at 7. That same day, plaintiff appealed the Superintendent's decision to CORC, stating that his doctor's appointment had been cancelled, and he was told at sick call that the doctor was sick, and he could reschedule his appointment for next month. Id.

**\*6** It is well-settled that "the PLRA requires that an inmate plaintiff must exhaust his available administrative remedies before commencing a lawsuit in federal court with respect to prison conditions." Peoples v. Beldock, 212 F.Supp.2d 141, 142 (W.D.N.Y. 2002); see McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017), report-recommendation and order adopted by 2018 WL 829270 (N.D.N.Y. Feb. 14, 2018) ("The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action.") (citation omitted); Couvertier v. Jackson, No. 9:12-CV-1282 (DNH/DEP), 2014 WL 2781011, at *3 (N.D.N.Y. June 19, 2014) ("In the event the defendant establishes that the inmate plaintiff failed to fully complete [ ] the administrative review process prior to commencing the action, the plaintiff's complaint is subject to dismissal.") (internal citation and quotation marks omitted); White v. Drake, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted). Here, plaintiff filed the original complaint in this action on April 20, 2017. See Dkt. No. 1. Plaintiff admits in his amended complaint that, at the time he filed the action, he had yet to receive a response from CORC. Am. Compl. at 4. The undersigned notes that approximately four months passed between when plaintiff appealed the Superintendent's decision to CORC and when he initiated this action.

Courts within this Circuit are split as to whether a delay by CORC constitutes unavailability that would excuse a

plaintiff's failure to exhaust his administrative remedies. Compare Casey v. Brockley, No. 9:13-CV-01271 (DNH/ TWD), 2015 WL 8008728, at *6 (N.D.N.Y. Nov. 9, 2015), report-recommendation and order adopted by 2015 WL 7864161 (N.D.N.Y. Dec. 03, 2015) ("CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust.") and Ford v. Smith, No. 9:12-CV-1109 (TJM/TWD), 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) (concluding that CORC's six month delay in responding to his appeal did not render the grievance process unavailable) with Rossi v. Fischer, No. 13-CV-3167 (PKC)(DF), 2015 WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) ("Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is not appropriate.") and Peoples v. Fischer, No. 11 Civ. 2694(SAS), 2012 WL 1575302, *6 (S.D.N.Y. May 3, 2012) on reconsideration in part, 898 F.Supp.2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination").

However, it is clear from the grievance documents attached to the amended complaint that plaintiff does not name or otherwise reference Nurse Sturgen, or conduct attributable to Nurse Sturgen, in grievance UST-59465-16 or the subsequent appeal statement. See Am. Compl. at 6-10. In New York State, the IGP regulations do not require that an inmate's grievance contain the name of the offending official. See Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009). "[T]he IGP regulations offer the general guidance that a grievance should 'contain a concise, specific description of the problem,' ... and the complaint form does not instruct the inmate to name the officials allegedly responsible for misconduct." Id. (internal citations omitted). Therefore, an inmate "is not required to name responsible parties in a grievance in order to exhaust his administrative remedies." Id. However, the grievance "must place defendants on notice of what, substantively, is claimed in order to permit a proper investigation." Messa v. Woods, No. 9:07-CV-306, 2009 WL 3076120, at *6

(N.D.N.Y. Sept. 23, 2009) (citing Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004) ). Here, it is clear that grievance UST-59465-16 did not address Nurse Sturgen or her alleged deliberate indifference to plaintiff's medical needs; instead, the grievance centers on the unnamed doctor's lack of response to his complaints of pain and discomfort. See Am. Compl. at 6-10. Thus, the undersigned finds that, even if plaintiff's grievance could be rendered unavailable by CORC's failure to timely respond, grievance UST-59465-16 failed to put defendant on notice of a deliberate indifference claim against Nurse Sturgen. Accordingly, it is recommended that defendant's motion on this ground be granted.

### III. Conclusion

**\*7 WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendant's' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 16) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's amended complaint (Dkt. No. 5) be **DISMISSED** in its entirety; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [6]

### All Citations

Slip Copy, 2018 WL 4290458

Footnotes

1    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and
     N.D.N.Y. L.R. 72.3(c).

2    Defendant corrects the spelling of Nurse Sturgeon's name to "Nurse Sturgen." See Dkt. No. 16-1 at 3. However, defendant
     uses both spellings interchangeably throughout the motion. See generally id. As it is unclear as to the correct spelling of
     defendant's name, the undersigned will use "Nurse Sturgen" for the purpose of this motion.

3    The undersigned makes no assessment as to whether plaintiff can state a claim as to negligence, a state-law claim not
     properly before this Court.

4    In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829
     F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue
     entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing
     Ross, 136 S.Ct. at 1858-59).

5    First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the
     alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days
     to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within
     sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of
     the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's
     determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1).
     If the superintendent's determination is unfavorable, the inmate may appeal to the Central Office Review Committee
     ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review
     each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the
     [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the
     appeal was received." Id. § 701.5(d)(3)(ii).

6    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-
     day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections.
     FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the
     deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

Case 9:16-cv-01284-TJM-DEP   Document 46   Filed 12/21/18   Page 36 of 91

1994 WL 519902

1994 WL 519902
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martin HODGE, Plaintiff,

v.

Thomas A. COUGHLIN III, Commissioner of
the New York State Department of Correctional
Services; Robert Greifinger, Deputy Commissioner
and Chief Medical Officer of the New York State
Department of Correctional Services; Gustav
Gavis, Regional Medical Director of the New
York State Department of Correctional Services;
and Guy Tufau, Director Facility Health Services
of Sullivan Correctional Facility, Defendants.

No. 92 Civ. 0622 (LAP).
|
Sept. 22, 1994.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW OPINION

PRESKA, District Judge.

**\*1** Plaintiff brings this action under 42 U.S.C. §
1983 for violation of his Eighth Amendment rights
under the Constitution. Plaintiff alleges that defendants,
officials of the New York State Department of
Correctional Services ("DOCS"), have been deliberately
indifferent to his serious medical needs. The case
centers around the treatment of Mr. Hodge's right eye,
eyelid and surrounding tissue. Plaintiff seeks declaratory
judgment; an injunction directing defendants to provide
constitutional medical care; and compensatory and
punitive damages.

A bench trial was held over six days following which
time the Court reserved judgment. The Court has made
the following findings of fact and conclusions of law
pursuant to Fed.R.Civ.P. 52. The Complaint is dismissed,
and judgment in favor of defendants shall be entered.

I. *Findings of Facts*

A. Plaintiff's Medical Condition

Plaintiff Martin Hodge contracted herpes zoster
ophthalmicus when he was thirteen years old. Tr. at 16. [1]
Herpes zoster ophthalmicus is a viral infection that affects
the first branch of the trigeminal nerve. Tr. at 99. The
trigeminal nerve is one of the cranial nerves affecting the
eye, face and forehead. *Id.* Some of the effects of herpes
zoster ophthalmicus are deep inflammation and scarring
of the skin, neuralgia, [2] corneal scarring, atrophy of the
iris, neurotrophic keratitis, keratouveitis [3] and pain. Tr.
at 99, 100, 377.

Herpes zoster presents one of the most difficult corneal
problems that a corneal specialist can encounter in his
or her practice. Tr. at 362. Very few patients with herpes
zoster ophthalmicus undergo corneal transplant surgery
because of the very high risk involved and due to the
reluctance among many corneal specialists to perform the
surgery. Tr. at 363. For example, between 1941 and 1973
at Johns Hopkins University, approximately 1000 corneal
transplants were performed. Out of that 1000, only three
transplants were performed on patients with herpes zoster
ophthalmicus. Tr. at 362. Similarly, between 1980 and
1985 at the University of Michigan, approximately 1300
transplants were performed. Of the 1300 transplants, only
ten were performed on patients with herpes zoster. Tr. at
362.

One of the risks associated with herpes zoster is that
wounds will not heal properly because of the lack of nerve
stimulation to the cornea. Tr. at 367. Herpes zoster is a
complicated medical condition. While there is corrective
surgery available to treat an eye inflicted with herpes, there
is no treatment for the disease. Surgery is only a remedial
action for something that may occur again and again. Tr.
at 323.

Plaintiff's attack of herpes zoster was acute and severe. He
suffered severe pain, blistering of the right eye, scabbing
and scarring of the internal and external surfaces of the
lid, damage to the tear duct of his eye and scabbing and
scarring to his forehead. As a result of the disease, he was
afflicted with entropion, or a turning in of the eyelid, and
trichiasis, a condition in which the eye lashes rub against
the surface of the eye, resulting in irritation and disease.
Tr. at 16, 17, 54, 55, 100, 101, 320, 323.

**\*2** Subsequent to the acute episode of herpes, plaintiff
had several skin grafts at Jacobi Hospital to repair his

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

Case 9:16-cv-01284-TJM-DEP    Document 46    Filed 12/21/18    Page 37 of 91

right eyelid. These grafts did not succeed in enabling plaintiff's right eye to close. Tr. at 17. Ultimately, despite the risk involved, plaintiff had plastic and optic surgery from Lester Silver, M.D. and Murray Meltzer, M.D., which included a corneal graft. [4] Tr. at 18, 54, 55.

Notwithstanding the surgery, plaintiff has suffered and continues to suffer pain. For example, he experiences post herpetic neuralgia during weather changes. Pain travels down the right side of his forehead and flares out across the eye. Tr. at 19, 320. He also needs to use artificial tears to lubricate the eye and predforte, a medication to prevent corneal graft rejection. [5] Tr. at 19. However, he has a normal left eye, with perfect vision that may exceed 20/20. Tr. at 68, 351; Trial Exh. 5 ("Exh.—").

B. Plaintiff's Entry into the Prison System
In 1986, plaintiff was incarcerated at Riker's Island, which is part of the New York City Correctional System. At Riker's Island plaintiff's vision in his right eye became blurry due to a cataract, which was probably induced by the steroid medication prescribed to keep the corneal graft from rejecting. Tr. at 105, 106. The cataract was removed in 1986, but a new lens was not inserted. Tr. at 20. A flap of skin created by the cataract surgery caused him discomfort, which plaintiff attempted to relieve with advil and motrin. Tr. at 21. When plaintiff entered the New York State prison system in November 1986, he was still suffering from the effects of this condition. Tr. at 23.

C. Initial Medical Care
Upon becoming an inmate in the prison system of the New York State Department of Correctional Services, plaintiff was referred to ophthalmology and plastic surgery clinics for plastic surgery consultations to treat the ptosis or drooping right eyelid. From June 1987 until the end of 1988, plaintiff was seen intermittently at ophthalmology or plastic surgery clinics. Exh. 27. The surgeons who evaluated Mr. Hodge's condition had differing opinions as to the correct course of treatment and whether plastic surgery was advisable. In July of 1987, a surgeon concluded that the ptosis could be treated, however, plaintiff would risk exposure, infection and possible loss of the globe. Tr. at 359; Exh. 27 at 180, 183. In October of 1987, a plastic surgeon recommended that the eyelid should not be lifted. Exh. 27 at 183. This doctor noted

on a previous visit that plaintiff was "able to close eye completely." *Id.* at 180.

Nonetheless, surgery to correct the ptosis and entropion was performed on December 12, 1988 at the Albany Medical Center ("AMC"). Tr. at 24, 25, 359–362; Exh. 27 at 189–196. After the surgery, plaintiff received numerous follow-up appointments. A few months after the surgery, plaintiff developed bullous keratopathy, which is a swelling of the cornea with blistering, and graft rejection. This was noted during an examination at AMC by Peter Zloty, M.D., who was an attending physician and Director of the AMC Ophthalmology Clinic. Tr. at 360; Exh. 27 at 197. Richard Smith, M.D., former chairman of the ophthalmology department at AMC, confirmed the graft rejection at AMC on January 3, 1989, noting graft failure with exposure keratopathy in his report. Tr. at 360; Exh. 27 at 196, 197, 198, 201. Exposure occurs when the lids do not meet. Tr. at 553.

**\*3**  Defendants' expert, Gregory J. Pamel, M.D., a board-certified ophthalmologist, explained that it appeared from the medical records of plaintiff's condition directly after the plastic surgery that "because the eye was exposed, the surface layer broke down," causing graft rejection. Tr. at 360, 552–53. The eye, which apparently had full or near closure before the plastic surgery, may have been slightly overcorrected. *Id.* Therefore, the concerns of some of the ocular plastic surgeons who had examined Mr. Hodge prior to the surgery appear to have been realized. Tr. at 360.

However, plaintiff's expert, Dr. Zloty, testified that the graft rejection occurred due to the failure of defendants to treat plaintiff's trichiasis effectively. Tr. at 112, 113. Based on all of the evidence, including observation of the witnesses, this Court found Dr. Pamel's testimony (citing exposure as the probable cause) more credible than that of Dr. Zloty. As noted by Dr. Pamel, the treating doctor listed exposure, and not trichiasis, as the cause of the graft rejection, Tr. at 553. Furthermore, from his review of the medical records, Dr. Pamel noted that plaintiff's trichiasis was documented intermittently and appropriately controlled. Tr. at 412, 553.

After the rejection was diagnosed, plaintiff received frequent examinations and treatments by resident and attending ophthalmologists at AMC, and by Gregory Goldman, M.D., also an ophthalmologist, at

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

Case 9:16-cv-01284-TJM-DEP   Document 46   Filed 12/21/18   Page 38 of 91

Shawangunk Correctional Facility ("Shawangunk"). Tr. at 26–29; Exh. 27 at 196–198, 201. On April 4, 1989, plaintiff was diagnosed at AMC as having an ulcer in his right eye. After being treated, he was scheduled to return to AMC on April 12, 1989.

He was instead referred to the Shawangunk Eye Clinic and treated by Dr. Goldman on April 8, 1989. Tr. at 60–62, 677. Dr. Goldman did not observe an ulcer on the eye, which had evidently healed, and he treated Mr. Hodge for a blep or blister. Tr. at 677; Exh. A at 251. The blep was probably the result of the corneal graft rejection process. Tr. at 678. For follow-up care, Dr. Goldman instructed medical personnel at Sullivan Correctional Facility ("Sullivan") to telephone him on April 14th. Pursuant to his instructions, Dr. Goldman was called on April 14, 1989. Tr. at 678–79, 688–689; Exh. A at 120. Subsequently, plaintiff's eye was examined on many occasions at the Sullivan Clinic, and on May 19, 1989, a provider noted that plaintiff's right eye looks "very good." Exh. 27 at 98.

At times, follow-up care was provided by a general practitioner, who consulted with a corneal specialist. Dr. Pamel testified that under ideal circumstances it is best that a patient be followed by an ophthalmologist, but it is not unreasonable to have a general practitioner provide follow-up care in consultation with an opthalmologist. In fact, Dr. Pamel testified that in his own private practice there are instances when he speaks with a relative and prescribes medication over the phone because the patient is not able to come to his office. Tr. at 386–87.

*4 After plaintiff was diagnosed with corneal graft rejection, physicians began to consider performing a new corneal transplant and lens insertion. Exh. 27 at 222, 224. On July 31, 1989, the ophthalmologist at the AMC ophthalmology clinic recommended that plaintiff be given a follow-up appointment with Dr. Goldman at Shawangunk for a corneal transplant. However, the physician also requested that Mr. Hodge return to AMC in at least six months for "any eye infection/severe pain/abrupt loss of vision OD." Exh. 27 at 224. Thereafter, Dr. Goldman informed Guy Tufau, M.D., Sullivan's Medical Director and a defendant in this case, that since AMC was able to provide tertiary care, Mr. Hodge should return to AMC for evaluation regarding the proposed corneal transplant rather than to the Shawangunk clinic. Exh. 27 at 225. Dr. Goldman's practice is limited to

general ophthalmology and the treatment of cataracts and glaucoma, and therefore the AMC clinic was the more appropriate place for Mr. Hodge to undergo evaluation. Tr. at 673.

Moreover, plaintiff had a history of continuous treatment at AMC. In the past, he had been treated by Dr. Smith, who was in charge of corneal transplants at AMC, and Mr. Hodge was already on the waiting list at AMC for a corneal transplant. However, AMC could not determine when the procedure would occur. Exh. 27 at 108, addendum to 9/7/89. There was a shortage of corneal tissue in the upstate New York area at that time, Tr. at 242, 578–79, and the waiting list for corneal transplant tissue was twelve to sixteen months. Tr. 578–579. Mr. Hodge believed that he might have to wait as long as two years. Tr. at 333, 461, 716, 720.

### D. Plaintiff's Treatment By Murray Meltzer, M.D.

Frustrated with the waiting list at AMC and Dr. Goldman's reluctance to perform the corneal graft, plaintiff suggested to Sharon Lilly, the nurse administrator at Sullivan, that Dr. Meltzer, the ophthalmologist who performed his original corneal graft in 1983, be contacted. Dr. Tufau concurred with plaintiff's suggestion. Nurse Administrator Lilly, therefore, telephoned Dr. Meltzer and scheduled an appointment. Tr. at 34, 64, 65, 463, 464, 465, 466, 717, 718.

Thereafter, beginning March 16, 1990, plaintiff's ophthalmological problems were treated by Dr. Meltzer. Plaintiff was transported to Dr. Meltzer's office in New York City on approximately five occasions. Tr. at 34, 64, 65, 463 and Exh. 27 at 237 (March 16, 1990); Exh. 27 at 238 (April 4, 1990); Id. at 239 (April 25, 1990); Id. at 240 (June 1, 1990); Id. at 244 (September 21, 1990). It is not the policy of DOCS, and is in fact quite unusual, for correction officers to transport and escort an inmate to the private physician the inmate used prior to incarceration. Tr. at 480. During the period of Dr. Meltzer's treatment, plaintiff was also sent to the ophthalmology clinic at AMC for an examination after an altercation in which Mr. Hodge was struck in the right eye. Exh. 27 at 242.

*5 In a letter to Dr. Tufau dated March 15, 1991, Dr. Meltzer recommended surgery consisting of penetrating keratoplasty (corneal graft) and IOL insertion (lens transplant), to be performed at Elmhurst General Hospital. Tr. at 34, 460; Exh. 27 at 237, 239, 244–245.

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

Case 9:16-cv-01284-TJM-DEP    Document 46    Filed 12/21/18    Page 39 of 91

1994 WL 519902

Dr. Tufau approved the surgical plan, and Nurse Lilly scheduled the appointments and made inquiries about setting up the necessary arrangements for security. Tr. at 336–40, 718. After learning of Dr. Meltzer's surgical plan, Exh. 27 at 245, Deputy Superintendent Clement Capuano, who, as Deputy Superintendent for Administration at Sullivan, has jurisdiction over the administration of the medical department, contacted Gustav Gavis, M.D. Tr. at 516. As Regional Medical Director, Dr. Gavis, who is also a defendant in this case, was the appropriate person to contact in order to coordinate the treatment of plaintiff. Tr. at 523–524.

Initially, Dr. Gavis supported the decision that plaintiff's surgery would be performed in New York City by Dr. Meltzer. Tr. at 308. When he learned that the surgery was scheduled at Elmhurst General Hospital, however, a problem arose because Elmhurst General Hospital does not accept New York State inmates. Tr. at 309. This policy originated in 1984, when a shooting occurred at Elmhurst General Hospital involving a New York State inmate and two corrections officers. Tr. at 310; Exhs. D1, D2. As a result of the shooting, Esta Armstrong, former director of prison services for the New York City Health and Hospital Corporation ("NYCHHC"), barred state inmates from utilizing the services of Elmhurst General Hospital, which is part of NYCHHC. Exh. D1. This policy continues to exist for all NYCHHC hospitals. Tr. at 616, 617, 664, 665.

Dr. Meltzer did not offer to perform surgery at any other of the medical centers at which he is on the staff. This may have been because physicians are often reluctant to perform surgical procedures on prisoners in private hospitals. Tr at 642–43. In any event, it was the NYCHHC policy, and not cost and security arrangements, which was the determinative factor in the decision that the surgery could not take place at Elmhurst General Hospital. Although the need for security and the added cost are always considerations in deciding whether to place an inmate in a nonsecure hospital, security has frequently been arranged to facilitate such a placement. Tr. at 466–67, 493–94, 504–05, 526, 616–18).

E. Plaintiff's Surgical Procedures at Albany Medical Center

Because the surgery could not be performed at Elmhurst General Hospital, and Dr. Meltzer did not propose any alternate site for the surgery, Dr. Gavis contacted AMC

to arrange for the surgery to be performed there after all. Tr. at 315. Although in the past there had been difficulties scheduling some New York State inmates at AMC, there were never problems in scheduling plaintiff for examination and treatment at AMC. This was principally because Mr. Hodge was a former AMC patient with a unit number, which insured that he would remain a patient of AMC. Tr. at 324, 635, 636.[6] The delay experienced by plaintiff in having surgery performed at AMC was no different than that endured by all AMC patients requiring corneal surgery. Tr. at 324, 715.

**\*6** Therefore, shortly after Dr. Gavis' involvement and approximately four months after defendants received notice of Dr. Meltzer's surgical plan and the fact that Dr. Meltzer could not perform the surgery, plaintiff received an appointment at AMC. Exh. 27 at 244; Exh. 25 at 3, 4. On July 29, 1991, plaintiff was evaluated for a corneal transplant and lens insertion by Dr. Zloty. Tr. at 94; Exh. 27 at 247.

Dr. Zloty planned a staged surgical procedure where he would perform a lens implant first and, after allowing the eye to "quiet down," proceed with the corneal transplant in a separate procedure if the initial procedure was sufficiently successful. Tr. at 140–41, 170. On August 22, 1991, he initially performed a corneal photocoagulation (laser treatment) to shrink the blood vessels in the cornea. Exh. 27 at 247. He saw Mr. Hodge on at least two or three other dates before performing a lens insertion on November 5, 1991. Exh. 27 at 251. Finally, additional photocoagulation treatments and a YAG capsulatomy were performed to open up the membrane of the posterior capsule. Exh. 27 at 260; Exh. 25 at 40. During the surgery itself, Dr. Zloty removed a region of blood vessel ingrowth, a small conjunctival tag and three or four of the largest bumps on the upper side of the cornea. Tr. at 139–144; 166–168; Exh. 25; Exh. 27 at 242–273.

Dr. Zloty saw Mr. Hodge six to ten times for post operative care. Tr. at 181–83; Exh. 25. In fact, the medical records show that between his initial consultation on July 29, 1991 through the surgery and follow-up appointments, which apparently concluded on March 4, 1992, plaintiff had fourteen consultations at AMC. Exh. 27 at 242, 247–48, 250–51, 253–558, 260, 262, 264–65. Each time Dr. Zloty scheduled a follow-up appointment, DOCS transported plaintiff to AMC. Tr. at 219.

While Dr. Zloty's surgical procedures did alleviate some of Mr. Hodge's pain, they did not improve his vision and in fact his vision may have deteriorated. Tr. at 144–45, 155–56, 186–97. After the lens was inserted, it displaced. Tr. at 196. In addition, the YAG capsulatomy was not successful, in that the opening in the membrane resealed itself. Tr. at 195–98. Indicative of this lack of success, on November 13, 1991, eight days after the surgery, Dr. Zloty noted "[m]arkedly changed appearance since last visit? Trauma. (Pt. [patient] denies). Wound leaks interiorly." Exh. 27 at 255. Then on June 4, 1992 he noted "no improvement to aphakic correction (+ 12.00 lens)." Exh. 25 at 43.

In actuality, it was unlikely that Dr. Zloty's surgical plan would significantly improve plaintiff's vision. Pre-operatively, plaintiff's vision in the right eye was 20/400, and with a lens placed in front of his eye, the vision only improved to 20/200. Tr. at 364–65; Exh. 25 at 6–7. More importantly, Dr. Zloty's plan of performing the lens implantation and corneal graft during two different surgeries was questionable, as this doubled the risk of hemorrhage, infection, inflammation, and other dangers associated with eye surgery. Tr. at 367–368.

F. Plaintiff's Scheduled Surgery with Richard Smith, M.D.

**\*7** After Dr. Zloty's surgical procedures, plaintiff was seen almost monthly at either the Fishkill or AMC clinic up until his referral to Dr. Smith for corneal transplant evaluation on February 4, 1993. [7] Dr. Gavis personally contacted Dr. Smith, the former chairman of the ophthalmology department at AMC, to ascertain if he would be willing to see Mr. Hodge in his private practice, and Dr. Smith agreed. Tr. at 315–16, 579, 583, 637–639. At his initial visit, plaintiff was examined at Dr. Smith's private office in Albany. At that time, Dr. Smith recommended a corneal graft, an anterior vitrectomy, a relocation of the displaced lens and possible removal of scar tissue. Tr. at 567–68, 572; Exh. 28 at 36.

Dr. Smith scheduled plaintiff's surgical procedure, including the corneal graft, for September 29, 1993. On September 29, 1993, DOCS transported Mr. Hodge to Memorial Hospital for the surgery. The corneal tissue was in the refrigerator adjacent to the operating room ready to be used in the surgery. Tr. 574–75. Immediately prior to the surgery, Dr. Smith visited the ambulatory room to

see Mr. Hodge and to insure that preoperative procedures had been taken. At this time, Mr. Hodge handed Dr. Smith two very detailed letters from Dr. Zloty addressed to plaintiff's attorney, William D. Rold, Esq., providing Dr. Zloty's prognosis and recommending specific surgical techniques and post operative care. Tr. at 569.

Dr. Smith disagreed with several points of Dr. Zloty's treatment. However, plaintiff informed Dr. Smith that he strongly wished Dr. Smith to treat him according to the procedure outlined in Dr. Zloty's letter. Since Dr. Smith believed that Dr. Zloty's treatment plan was not appropriate, Dr. Smith was compelled to cancel the surgery. Tr. at 569–571, 574–575; Exh. A at 271, 273–276). As testified by Dr. Smith:

> So it put me in the no win position of either going against Dr. Zloty's treatment plan and Mr. Hodge's expressed strong wishes or else going along with it and doing something that I didn't think was appropriate based on my personal clinical judgment.

Tr. at 571. As he further stated in his letter dated October 1, 1993:

> Based on all of the above, I felt that Mr. Hodge's actions had irretrievably broken the doctor/ patient relationship, and I cancelled the surgery because I felt severely threatened by the situation.

Exh. A at 273–274. Dr. Smith's decision not to perform the surgery was a reasonable and appropriate exercise of his professional judgment. Other surgeons in his position would have made the same decision. Tr. at 389, 637–640. Mr. Hodge's own conduct in insisting on a certain surgical procedure caused the surgery, which was moments away from being performed, to be cancelled.

Plaintiff interfered with his medical treatment on other occasions as well by failing to keep medical appointments and refusing medications. Tr. at 71–72, 723; Exh. A at 25, 49, 85, 104, 108, 134, 251. While at least one of Mr.

Hodge's failures to appear was due to his being in court, Exh. A at 25, on one occasion he refused to leave for a medical appointment on time because he wanted to finish his lunch. Exh. A at 104. Mr. Hodge also failed to provide the medical department with advance notice that he was going to run out of his medications, which would have permitted the facility to renew his prescriptions in a timely manner. Tr. at 713; Exh. A at 59, 61.

**\*8** Plaintiff contends that not only did he provide sufficient advance notice, many times defendants failed to provide him with the proper artificial tears prescription, and, on one occasion, delayed twelve days before providing him with a graft rejection medication. Tr. at 146. Nurse Lilly testified that when prescribed medicine was out of stock, the inmate's doctor was called and a substitute medicine was provided. Tr. at 711–12. [8] For example, Dr. Pamel testified that there are many substitute medications for Mr. Hodge's prescribed artificial tear medication, celluvisc. Tr. at 394–95, 543. Furthermore, there is no evidence that Mr. Hodge suffered specifically because of the twelve-day delay in receiving the graft rejection medication.

G. Plaintiff's Overall Medical Care

Since 1989 plaintiff has been transported to a total of 52 consultations by medical specialists. Tr. at 739. This averages to almost one specialty consultation per month. *Id.;* Exh. I. Moreover, from 1989 through 1993, plaintiff has experienced a total of 402 health care encounters with physicians, nurses and physician assistants at the facility clinics. [9] Tr. at 739–749; Exh. I. Altogether, over a five year period, plaintiff averaged 1.7 encounters each week with some kind of health care provider.

Plaintiff argues that while he may have been "seen" by "medical staff" extensively, he did not receive continuous or adequate treatment from specialists. In support of this argument, plaintiff asserts that Dr. Meltzer's treatment plan was aborted, Dr. Smith never treated plaintiff and plaintiff did not receive continuous treatment at AMC, but merely had visits at AMC.

Rather than finding defendants' understanding of the term "treatment" as all-encompassing, however, the Court finds plaintiff's understanding of that term to be overly narrow. In the very least, when a patient is examined and diagnosed, the plaintiff has

been "treated" by the physician. Although surgery by Dr. Meltzer was necessarily cancelled, plaintiff had approximately six appointments with Dr. Meltzer and at each visit he was examined, diagnosed and provided with a recommendation. Exh. 28 at 238–44. Plaintiff was also examined, diagnosed and provided with a recommendation by Dr. Smith. Exh. 28 at 36. As noted above, when Dr. Smith was to perform the surgery, plaintiff required him to adhere to another doctor's treatment plan, causing Dr. Smith, not unreasonably, to cancel the surgery. Tr. at 569–71. Finally, plaintiff's appointments at the AMC clinic are too numerous to document, but the record is replete with evidence of plaintiff's being examined and diagnosed at AMC on numerous occasions.

H. Current Prognosis and Treatment Plan

Despite the cancellation of Mr. Hodge's surgery with Dr. Smith, he is still under consultation at Albany Medical Center. Tr. at 49, 324, 721–723. Subsequent to the aborted surgery, plaintiff was treated and/or evaluated at AMC on October 25, 1993, November 11, 1993, December 6, 1993, December 22, 1993, January 13, 1994 and February 4, 1994. Exh. 66 at 44–45, 48; Exh. 71 at 44–49; Exh. 72; Exh. V. [10]

**\*9** Mr. Hodge was examined on December 10, 1993 by Dr. Belin, an Associate Professor and Director of Corneal External Disease and Refractive Surgery at Albany Medical College. Tr. at 581. After examining plaintiff, Dr. Belin concluded that plaintiff represents a high-risk corneal transplant patient, given his previous graft rejection and heavy vascularization.

Dr. Belin recommended against surgery for a number of reasons. First, plaintiff has normal vision in his left eye. Therefore, in placing the surgical risks and benefits in perspective, since plaintiff is not in a "professional and/or social environment that requires binocular vision, this is a case that [Dr. Belin] normally would not recommend for surgical intervention." Exh. 70 at 2.

Secondly, the complexity and high risk of regrafting requires multiple and frequent examinations, which is difficult for an incarcerated person. Nevertheless, Dr. Belin's decision to recommend "no further surgical intervention is significantly not different from how [he would] evaluate non-incarcerated patients." Exh. 70 at 1–

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 519902

2. Given the risk-benefit ratio, Dr. Belin strongly urged no further intervention, since Mr. Hodge has only a limited potential benefit. Exh. 70 at 2.

Dr. Smith testified that he believed the conclusions reached by Dr. Belin were medically reasonable. Tr. at 581–82. Although Dr. Smith had originally agreed to perform the surgery, Dr. Smith recognized that there was a very guarded chance of success since plaintiff had a difficult case with a past history of surgeries and lid deformities. Tr. at 572. Additionally, Dr. Smith noted that the herpes zoster had attacked the eye causing loss of sensation in the cornea and affecting the tissue. As a result, the eye, especially the surface of the eye (which is critical in a corneal transplant) would not heal well. Tr. at 580–81. Dr. Smith summed up his prognosis:

> The bottom line is that almost anyone who has a severe enough damage to their cornea from shingles has a very poor prognosis for corneal grafting because of all these factors. They just don't heal well, they don't keep a clean graft, and they don't recover vision. Nevertheless, we try to do things, but we have to tell the patient that the outlook is not good.

Tr. at 581. Therefore, Dr. Smith estimated the chance of success as well below fifty percent. Tr. at 573.

Likewise, Dr. Pamel opined that even if there was a period of quiescence within which to perform surgery, major risks, such as infection and hemorrhage, would still be involved with surgery. Tr. at 547. Additionally, he explained that surgery causes inflammation which promotes graft rejection. He also agreed that Mr. Hodge's herpes zoster would create further wound healing problems. Tr. at 367. He estimated Mr. Hodge's chance of successful surgery at between thirty and forty percent. Tr. at 559.

Dr. Zloty, who was plaintiff's expert witness, also expressed doubt that a new corneal graft would be successful. As stated in his deposition:

> **\*10** To do more extensive surgery, such as a cornea transplant, has a risk of being counterproductive in that it can set up more inflammation.

Exh. 61 at 46; Tr. at 206. As further stated in his deposition:

> It would be an option for him if he wanted to take the risk of proceeding with an additional surgical procedure. Anytime you do any surgery, there is risk of infection and bleeding, and, particularly with a corneal transplant, a risk that it would reject it and become uncomfortably painful and make the situation even worse.

Exh. 61 at 50; Tr. at 210. Finally, in Dr. Zloty's letter dated August 26, 1993 to William I. Rold, Esq. he wrote:

> With vessel ingrowth noted 360 degrees, I would be hesitant to perform a repeat transplant. The patient would be at a high risk for rejection as well as a recrudescence of the inflammation often seen in zoster patients. Unfortunately, the posterior capsule is too fibrotic to be adequately incised with the YAG laser, as was my original intention.

Exh. 16 at 3.

Therefore, it seems that, although any type of surgery is inherently risky, with Mr. Hodge's added poor eye condition, more extensive surgery could very likely worsen his condition.

## II. *Conclusions of Law*

Recovery under the Eighth Amendment based on inadequate medical care is limited to those cases in which a prisoner can establish "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). There is an objective component to this standard, "was the deprivation sufficiently serious, violating contemporary standards of decency," *Helling v. McKinney,* 113 S.Ct. 2475, 2480–82 (1993); and a subjective component, "did the officials act with a sufficiently culpable state of mind?" *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 2324–26 (1991). In analyzing the objective component, the Supreme Court has stated that "only those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)).

With respect to the subjective component, a plaintiff must prove that the defendant acted wantonly or with deliberate indifference. *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). Proper allegations of "deliberate indifference" include allegations of callous indifference to medical needs; intentional denial or delay of an inmate's access to medical care; or intentional interference with treatment. *Estelle,* 429 U.S. at 104–05; *Harding v. Kuhlman,* 588 F.Supp. 1315, 1316 (S.D.N.Y.1984), *aff'd,* 762 F.2d 990 (2d Cir.1985).

Negligence or mere allegations of malpractice on the part of a diagnosing or treating physician will not state a valid Eighth Amendment claim. *Estelle,* 429 U.S. at 106 & n. 14. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Rather, the plaintiff must allege conduct that is " 'repugnant to the conscience of mankind' " or incompatible with the "evolving standards of decency that mark the progress of a maturing society." *Id.* 429 at 102, 105 (citations omitted).

**\*11** A prisoner's disagreement with the diagnostic techniques or forms of treatment utilized by prison medical personnel does not give rise to a cognizable Eighth Amendment claim: "A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment." *Estelle,* 429 U.S. at 107; *accord, Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982). Nor does an allegation of "misdiagnosis or faulty [medical] judgment" state a claim. *Tomarkin,* 534 F.Supp. at 1230. Furthermore, a dispute between two doctors as to the

proper course of medical treatment will not give rise to an Eighth Amendment violation. *Estelle,* 429 U.S. at 107; *Martinez v. Mancusi,* 443 F.2d 921, 924 (2d Cir.1970), *cert. denied,* 401 U.S. 983 (1971).

The same standards apply to a claim of deliberate indifference to serious medical needs on the part of nonmedical prison personnel. To establish such a claim plaintiff must prove that prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison personnel or that the inmate suffered a complete denial of medical treatment. *Harding v. Kuhlman,* 588 F.Supp. at 1315–16 (quoting, *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) and *Ferranti v. Moran,* 618 F.2d 888, 890 (1st Cir.1980)). "At a minimum, there must be at least some allegations of a conscious or callous indifference to a prisoner's rights." *Zaire v. Dalsheim,* 698 F.Supp. 57, 59 (S.D.N.Y.1988), *aff'd,* 904 F.2d 33 (2d Cir.1990).

In the present case, the facts simply do not support the type of egregious lack of medical care that would establish a claim of "deliberate indifference" to serious medical needs.[11] On the contrary, although there were some short periods of delay in treatment at AMC, Mr. Hodge's eye condition was never ignored. The evidence demonstrates that plaintiff was seen on a regular basis by the health care providers at Green Haven, Sullivan, Newburgh, Fishkill and Shawangunk Correctional Facilities. Plaintiff's treatment was continuous and conformed with good medical judgment.

1. Alleged Delay in Providing Plastic Surgery

Mr. Hodge contends that there was a delay in providing him medical treatment for ptosis, since surgery was first recommended in April or May of 1987 and was not performed until December 12, 1988. As aforementioned, there were differing opinions as to whether plastic surgery to raise plaintiff's eyelid would place plaintiff's eye at risk, and the surgery likely did cause Mr. Hodge's subsequent graft rejection. Furthermore, far from being ignored during this period, plaintiff was seen quite often at ophthalmology and plastic surgery clinics. Therefore, especially due to the difference in medical opinion as to the advisability of the plastic surgery, the delay in performing the actual surgery was not unreasonable and certainly not

"repugnant to the conscious of mankind." *Estelle, 429 U.S. at 102.*

2. Alleged Delay in Treating the Ulcer

**\*12** Mr. Hodge additionally argues that defendants delayed in treating his eye for an ulcer. On April 4, 1989 a doctor at AMC noted that plaintiff had an ulcer. Dr. Goldman testified that he examined plaintiff four days later and plaintiff did not have an ulcer, but a blep, or blister, induced by the graft rejection. In addition to the follow-up treatment by Dr. Goldman, plaintiff was seen and evaluated at Sullivan by Dr. Tufau, who consulted with Dr. Goldman. Evidently, therefore, appropriate care was provided for this condition.

3. Alleged Delay in Further Corneal Surgery

In 1989, Dr. Smith placed Mr. Hodge on a twelve- to sixteen-month long waiting list at AMC for a corneal transplant. Tr. at 578–579. Being placed on a waiting list was not a denial of medical care, but normal for a person waiting for a corneal transplant. Tr. at 682. Indeed, Mr. Hodge's own expert, Dr. Zloty, testified that only a limited supply of corneal tissue exists in this country. Tr. at 242. The initial four-month delay in receiving an appointment with Dr. Zloty at AMC for evaluation of corneal transplant surgery (after Dr. Meltzer's surgical plan was aborted) was not sufficiently egregious to constitute an Eighth Amendment violation. Likewise, the seven-month delay in receiving the appointment with Dr. Smith for evaluation of corneal surgery (after Dr. Zloty left New York), especially in light of the intermittent care provided by the AMC and Fishkill clinics during the seven months, was also not sufficiently extreme to constitute deliberate indifference.

Plaintiff has additionally argued throughout the litigation that his claim that defendants' failure to render possible the surgery by Dr. Meltzer constituted an Eighth Amendment violation. Quite to the contrary, the fact that defendants facilitated plaintiff's treatment by his personal physician in the first place demonstrated their concern for plaintiff. Indeed, arranging for a prisoner's treatment by his private physician, with the attendant expense of transporting him under guard to Dr. Meltzer's unsecured private office, is a striking exception to prison protocol. Tr. at 307. In any case, it is not constitutionally required that an inmate be treated by a physician of his own choosing. *See Ross v. Kelly,* 784 F.Supp. 35, 46–47

(W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 113 S.Ct. 828 (1992); *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988). As recently stated by the District Court:

> We reject completely the notion that a prisoner has a constitutional right to select the doctor who treats him —a privilege not normally available even to those who pay for their own treatment at Health Maintenance Organizations.

*Gayle v. Howard,* No. 93–3267 (Goettel, J.) (S.D.N.Y. Jan. 11, 1994).

Furthermore, the additional delay in further corneal surgery was caused by Mr. Hodge's own conduct in insisting, on the verge of surgery, that Dr. Smith follow Dr. Zloty's surgical procedure and technique. The failure of defendants to obtain an early date for plaintiff's second corneal transplant, a procedure noted by many experts to be quite risky for Mr. Hodge, does not rise to the level of "deliberate indifference." *Estelle,* 499 U.S. at 104.

4. Alleged Shortages of Medication

**\*13** Plaintiff also alleges that defendants failed to provide him with prescribed medications. This allegation is without merit. The evidence shows that, at times, Sullivan was caught short of medications because plaintiff failed to notify the nurse before he ran out of medications. Nurse Administrator Lilly also facilitated plaintiff's receipt of medications that were difficult to obtain by arranging with AMC to fill prescriptions directly. Finally, as recently stated by the district court:

> The fact that the specific medication sought by plaintiff was merely out of supply belies the intentionality required to sustain an Eighth Amendment claim based on improper medical treatment.

*Leroy McBride v. Nurse Sandy Gomez, et al.,* 1994 WL 37816, at \*2 (McKenna, J.) (S.D.N.Y. Feb. 8, 1994). *See also, United States ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir.1970) (prisoner's preference for pills as opposed to

Hodge v. Coughlin, Not Reported in F.Supp. (1994)

Case 9:16-cv-01284-TJM-DEP   Document 46   Filed 12/21/18   Page 45 of 91

1994 WL 519902

liquid form of medication did not make out an actionable claim).

5. Level of Plaintiff's Medical Care

The total number of health care encounters experienced by plaintiff, along with his frequent and steady appointments with ophthalmologists with corneal and anterior specialties hardly constitute a deprivation that denies "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). Nonetheless, the Second Circuit has recognized that despite receiving extensive medical care, a plaintiff could still have an Eighth Amendment claim where the quality of care is quite low or the care is ineffective. *Kaminsky v. Rosenblum,* 929 F.2d 922, 924 (2d Cir.1991) (proof of three-month gap in care and failure to monitor plaintiff's condition despite alarming deterioration, resulting in death); *Archer v. Dutcher,* 733 F.2d 14, 15–17 (2d Cir.1984) (plaintiff identified intentional efforts of defendant to delay access to medical care when defendant knew that plaintiff was in extreme pain); *see also Williams v. O'Leary,* 805 F.Supp. 634, 638 (N.D.Ill.1992) (prison doctors prescribed ineffective medicine for over two years causing inmate constant pain).

Yet, while incarcerated persons are entitled to quality medical care, the level of care must be seriously low before an Eighth Amendment violation is established. As also recently stated by Judge Goettel:

> As "guests" of the state, prisoners are entitled to receive medical care. While their medical care is not necessarily of the highest quality (although it does exceed that available to many taxpayers who are paying for the prisoner's treatments), it must fall to a low level with serious repercussions before it constitutes a civil rights violation.

*Gayle v. Howard,* No. 93–3267 (Goettel, J.) (S.D.N.Y. Jan. 11, 1994); *Archer,* 733 F.2d 14, 17 ("[w]e have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital"). After hearing and reviewing the evidence in

this case, this Court has found the quality of care to meet standards of reasonableness.

**\*14** Finally, throughout this litigation, plaintiff has also argued that defendants have failed to fund adequately and provide specialty medical consultations to plaintiff and other inmates in the New York State prison system. The care provided to inmates as a class is not at issue in this action. The evidence shows that plaintiff was provided with frequent, continuous and effective treatment with ophthalmologists who specialize in corneal and anterior eye diseases. Sharon Lilly, R.N., who, as nurse administrator at Sullivan, was responsible for scheduling specialty consults, testified that she never experienced a problem setting up timely consultations for specialty services.

Plaintiff argues, however, that the low rate of reimbursement to medical providers restricts the availability of specialists, especially surgeons, to treat inmates and that it has had a direct impact on his care. Individual providers are as a rule reimbursed at the Medicaid Rate. Presently, the rate for ophthalmology and plastic surgery is twenty-four dollars for initial and follow-up visits. Tr. at 653. As stated previously, however, plaintiff never suffered from the unavailability of ophthalmological services—the evidence clearly shows that the defendants were far from indifferent to the needs of Mr. Hodge for specialty medical services. Thus he has failed to prove the objective component of an Eighth Amendment claim.

Plaintiff has also failed to establish the subjective component of his claim, *i.e.,* that the defendants had the requisite state of mind necessary to show an Eighth Amendment violation. The defendant's conduct, together will all reasonable inferences to be drawn therefrom, does not come remotely close to meeting the standard of deliberate indifference; throughout plaintiff's incarceration in the state system he received good and adequate medical care and continues be provided with such care.

*Conclusion*

Plaintiff has not established a claim for violation of his Eighth Amendment rights, and, therefore, the Complaint

is dismissed and judgment shall be entered for the defendants.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1994 WL 519902

Footnotes

1   The trial transcript is referred to as "Tr. at —".

2   Neuralgia is a pain that occurs after shingles from nerve inflammation. Tr. at 377.

3   Both neurotrophic keratitis and keratouveitis are types of inflammations. Tr. at 100.

4   A corneal graft, or corneal transplant, is a transplant of the front surface of the eye. Tr. at 102.

5   During a corneal transplant, part of the patient's cornea is removed and replaced with donor tissue. Corneal graft rejection occurs when the patient rejects the donor tissue. Such rejection is a risk with any transplant. Tr. at 102, 104.

6   Whether AMC was open to New York State inmates was an issue frequently raised during the trial. However, Nurse Administrator Sharon Lilly testified that she never had a problem scheduling a Sullivan inmate at AMC. Tr. at 332, 715. Hodge had a total of 20 consults at AMC, and was on the waiting list for a transplant as early as September 7, 1989. Exh. 27 at 108; Tr. at 333.

7   Dr. Zloty had left New York and therefore could no longer treat plaintiff. In support of his claim, plaintiff asserts that there was a seven month delay from when he last saw Dr. Zloty at AMC on June 25, 1992 until he saw another ophthalmologist —Dr. Smith—in February 1993. However, this assertion is misleading. Upon review of the records, Mr. Hodge was seen at either the Fishkill or AMC clinic on the following dates in 1992 (unless otherwise noted): July 16, Ex. 28 at 31; August 26, plaintiff requested to see Dr. Tufau only, Ex. 28 at 7; September 17, Ex. 28 at 33; October 23, Ex. 28 at 34; November 18 and 27, a general practitioner consulted with an AMC ophthalmologist, who stated that there was no need for a consultation with Mr. Hodge until his regular check-up, Ex. 28 at 14, 15; January 18, 1993, Ex. 28 at 35. Far from being completely neglected for nine months, plaintiff was seen at least monthly at the plastic or eye clinic outside Sullivan.

    Furthermore, the fact that Mr. Hodge had not seen an ophthalmologist regarding corneal transplant surgery since June 1992 is not unreasonable. After Dr. Zloty's surgery in November 1992, further corneal surgery could not be performed until a sufficiently long period of quiescence existed. The Court credits Dr. Pamel's testimony that for corneal graft surgery, a quiescent period of at least two to three years would be necessary. Tr. at 544. During the seven month period between seeing Dr. Zloty and Dr. Smith, Mr. Hodge's eye was certainly not "quiet." Ex. 28 at 11, 13, 31, 33.

8   Plaintiff also cites inventory problems and inefficiency in providing medication at Sullivan due to the loss of its pharmacist. Plaintiff argues that the pharmacist has not been replaced due to the low, uncompetitive salary offered for the position and that this has had a negative effect on his medical care. Nurse Lilly testified that, to the best of her knowledge, she does not recall a patient suffering because of medications being out of stock. Tr. at 711–12. When the pharmacist was phased out, the facility simply filled prescriptions from a central pharmacy or a local pharmacy. *Id.* She also testified that, although there were times that Mr. Hodge did not receive his necessary medication, this did not occur frequently. Tr. at 712.

9   Approximately 36 of these visits were not eye-related.

10  The latest examination of Mr. Hodge on February 4, 1994, occurred after trial and is therefore not a part of the trial record.

11  The *Estelle* Court illustrated the type of conduct that would give rise to a cause of action under this standard by citing to several Circuit Court decisions:

    *See, e.g., Williams v. Vincent,* 508 F.2d 541 (C.A.2 1974) (doctor's choosing the "easier and less efficacious treatment" of throwing away the prisoner's ear and stitching the stump may be attributable to "deliberate indifference ... rather than an exercise of professional judgment"); *Thomas v. Pate,* 493 F.2d 151, 158 (C.A.7), *cert. denied sub nom. Thomas v. Cannon,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974) (injection of penicillin with knowledge that prisoner was allergic, and refusal of doctor to treat allergic reaction); *Jones v. Lockhart,* 484 F.2d 1192 (C.A.8 1973) (refusal of paramedic to provide treatment); *Martinez v. Mancusi,* 443 F.2d 921 (C.A.2 1970), *cert. denied,* 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971) (prison physician refuses to administer the prescribed pain killer and renders leg surgery unsuccessful by requiring prisoner to stand despite contrary instructions of surgeon).

    429 U.S. at 104, n. 10.

**Hodge v. Coughlin, Not Reported in F.Supp. (1994)**

1994 WL 519902

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5080404
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jason A. KETCHUCK, Plaintiff,

v.

Brad A. BOYER, Defendant.

No. 3:10–CV–870 (TJM / DEP).
|
Oct. 25, 2011.

**Attorneys and Law Firms**

Jason A. Ketchuck, Endicott, NY, pro se.

Roger W. Kinsey, Office of Attorney General, Albany, NY, for Defendant.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

 *1  Plaintiff Jason A. Ketchuck commenced this action *pro se* asserting claims of false arrest, malicious prosecution, and abuse of process pursuant to 42 U.S.C. § 1983. *See* Compl., dkt. # 1. Defendant moves for summary judgment seeking to dismiss the action in its entirety. *See* Motion, dkt. # 15. In opposition, Plaintiff filed only affidavits from himself and his father. *See* Opp., dkt. # 18. [1] Defendant has filed a reply. *See* Reply, dkt. # 19. The Court has determined to decide the motion based upon the submissions alone. *See* N.D.N.Y.L.R. 7.1(h) ("In the district court judge's discretion ..., the district court judge may dispose of a motion without oral argument. Thus, the parties should be prepared to have their motion papers serve as the sole method of argument on the motion.").

**II. STANDARD OF REVIEW**

The Court may grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if the relevant evidence is such that a reasonable jury could return a verdict for

the nonmoving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party must show, by affidavits or other evidence, admissible in form, that there are specific factual issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). "[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment." *Viscusi v. Proctor & Gamble,* 2007 WL 2071546, at * 9 (E.D.N.Y. July 16, 2007).

In determining whether to grant summary judgment, the Court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, or by a factual argument based on "conjecture or surmise." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). In this regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998).

 *2  The Local Rules of the Northern District require a party moving for summary judgment to submit a "Statement of Material Facts" which sets forth, with citations to the record, each material fact about which the moving party contends there exists no genuine issue. N.D.N.Y.L.R. 7.1(a)(3). Once a properly supported Local

Rule 7.1(a)(3) Statement is submitted, the party opposing the motion must

> file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

*Id.* (underscoring in original).

The responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly. *See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 648–49 (2d Cir.2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a) (3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (*per curiam* ) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp.,* 103 F.Supp.2d 104, 108 (N.D.N.Y.2000) (deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations—specific or otherwise—to the record") (emphasis in original); *McKnight v. Dormitory Auth. of State of N.Y.,* 189 F.R.D. 225, 227 (N.D.N.Y.1999) (McAvoy, J.) ("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999) (McAvoy, J.)

(deeming admitted all facts in defendants' Rule 7.1(a) (3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record").

While the Court must construe a *pro se* litigant's pleadings and papers liberally and interpret them to raise the strongest arguments that they suggest, *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003);[2] *Veloz v. New York,* 339 F.Supp.2d 505, 513 (S.D.N.Y.2004), the application of this lenient standard does not relieve a *pro se* litigant of the requirement to follow the procedural formalities of Local Rule 7.1(a)(3). *Govan,* 289 F.Supp.2d at 295; *see also Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Edwards v. INS,* 59 F.3d 5, 8 (2nd Cir.1995) ("While a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.").

## III. BACKGROUND

**\*3** Because Plaintiff has not submitted an opposing Statement of Material Facts, the properly supported facts set forth in Defendant's Statement of Material Facts are deemed admitted for purposes of this motion. N.D.N.Y.L.R. 7.1(a)(3). Except where indicated otherwise, the following facts are taken from Defendant's Statement of Material Facts.

Defendant Brad A. Boyer is a uniformed New York State Trooper assigned to the Owego Barracks of Troop C of the New York State Police, headquartered in Sidney, New York. On October 22, 2008, he responded to a call from an individual named Carol A Smith who complained that Plaintiff Jason Ketchuck, one of the sons of her next door neighbor, had repeatedly driven his vehicle through her yard, and that the most recent occasion on which this had occurred was at approximately 7:38 AM on October 22, 2008. She complained that this course of conduct had caused rutting and damage to her front lawn.

Upon responding to the call, Trooper Boyer observed the rutting and damage to Ms. Smith's lawn alongside the roadway in front of her house, and took a series of photographs of the lawn. Trooper Boyer took a sworn statement from Ms. Smith on October 22, 2008, and she

signed a Complaint against Jason A. Ketchuck on the same date accusing him of Trespass, in violation of New York Penal Law § 140.05. Based upon the information provided by Ms. Smith and the property damage that he observed and photographed on October 22, 2008, Trooper Boyer also prepared and signed an Information charging Jason A. Ketchuck with Criminal Mischief in the Fourth Degree.

On October 31, 2008, Trooper Boyer requested that Plaintiff come to the Owego Barracks to meet with him concerning Ms. Smith's complaint, which he did. Mr. Ketchuck admitted that he had been the driver of the small grey car on the date and time that had been the subject of Ms. Smith's complaint; however, he denied that he had driven the car on her lawn. Mr. Ketchuck also contended that the ruts near the road were on property that was abandoned by the Town of Owego in 1934 and that, although Ms. Smith "extended the landscaping of her property onto the abandoned road without the Town's permission" seven (7)years prior, his father was claiming ownership of this property in a quite title action in New York State Supreme Court. Jason Ketchuck Aff., ¶ 9; *see* James Ketchuck Aff., ¶¶ 2, 8. Ketchuck's father also contends that, prior to charges being levied against his son, he met with Trooper Boyer and attempted to show Trooper Boyer "property maps, surveys, deeds, and town records which set forth the property lines and boundaries of the property owned by [Ms.] Smith," but Trooper Boyer "refused to look at them." James Ketchuck Aff., ¶¶ 6–7.

Trooper Boyer issued Plaintiff an appearance ticket charging him with Trespass in violation of Penal Law § 140.05 and Criminal Mischief in the Fourth Degree in violation of Penal Law § 145. After issuing the appearance ticket to Jason A. Ketchuck on October 31, 2008, Trooper Boyer did not have any further involvement in the prosecution of this case. The charges were Dismissed in the Interest of Justice in the Owego Town Court on May 27, 2009.

## IV. DISCUSSION

### a. False Arrest

**\*4** Plaintiff claims that he was falsely arrested by Defendant. A false arrest claim, whether brought under federal or state law, [3] will fail if, at the time of the seizure, the arresting officer had probable cause to make an arrest. *Jocks v. Tavernier,* 316 F.3d 128, 135 (2d Cir.2003); *Smith*

*v. Edwards,* 175 F.3d 99, 105 (2d Cir.1999); *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996); *see Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006) ("Under New York law, the existence of probable cause is an absolute defense to a false arrest claim."). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 593, 160 L.Ed.2d 537 (2004) (citing *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)).

"Probable cause exists if at the time of the arrest 'the facts and circumstances within th[e officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *Amore v. Novarro,* 624 F.3d 522, 536 (2d Cir.2010 (citing *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)); *see Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 414 (2d Cir.1999). The relevant inquiry is whether "probable cause existed to arrest a defendant" and "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly,* 439 F.3d at 154; *see Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (probable cause to arrest can exist even if offense relied upon is not even "closely related" to offense charged). "A probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." *Hahn v. County of Otsego,* 820 F.Supp. 54, 55 (N.D.N.Y.1993), *aff'd,* 52 F.3d 310 (2d Cir.1995). "[T]he eventual disposition of the criminal charges is irrelevant to the probable cause determination." *Hahn,* 820 F.Supp. at 55 (citing *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)).

"It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (quoting *Miroslavsky v. AES Eng'g Soc'y,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd* 993 F.2d 1534 (2d Cir.1993)). "If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable ... merely because it later turns out that the complaint was unfounded."

*Lee v. Sandberg,* 136 F.3d 94, 103 (2d Cir.1997); *see Calderola v. Calabrese,* 298 F.3d 156, 165 (2d Cir.2002) ("[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that might not be the case."). Once a police officer has probable cause, he need not explore "every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. New York City Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997); *see Coons v. Casabella,* 284 F.3d 437, 441 (2d Cir.2002) ("[P]olice officers are not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."); *Hotaling v. LaPlante,* 67 F.Supp.2d 517, 522 (N.D.N.Y.2001) (valid probable cause to arrest rested upon information supplied by an identified witness, and even though a further investigation by the Trooper would have led to a contradictory conclusion, Trooper's conduct was not unreasonable under the circumstances).

**\*5** Where the facts surrounding the arrest are uncontroverted, the determination as to whether probable cause existed may be made by the Court as a matter of law. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). Even where factual disputes exist, a § 1983 claim may fail if the plaintiff's version of events is sufficient to establish probable cause to arrest. *Mistretta v. Prokesch,* 5 F.Supp.2d 128, 133 (E.D.N.Y.1998).

Here, the alleged victim provided Defendant with a sworn statement that Plaintiff repeatedly drove his vehicle over a portion of her lawn causing damage to it. The victim's statement was corroborated by the tire marks and the ruts in the lawn which Defendant observed and photographed; and by Plaintiff's admission that he was the driver of the car alleged to have caused damage to the lawn. These facts provided more than ample probable cause for Defendant to believe that Plaintiff committed the offense of Trespass under Section 140.05 of the New York Penal Law.[4] In this regard, the facts provided probable cause to believe that Plaintiff had intentionally driven his car across Ms. Smith's lawn on October 22, 2008; that she did not consent to his doing so; and that Plaintiff's conduct on his neighbor's property, which had caused observable damage to the lawn, was not conduct that Defendant was licensed or privileged to engage in. *See Caidor v. Harrington,* 2009 WL 174958 (N.D.N.Y.2009) (Suddaby, J.) (granting summary judgment dismissing § 1983 false arrest claim based on arrest for violation of

P.L. § 140.05). Moreover, these same facts provided ample probable cause to believe that Plaintiff had committed the offense of Criminal Mischief in the Fourth Degree in violation of N.Y. Penal Law § 145[5] in that the facts, including the allegation that Plaintiff's car was repeatedly driven on the lawn, provided probable cause to believe that Plaintiff intentionally damaged Ms. Smith's property by driving his car on it.

Because a police officer need not explore every theoretically plausible claim of innocence before making an arrest, and because the existence of probable cause is determined by a standard far less burdensome than determining guilt, Defendant's probable cause determination is not negatively affected by Plaintiff's assertion of innocence or by Defendant's failure to review the property maps or surveys.[6] A police officer is not required to conduct an investigation if the facts demonstrate that probable cause exists that an offense has been committed. Accordingly, Defendant was not required to conduct independent research into who actually owned the property claimed by Ms. Smith as her front lawn before issuing the appearance ticket. This is especially so in light of the undisputed facts that the tire marks were on property abutting Ms. Smith's front lawn and on a piece of property over which Ms. Smith purportedly "extended the landscaping of her property" some seven (7) years prior to the incident. These facts provided reasonable corroboration for Ms. Smith's sworn statement that the tire marks and ruts were on her property.

**\*6** Even assuming, *arguendo,* that actual probable cause did not exist such to satisfy the demands of the Fourth Amendment, arguable probable cause existed such to entitle Defendant to qualified immunity. *See Zellner v. Summerlin,* 494 F.3d 344, 369–70 (2d Cir.2007) (discussing "arguable probable cause" as basis for qualified immunity). Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Amore,* 624 F.3d at 536 (citing *Walczyk v. Rio,* 496 F.3d 139, 163 (2d Cir.2007)). To determine whether an officer had arguable probable cause, the objective information he possessed at the time of the arrest is examined, not the "subjective intent, motives or beliefs" of the officer. *Id.* Here, the information Defendant possessed at the time he issued the appearance

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

ticket provided an objectively reasonable basis for him to believe that probable cause existed for the two offenses with which Plaintiff was charged. Accordingly, Defendant is entitled to qualified immunity on the false arrest claim because it was objectively reasonable for him to believe that his acts did not violate Plaintiff's clearly established rights under the Fourth Amendment. *Id.* at 530 ( [Q]ualified immunity ... is sufficient to shield executive employees from civil liability under § 1983 if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable [for them] to believe that their acts did not violate these clearly established rights."). For these reasons, the false arrest claim is dismissed.

### b. Malicious Prosecution

Based on the undisputed facts that supplied Defendant with actual probable cause to believe that Plaintiff committed the two offenses for which he was charged, the malicious prosecution claim also fails as a matter of law. *See Rohman v. New York City Transit Auth.,* 215 F.3d 208, 215 (2d Cir.2000) (an element of a malicious prosecution claim is that the defendant lacked probable cause to believe the proceeding could succeed).

Moreover, to state a claim for malicious prosecution under either § 1983 or New York state common law, Plaintiff must establish, *inter alia,* "termination of the proceeding in [the accused's] favor." *Green v. Mattingly,* 585 F.3d 97, 104 (2d Cir.2009). Whether termination is deemed favorable to the accused is determined in accordance with applicable state law, here, New York law. *Hygh v. Jacobs,* 961 F.2d 359, 367 (2d Cir.1992). Proceedings are "terminated in favor of the accused" when their final disposition is such as to indicate the accused is not guilty. *DiBlasio v. City of New York,* 102 F.3d 654, 657 (2d Cir.1996). "Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence." *Fulton v. Robinson,* 289 F.3d 188, 196 (2d Cir.2002). A dismissal "in the interest of justice" under New York Criminal Procedure Law § 170.40 "cannot provide the favorable termination required as the basis for a claim of malicious prosecution." *Hygh,* 961 F.2d at 368 (citing *Ryan v. N.Y. Tel. Co.,* 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487, 493 (1984)). Thus, Plaintiff cannot establish the "favorable termination" element of his malicious prosecution claim.

*7 Further, the undisputed facts are that Trooper Boyer never had any prior contact with either Mr. Ketchuck or Ms. Smith before this incident. He attested that he harbored no improper motive in instituting the charges, and that he issued the appearance ticket and filed the accusatory instruments in the Town Court only because of his good faith belief that there was the probable cause to pursue such charges. *See* Boyer Aff. ¶¶ 11, 13. There are no facts from which a reasonable fact finder could conclude that Trooper Boyer instituted the underlying proceeding with a malicious motive or intent such to state a viable malicious prosecution claim. *See Manganiello v. City of New York,* 612 F.3d 149, 161 (2d Cir.2010) (to prevail on a malicious prosecution claim, a plaintiff must establish, *inter alia,* that the proceeding was begun with malice); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996) (malice may be proven by showing that the prosecutor had "a wrong or improper motive, something other than a desire to see the ends of justice served") (internal quotation marks omitted).

Finally, for the reason discussed above with regard to Trooper Boyer's entitlement to qualified immunity on the false arrest charge, he is also entitled to qualified immunity on the malicious prosecution claim. That is, under the circumstances it was objectively reasonable for reasonable officers to believe that there was probable cause to commence the prosecution for the offenses charged. Accordingly, the malicious prosecution claim is dismissed.

### c. Abuse of Process

Plaintiff's third claim against Trooper Boyer is for malicious abuse of process in connection with the institution of the Town Court proceeding. "In the criminal context, malicious abuse of process is by definition a denial of procedural due process.... Procedural due process forbids the use of legal process for a wrongful purpose." *Abreu v. Romero,* 2010 WL 4615879, at *8 (S.D.N.Y. Nov.9, 2010) (citation omitted). To state a claim for the malicious abuse of process, Plaintiff must prove that the Defendant (1) employed regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification (3) in order to obtain a collateral objective that is outside the legitimate ends of the process. *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003). "The pursuit of a collateral objective must occur after

the process is issued; the mere act of issuing process does not give rise to a claim." *Lopez v. City of New York,* 901 F.Supp. 684, 691 (S.D.N.Y.1995) (citing *PSI Metals v. Firemen's Ins. Co.,* 839 F.2d 42, 43 (2d Cir.1988)). In other words, Plaintiff "must claim that [Defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino,* 331 F.3d at 77. "In New York, such wrongful purposes have included economic harm, extortion, blackmail, and retribution." *Abreu,* 2010 WL 4615879, at *8 (citing *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 404, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975)).

**\*8** Plaintiff's malicious abuse of process claim fails as the facts are devoid of any allegations concerning a "collateral objective" that Defendants may have had in instituting criminal charges against Plaintiff. There is no factual basis upon which a reasonable fact finder could conclude that the issuance of the appearance tickets to Plaintiff was motivated by anything other than Trooper Boyer's good-faith belief that he had probable cause to conclude that Plaintiff had engaged in conduct that constituted trespass and/or criminal mischief. Furthermore, there is no evidence that Trooper Boyer had any involvement in the prosecution of the case against Plaintiff after he issued the appearance tickets on October 31, 2008. Under these uncontested facts, the claim fails as a matter of law.

Finally, and assuming *arguendo* that a viable malicious prosecution claim existed, Trooper Boyer is entitled to qualified immunity on the claim in that there existed, at the least, arguable probable cause to commence the criminal proceeding. This arguable probable cause provides an objectively reasonable justification for issuing process commencing the underlying proceeding. *Cf. Abreu,* 2010 WL 4615879, at *8 ("While probable cause is not an element of an abuse of process claim, under New York law, a showing of probable cause at the time process issued suffices ... to establish excuse or justification for the purposes of a defense to abuse of process.") (internal quotation marks and citation omitted). Accordingly, the abuse of process claim is dismissed.

## V. CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment [dkt. # 15] is **GRANTED** and all claims in this case are **DISMISSED.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5080404

---

Footnotes

1    Plaintiff was served with the Northern District's standard summary judgment notification for *pro se* litigants, *see* dkt. # 15–1. This notification provided, *inter alia,*

   Pursuant to Local Rule 7.1 of the Northern District of New York, you are required to submit the following papers in opposition to this motion: (I) a memorandum of law (containing relevant factual and legal argument); (ii) one or more affidavits in opposition to the motion and (iii) a short and concise statement of material facts as to which you claim there are genuine issues in dispute. These papers must be filed and served in accordance with the time set by Local Rule 7.1.

   If you do not submit a short and concise statement of material facts as to which you claim there are genuine issues in dispute, all material facts set forth in the statement filed and served by the defendant(s) shall be deemed admitted.

2    To construe pleadings liberally means the Court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan,* 289 F.Supp.2d at 295.

3    Plaintiff asserts claims only under federal law pursuant to 42 U.S.C. § 1983. However, given Plaintiff's *pro se* status, the Court examines the potential supplemental state law claims that might be asserted.

4    Section 140.05 of New York Penal Law provides that "[a] person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises. Trespass is a violation." "Premises" is defined to include any "building" or "real property." Penal Law 140.00(1). Penal Law § 140.00(5) provides that a person "enters or remain(s) unlawfully upon premises when he is not licensed or privileged to do so."

5    In relevant part, Penal Law § 145 provides:

2011 WL 5080404

> A person is guilty of criminal mischief in the fourth degree when, having no right to do so nor any reasonable ground to believe that he or she has such right, he or she:
>
> 1. Intentionally damages property of another person[.]
>
> "While no statutory definition of 'damages' is provided, it is commonly recognized that the term contemplates 'injury or harm to property that lowers its value or involves loss of efficiency' and that only 'slight' damage must be proved" to establish a violation of Penal Law § 145. *People v. Collins,* 288 A.D.2d 756, 758, 733 N.Y.S.2d 289 (3d Dept.2001).

6    Defendant denies that the purported property dispute regarding the subject portion of Ms. Smith's front yard was ever articulated to him. Regardless, even if a property dispute regarding the subject property was articulated to Defendant, he was not required to a perform a title search or make additional inquiry to resolve the dispute in light of the sworn statement by Ms. Smith that the property in question belonged to her.

---

          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 6001595
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Omar OCASIO, Plaintiff,

v.

F. DELUKE, C.O., Great Meadow Correctional
Facility; P. VanGuilder, Deputy of Security, Great
Meadow Correctional Facility; Richard Roy,
Inspector General; D. Beebe, C.O.; S. Hamel, C.O.;
T. Lespier, Sgt.; C. Murray, Sgt.; R. Armstrong, Lt.;
S. Rowe, Captain; Julie Daniels, Inmate Grievance
Coordinator; M. Harris, Nurse; Richard A. Dunning,
as Administrator of the Estate of Elaine Dunning;
Great Meadow Correctional Facility, Medical
Grievance Department; Lucien LeClaire, Jr.;
Edward Mcsweeny; and Donald Selsky, Defendants.

No. 08–CV–51 (GLS/DRH).
|
Sept. 3, 2010.

**Attorneys and Law Firms**

Omar Ocasio, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, James Seaman, Esq., Adam Silverman,
Esq., Assistant Attorneys General, of Counsel, Albany,
NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Omar Ocasio ("Ocasio"), formerly
an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), brings
this action pursuant to 42 U.S.C. § 1983 alleging
that defendants, fifteen DOCS employees and a facility
grievance department, violated his constitutional rights
under the First, Eighth, and Fourteenth Amendments.
Compl. (Dkt. No. 1). Presently pending is defendants'
motion for summary judgment pursuant to Fed.R.Civ.P.
56. Dkt. No. 129. Ocasio opposes the motion. Dkt. Nos.

135, 148. For the following reasons, it is recommended
that defendants' motion be granted.

**I. Background**

The facts are related herein in the light most favorable
to Ocasio as the non-moving party. *See* subsection II(A)
*infra.* The events in question occurred during Ocasio's
incarceration at Great Meadow Correctional Facility
("GMCF").

**A. Excessive Force**

On January 13, 2006, Ocasio was involved in an incident
with defendants Deluke, Beebe, and Maguire. Dkt. No.
128–8 at 7. Deluke and Beebe escorted Ocasio from the
shower to his cell. [2] Dkt. No. 128–8 at 7; Ocasio Dep.
1 (Dkt. No. 129–3, Ex. A) at 24. [3] When he entered his
cell, Ocasio was instructed to place his hands through
a slot in the cell door so that the restraints could be
removed. [4] Dkt. No. 128–8 at 7; Ocasio Dep. 1 at 26–27.
As Deluke was passing the retention strap [5] through the
feed-up slot to Beebe, Ocasio allegedly turned his body
attempting to maintain control of the restraints. Dkt. No.
128–8 at 7. Murray heard Beebe and Deluke "give Ocasio
several orders to release the feed-up port and place his
hands through the port so the restraints could be removed.
Ocasio failed to comply with their orders...." Dkt. No.
129–8 at 12; *see also* Murray Decl. (Dkt. No. 129–8 at
1–5) ¶ 14. Ocasio disputes this fact, contending that he
was completely compliant. Ocasio Dep. 1 at 28–29, 68–
69 (reporting that both defendants repeatedly told him to
"Stop resisting" but that Ocasio maintains that he was
complying with the officers' requests). Beebe maintained
control of Ocasio's right hand and Deluke maintained
control of the left. Dkt. No. 129–8 at 7, 12, 14–15;
Ocasio Dep. 1 at 27–32, 71. According to Ocasio, he faced
forward upon arriving at his cellas required. Ocasio Dep.
1 at 33, 65, 71–75. Non-party Maguire ultimately removed
the restraints, Beebe and Deluke released Ocasio's hands,
Ocasio remained in his cell, and the feed-up slot was closed
without further incident. Dkt. No. 128–8 at 7, 13–15;
Dkt. No. 148 at 22. Video of the event, while poor in
audio quality, indicates that the entire event transpired in
approximately three and a half minutes. Video. As a result
of the incident, Ocasio was issued a misbehavior report

2010 WL 6001595

for failing to follow a direct order and exhibiting violent conduct. Dkt. No. 129–8 at 23.

On January 13, 2006, defendant Harris was called to Ocasio's cell at approximately 9:30 a.m. to complete a use of force medical exam. Harris Decl. (Dkt. No. 129–6 at 1–5) ¶ 8; Dkt. No. 129–6 at 12; Dkt. No. 148 at 65. Harris asserts that Ocasio refused the examination. Harris Decl. ¶ 8; Dkt. No. 129–6 at 12; Dkt. No. 129–8 at 8, 10, 12; Dkt. No. 148 at 22, 34; Ocasio Dep. 1 at 114, 116–19. Ocasio informed Harris that she was not allowed into Ocasio's cell, so Murray proposed that Ocasio "stick his] hand out the slot ...." for Harris to perform the medical evaluation...." Ocasio Dep. 2 at 94. Ocasio agreed, but when he insisted that the examination be done professionally, Murray told Harris to to continue on her rounds. *Id.* at 94–95. Non-party Officer Little attempted to take pictures of Ocasio after the incident, but Ocasio refused to comply and turned off the light in his cell. Dkt. No. 129–8 at 12.

**\*2** Ocasio denies ever receiving a medical examination and only receiving medical attention after his fiancee called the IG's office with a complaint of excessive force after visiting Ocasio on January 15. Ocasio Dep. 1 at 84, 116–19. Ocasio claims that the medical staff still did not evaluate him until weeks later. *Id.* at 85. Ocasio claims that the immediate injuries included pain and significant bleeding and that his right arm and wrist had been twisted. *Id.* at 34–37, 39–49, 77–80; Ocasio Dep. 2 at 12–13.

Later that day, defendant Dunning, a nurse, examined Ocasio and noted two complaints, a rash on his forehead and dental pain. Harris Decl. ¶ 9; Dkt. No. 129–6 at 13. The following day, January 14, Ocasio offered no medical complaints. Harris Decl. ¶ 10; Dkt. No. 129–6 at 13; Dkt. No. 148 at 23. On both January 15 and 16, Ocasio complained of vague pain in his forearms, but examination showed no abrasions or swelling. Harris Decl. ¶ 11; Dkt. No. 129–6 at 13–14; Dkt. No. 148 at 23, 64, 66. Ocasio asserts that on January 15, his hand was swollen two to three times its normal size but that he continued to write dozens of grievances. Ocasio Dep. 1 at 101; Ocasio Dep. 2 at 13–15. Ocasio stated that his hand remained swollen and discolored for weeks. Ocasio Dep. 2 at 15–16.

On January 17, 2006, Ocasio was examined by Nurse Lipka to whom he complained of dental pain and

requested to see a dentist and was then seen by Nurse Stevens to whom he reported left arm and right hand pain.[6] Harris Decl. ¶ 13; Dkt. No. 129–6 at 14; Dkt. No. 148 at 64. Ocasio was escorted to Nurse Stevens by non-party Sergeant Hendry, who photographed Ocasio's injuries. Dkt. No. 129–7 at 4; Dkt. No. 148 at 22. Hendry "observed Ocasio dress himself in his cell prior to the escort. Ocasio had no problem putting on his jumpsuit, sneakers, or allowing us to place him in handcuffs and waist chain." Dkt. No. 129–7 at 4. Stevens' examination of Ocasio revealed puffiness and bruising on his right hand and two scratches on his left arm. Harris Decl. ¶ 13; Dkt. No. 129–6 at 14; Dkt. No. 129–8 at 9, 11; Dkt. No. 148 at 33. Stevens found no further injuries and that Ocasio displayed a full range of motion while dressing and undressing for the examination. Dkt. No. 129–8 at 9. Ocasio's subjective complaints included that "his hands were in terrible pain, his arm wouldn't move properly, and he couldn't make a fist with his right hand." Dkt. No. 129–7 at 4. According to Ocasio, Stevens failed both to palpate his hand during the examination, relying on her observations from afar, and record the severity of his injuries. Ocasio Dep. 1 at 110–111, 121, 126–30. According to Ocasio, despite the pain and swelling in his hand, he continued to write grievances to individuals and use his hands to eat, and he still experiences fatigue, pain, and tingling occasionally. Ocasio Dep. 1 at 131–32, 136–38.

Nurse Lipka saw Ocasio on rounds again on January 18, 19 and 20, and during that time Ocasio offered no complaints of pain in his arms or hands. Harris Decl. ¶ 14; Dkt. No. 129–6 at 15; Dkt. No. 148 at 63. On January 19, non-party Ortiz from the Inspector General's ("IG's") Office, received a complaint about the incident on January 13. Ortiz Decl. (Dkt. No. 129–9 at 1–2) ¶ 2. Ortiz conducted an investigation, which included an interview of Ocasio on February 7, 2006. *Id.* ¶ 4; *see also* Dkt. No. 148 at 20, 22 (copy of investigation request and report). Ocasio stated that the use of force constituted Deluke "putting a lot of pressure on [his] hands ..." which caused Ocasio pain, until Maguire arrived and removed his handcuffs. Dkt. No. 129–9 at 4; Dkt. No. 148 at 22. Ocasio added that there was no medical evaluation completed because if things "were not going to be [done] as per [his] request, [he] refuse[d]. [He] wanted in detail [his] medical evaluation." Dkt. No. 129–9 at 5; *see also* Dkt. No. 148 at 22, 27.

**\*3** On January 23 and 24, 2006, Ocasio complained to Dunning about his right hand, requested an x-ray, and she scheduled a doctor's appointment for February 17, 2006. Harris Decl. ¶ 15; Dkt. No. 129–6 at 16; Dkt. No. 148 at 23, 62; Ocasio Dep. 2 at 102–05. On January 26, 2006, Ocasio complained to Lipka of right hand pain and numbness, though she observed no swelling or decreased range of motion. Harris Decl. ¶ 16; Dkt. No. 129–6 at 17; Dkt. No. 148 at 61. Lipka spoke with the physician's assistant about Ocasio's complaints and he agreed to see Ocasio. Harris Decl. ¶ 16; Dkt. No. 129–6 at 17. On January 27, 2006, Ocasio again saw Dunning and complained of right hand pain. Harris Decl. ¶ 17; Dkt. No. 129–6 at 17; Dkt. No. 148 at 61. Dunning told Ocasio that he was scheduled to see a physician on February 17, 2006 and noted that he did not appear to be in any distress. Harris Decl. ¶ 17; Dkt. No. 129–6 at 17; Dkt. No. 148 at 61.

On January 28, 2006, the physician's assistant saw Ocasio and discussed only a restricted diet. Harris Decl. ¶ 18; Dkt. No. 129–6 at 18. Ocasio inquired about x-rays the following day and on February 1. Dkt. No. 148 at 45–46. On February 14, 2006, Ocasio complained of right hand pain to Nurse Nichols and requested an x-ray. Harris Decl. ¶ 19; Dkt. No. 129–6 at 22; Dkt. No. 148 at 56. On February 17, 2006, Ocasio saw a physician who ordered an x-ray of his right hand. Harris Decl. ¶ 20; Dkt. No. 129–6 at 23; Dkt. No. 148 at 55. On February 22, 2006, Ocasio requested another follow-up appointment on his right hand. Dkt. No. 129–6 at 24, Dkt. No. 148 at 54; Ocasio Dep. 2 at 102.

On February 23, 2006, an x-ray was taken and revealed a fracture in Ocasio's third metacarpal which was healing. Harris Decl. ¶ 21; Dkt. No. 1–1 at 6; Dkt. No. 129–6 at 25; Dkt. No. 148 at 53; Ocasio Dep. 1 at 110, 112. Ocasio was instructed to rest and await further instruction during his follow-up appointment in March. Dkt. No. 129–6 at 25. Ocasio was not given a brace or any other assistive device. Ocasio Dep. 2 at 105. On February 28, 2006, Ocasio again inquired as to his hand and was again told to wait until his appointment on March 14, 2006. Dkt. No. 129–6 at 25. Ocasio continued to ask for status reports, but was always reminded to wait until his follow-up in March. Dkt. No. 129–6 at 27–28; Dkt. No. 148 at 50–51, 53.

Ocasio was again seen by medical staff on March 14, 2006. Harris Decl. ¶ 22; Dkt. No. 129–6 at 32; Dkt. No. 148 at 48. The examination "revealed slight tenderness over [the] third metacarpal with no crepitus ... [and] normal range of motion and normal grip strength. The doctor concluded that the fracture was healing." Harris Decl. ¶ 22; Dkt. No. 129–6 at 32; *but see* Ocasio Dep. 1 at 97 (claiming that he never had someone "look at [his] hand specifically, see what was going, see[ ] the function of [his] hand, things like that ... never happened."). Ocasio's hand function was determined to be normal. Dkt. No. 129–6 at 32. Ocasio testified that he presently continues to experience nerve damage in his hand from the use of force. Ocasio Dep. 1 at 102. Ocasio continued to inquire about his x-ray results from medical staff, though the x-rays had already been completed and read to Ocasio and he was told that no further x-rays had been ordered or were needed. Dkt. No. 129–6 at 34, 39–40, 45, 52. Ocasio continued to see the medical department on an almost daily basis throughout 2006. Dkt. No. 129–6 at 34–71.

**\*4** A disciplinary hearing on the misbehavior report issued to Ocasio was held in January 2006. Dkt. No. 148 at 26. On January 26, 2006, the hearing officer determined that certain of Ocasio's witnesses were unnecessary because they lacked personal knowledge of the events of the day in question. Dkt. No. 148 at 24–25. Ocasio claims he was denied a fair and impartial hearing by defendant Armstrong because he was precluded from viewing and introducing the video as evidence. Ocasio Dep. 2 at 81–86. The hearing concluded on January 31, 2006 with a finding of guilt a sentence of nine months in the Special Housing Unit (SHU), [7] loss of privileges, twelve months loss of good time, and seven days of restricted diet. Dkt. No. 148 at 26; Ocasio Dep. 1 at 174–75.

The disciplinary finding and sentence were later reversed. Ocasio Dep. 1 at 173–74; Dkt. No. 129–3 at 306; Ocasio Dep. 2 at 126. However, Ocasio was already confined to SHU for a period of years and his SHU confinement on this charge never commenced. Ocasio Dep. 1 at 176–77. Ocasio did receive a restricted diet as a result of the hearing. *Id.* at 181. While Ocasio was receiving this diet, defendant Hamel prevented medical staff from evaluating Ocacio to ensure that he remained healthy on the restricted diet. Ocasio Dep. 2 at 74, 78–79.

### B. Grievances

DOCS maintained an Inmate Grievance Program (IGP) for inmates to seek redress over issues of their confinement. "The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

"DOCS Directive # 4040 requires that grievance files and logs be maintained for at lest the current year plus the previous four calendar years ... The CORC computer database contains records of all appeals received from the facility Inmate Grievance Program Offices and which were heard and decided by CORC since 1990." Bellamy Decl. (Dkt. No. 129–5 at 1–2) ¶ 6. Ocasio was well aware of the grievance process, correctly reciting the steps required to file a grievance and any appeals thereof. Ocasio Dep. 1 at 123, 143; Ocasio Dep. 2 at 109.

Attached to Ocasio's complaint and filed with his response on this motion are multiple letters filed to multiple individuals both inside and outside DOCS relating to various complaints by Ocasio about his confinement prior to January 13, 2006. Dkt. No. 1–1 at 1–2, 4, 10–11, 13–14; Dkt. No. 1–2 at 1–5, 7, 17–19, 20–21; Dkt. No. 1–3 at 6–11, 13–14, 21; Dkt. No. 148 at 13. In a number of these letters, Ocasio was directed to follow the steps outlined in the facility grievance procedures, or his complaints were forwarded to the Superintendent of the facility in which he was housed, so that the grievance process would be initiated. Dkt. No. 1–1 at 2, 7; Dkt. No. 1–2 at 3, 5. The responses also indicated that Ocasio's grievances which were properly filed were being addressed accordingly and encouraged Ocasio to continue following facility procedures for the most efficient and optimal resolution to his complaints. Dkt. No. 1–2 at 5; Dkt. No. 1–3 at 7–8.

**\*5** In January 2006, Ocasio filed five grievances. Dkt. No. 129–10 at 5. However, of the five filed, none mentioned medical treatment or excessive force. Dkt. No. 129–10 at 5. In March 2006, Ocasio filed a grievance concerning receiving x-rays for his right hand, but did not ever file a grievance charging excessive force by officers. White Decl. (Dkt. No. 129–10 at 1–2) ¶¶ 5–6, 8; Dkt. No.

129–10 at 5; Dkt. No. 129–10 at 7 (grievance seeking x-rays to be taken), 8 (response that x-rays were taken and the results were discussed in March). In 2006, Ocasio only appealed two grievances to CORC which had been filed at GMCF. Bellamy Decl. ¶ 7. Both grievances were filed on November 1, 2006 and pertained to over the counter medications and the grievance process respectively. *Id.* ¶ 7.

The only grievances approaching he matters alleged in this case were one letter to DOCS Deputy Director Nadler and another to Superintendent Greene asserting that Ocasio had been assaulted on January 13 by two officers. [8] Dkt. No. 1–2 at 22, 24. The letters were difficult to read. In the first, Ocasio asked Nadler to forward the letter to the forensic investigation unit, stating that there were witnesses to the assault and subsequent swnial of medical attention. *Id.* at 22. The second letter only identified Deluke as an assailant and that Deluke was being investigated by the DOCS Inspector General. *Id.* at 24. However, this letter never sought to lodge a formal complaint or initiate the grievance process. As the months passed, responses to Ocasio re-emphasized that Ocasio's compliance with the grievance system was imperative and detailed the responses to Ocasio's previously filed grievances. Dkt. No. 1–1 at 3; Dkt. No. 1–2 at 10, 16; Dkt. No. 148 at 30. Additionally, Ocasio continually filed letters to various departments and individuals immediately after the alleged use of force. *See* Dkt. No. 1–1 at 7–9, 12; 1–2 at 22–24 (six letters written by Ocasio in January 2006); Dkt. No. 1–1 at 5, 15; Dkt. No. 1–3 at 1–5 (four letters written by Ocasio in February 2006).

Ocasio testified that he grieved the issues surrounding January 13, 2006 multiple times. Ocasio stated that he filed ten to fifteen complaints per week regarding the excessive use of force, and that he received no responses, so "[n]othing was being exhausted." Ocasio Dep. 1 at 122; *compare* Ocasio Dep. 2 at 121–22 (stating that in the six months subsequent to the alleged incident, he filed 200–25 grievances, averaging approximately fifty pages per week throughout these first few month). These complaints were filed with different agencies and organizations. Ocasio Dep. 1 at 123–24. Ocasio stated that he filed grievances "at least four or five times" regarding the lack of medical treatment that was afforded to him after the use of force incident. *Id.* at 120. Regarding the events of January 13th as a whole, Ocasio could not exhaust his claims "on record because [defendants] did [not] let ... specific grievance [s] ... lead to specifically an exhaustive remedy process...." *Id.*

at 122–23; *see also* Ocasio Dep. 1 at 139–45, 160–62. Ocasio contended that defendants frustrated his right to participate in the grievance process, but failed to proffer any specific examples of grievances filed or the failure of DOCS to review them in the appeals process. Ocasio Dep. 1 at 125–26. During Ocasio's second deposition, he identified Murray as the individual who frustrated his attempt to file grievances by informed Ocasio that "as far as what took place on the 13th, [he] will never be able to exhaust that through the grievance officials while [Murray was t]here." Ocasio Dep. 2 at 39.

**\*6** Ocasio also stated that while his grievances were being accepted and presumably mailed, he was also sending copies to Albany to ensure that his complaints were being addressed, but he still failed to receive any responses. Ocasio Dep. 1 at 149–57. Other grievances that he filed were completely exhausted despite Murray's alleged threats. Ocasio Dep. 1 at 157–58; Ocasio Dep. 2 at 40. Ocasio also blamed the limited number of grievances actually taken to completion on defendant Daniel because there were only a portion of those grievances which "she felt ... [were] actually exhaustive through ... the grievance mechanism within the CORC office in Albany...." Ocasio Dep. 2 at 53; *see also* Ocasio Dep. 2 at 55–60.

Ocasio also contends that multiple defendants were included in the present action for failing to respond to complaints which Ocasio had sent them. This included VanGuilder's failure to respond to Ocasio's letters (Ocasio Dep. 2 at 61–66, 123); Roy's failure to respond or initiate investigations into Ocasio's complaints (*id.* at 72–73), Rowe's lack of response to Ocasio's complaints (*id.* at 88); and Leclaire, Selsky, and McSweeny's proclivity to forward the grievances and complaints Ocasio sent to them back to GMCF without conducting their own investigation (*id.* at 107–09, 113–14, 117–19).

#### C. Retaliation

Ocasio had previously complained about Deluke and Beebe, resulting in investigations against both of them. Ocasio Dep. 1 at 49–56, 62. Ocasio had Deluke investigated "at least two or three times ... prior to [him] being assaulted ... [for] harassment ... [and] physical infliction." Ocasio Dep. 2 at 19. Deluke was aware of these complaints. Ocasio Dep. 1 at 56–61; Ocasio Dep. 2 at 25–28. Deluke informed Ocasio that he knew the

investigator with whom Ocasio had lodged his complaints and that Deluke had influence over him. Ocasio Dep. 1 at 59; Ocasio Dep. 2 at 26–27. This incident occurred approximately four to six months before the incident forming the basis of the present complaint. Ocasio Dep. 1 at 59–61.

Ocasio also claimed that the video cameras in SHU were not working properly, another element of the alleged retaliation. Ocasio Dep. 2 at 30, 81–82. This claim was reiterated with regard to defendant Armstrong for failing to maintain and provide such tapes to inmates during their disciplinary hearings. *Id.* at 84–85. Additionally, Ocasio claims he was placed on full restraints in retaliation for the events of January 13, 2006. *Id.* at 32–33. Beebe would place the full restraints on very tightly when he escorted Ocasio throughout the facility subsequent to January 13. *Id.* at 35. Furthermore, Ocasio claims that all of the documents produced in the course of reporting the use of force incident, including the summary provided to Armstrong by Murray, was a falsified report meant to conceal the real events that transpired that day. *Id.* at 46–51.

Ocasio also contends that his filings of grievances against Hamel and Lespier ended in retaliatory acts. Ocasio Dep. 2 at 76–80. Ocasio stated that due to the multiple investigations he requested against both defendants, they issued approximately twenty disciplinary charges which caused the amount of time Ocasio was required to remain in SHU to be extended. *Id.* at 76–80.

### III. Discussion

**\*7** Ocasio alleges that he was subject to excessive force and to deliberately indifferent medical treatment and that defendants retaliated against him for filing grievances. Liberally construing the complaint, it also appears that Ocasio alleges a due process violation due to a biased disciplinary hearing and disposition resulting from the misbehavior report lodged against him after the use of force. Defendants contend that (1) several defendants should be dismissed for lack of personal involvement, (2) Ocasio has failed to exhaust his administrative remedies with regard to his Eighth Amendment claims, (3) Ocasio's claims are meritless, (4) the Eleventh Amendment bars all claims against Great Meadow, and (5) defendants are entitled to qualified immunity.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P. 56(c)*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1*, 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson*, 477 U.S. at 247–48.

## B. Failure to Exhaust

Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. *Porter v.. Nussle*, 534 U.S. 516, 524 (2002); *see also Woodford v. Ngo*, 548 U.S. 81, 83 (2006). This exhaustion requirement applies to all prison condition claims. *Porter*, 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. *Nussle*, 534 U.S. at 524.

**\*8** While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir.2006) (citing *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir.2004)). Exhaustion for an inmate in DOCS custody is generally achieved through the Inmate Grievance Program (IGP). *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1, *et seq.*. However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims. A court must consider whether

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero*, 467 F.3d at 175 (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir.2004)).

Administrative remedies are unavailable when there is no "possibility of [ ] relief for the action complained of." *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir.2004) (citing *Booth v. Churner*, 532 U.S. 731, 738 (2001)). The test to determine the availability of an administrative remedy is an objective one asking whether "a similarly situated

individual of ordinary firmness" would have deemed it accessible. *Id.* at 688.

The record shows that Ocasio has failed to file any grievances, pursuant to facility policy, regarding his excessive force claims. Dkt. No. 129–15 at 5. Additionally, while Ocasio filed a grievance related to the medical care he received for his hand, he failed fully to exhaust this grievance by appealing it up through CORC. White Decl. ¶¶ 5–6; Dkt. No. 129–10 at 5, 7–8; Bellamy Decl. ¶ 7. It is also undisputed that Ocasio was well informed about the grievance process, understood how it worked, and effectively utilized it on multiple occasions both prior and subsequent to the incident on January 13. *See generally* Ocasio Dep. 1 at 123, 143; Ocasio Dep. 2 at 109.

Ocasio contends that despite this knowledge, and despite the fact that he literally filed hundreds of complaints in the months following January 2006, the grievance process was generally unavailable to him as he was frustrated by a single threat by Murray and Daniel's selective processing of his grievances. Ocasio Dep. 1 at 120–26, 139–45, 160–62; Ocasio Dep. 2 at 121–22. These claims are belied by Ocaiso's own actions. Ocasio's testimony indicates that he continued to file dozens of letters of complaint immediately following the use of force and alleged impediments created by DOCS staff. Ocasio Dep. 1 at 122; Ocasio Dep. 2 at 121–22. Accordingly, even construing the facts in the light most favorable to Ocasio, administrative remedies remained available as he continued to file grievances with various individuals in spite of an alleged use of force and threats.

**\*9** This conclusion is supported by Ocasio's provision to the Court of copies of ten letters that he wrote directly after the use of force and threat. *See* Dkt. No. 1–1 at 7–9, 12; 1–2 at 22–24 (six letters written by Ocasio in January 2006); Dkt. No. 1–1 at 5, 15; Dkt. No. 1–3 at 1–5 (four letters written by Ocasio in February 2006). It is, therefore, undisputed Ocasio continued to lodge numerous complaints, but chose not to fashion the complaints in the form of a facility grievance. Moreover, any arguments that Ocasio's injuries prevented him from filing grievances is also contradicted by his testimony. The record illustrates that, regardless of Ocasio's physical state, he was able to continue file complaints about his conditions of confinement. Ocasio Dep. 1 at 122; Ocasio Dep. 2 at 121–22; Dkt. No. 1–1 at 5, 7–9, 12, 15; 1–2 at 22–24; Dkt. No. 1–3 at 1–5.

The record also establishes without contradiction that Ocasio was well aware of the grievance procedure, and remained engaged in it without pause, prior to and after January 13. Docket No. 129–10 at 4–5 (recording two grievances filed on December 8, 2005, five grievances filed on January 9, 2006, and two grievances filed on March 8, 2006, one of which was the grievance regarding Ocasio's medical care). Ocasio also pursued some grievances through CORC to completion. White Decl. ¶ 7. It appears that, in this instance, Ocasio simply failed to participate and properly utilize the mandatory administrative system. This failure is fatal to Ocasio's claim. *See generally Ruggiero v. County of Orange,* 467 F.3d 170, 177 (2d Cir.2006) (explaining that where there are administrative remedies available, the inmate is "required to exhaust them.") (citations omitted).

Accordingly, defendant's motion should be granted on this ground.[9]

### C. Personal Involvement

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*10** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

#### 1. VanGuilder and Rowe

Ocasio's principle complaints against VanGuilder and Rowe were that they failed to respond to Ocasio's multiple letters of complaint. Ocasio Dep. 2 at 61–66, 88, 123. However, such contentions are insufficient to establish personal involvement. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.") (citations omitted).

Similarly, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). The complaint also fails to establish any facts that defendants received or responded to complaints or letters. Additionally, the record fails to support any contentions that either defendant was involved with training the individuals involved in these alleged constitutional violations or that either was grossly negligent in performing his employment duties.

Accordingly, defendants' motion should be granted on this ground as to VanGuilder and Rowe.

#### 2. Roy

To the extent that Ocasio claims Roy was personally involved as the DOCS Inspector General, such contentions are meritless because a position in a hierarchical chain of command, without more, is insufficient to establish personal involvement. *Wright,* 21 F.3d at 501. Moreover, for the reasons outlined above, Roy was not personally involved merely because Ocasio sent him multiple pieces of correspondence to which he did not reply. Similarly, there is no evidence that Roy received or responded to complaints or letters. Additionally, the record fails to support any contentions that Roy was involved with training the individuals involved in these alleged constitutional violations or that he was grossly negligent in performing his employment duties. Lastly, Ocasio has no constitutional right to an investigation and, therefore, such contentions cannot serve as the basis for § 1983 relief. *See Carrasquillo v. City of New York.,* 324 F.Supp.2d 428, 438 (S.D.N.Y.2004) (holding that prisoners have "no constitutional or federal right to an investigation into ... [an] accident, or to have his requests for an investigation answered").

Accordingly, defendants' motion should be granted on this ground as to Roy.

#### 3. LeClaire, Selsky, [10] and McSweeny

**\*11** To the extent that LeClaire, Selsky, or McSweeny are claimed to be personally involved because of their high ranking positions in DOCS, such contentions fail. *Wright,* 21 F.3d at 501. Moreover, for the reasons outlined above, defendants were not personally involved merely because Ocasio claims to have sent them multiple pieces of correspondence to which he did not reply. The complaint fails to establish any facts that defendants received or responded to complaints or letters. Additionally, the record fails to support any contentions that these defendants were involved with training the individuals involved in these alleged constitutional violations or that any was grossly negligent in performing his employment duties. Furthermore, for the reasons outlined above, Ocasio has failed to state a claim when contending that these defendants failed to investigate his claims.

Lastly, to the extent Ocasio has argued that these defendants actions in referring these complaints to the appropriate correctional facility or Superintendents render them personally involved, such contentions are meritless as such delegation is appropriate. *See Bodie,* 342 F.Supp.2d 193, 203 (citations omitted) (finding personal involvement where supervisory official received, reviewed, and responded to an inmate's complaint); *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (holding

that Commissioner of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation).

Accordingly, defendants' motion should be granted on this ground as to LeClair, Selsky, and McSweeny.

### 4. Hamel, Lapier, Armstrong, and Daniel

With respect to each of these four defendants, Ocasio has offered evidence of their direct involvement in his contended constitutional violations. Ocasio stated that Daniel chose to selectively process his grievances, rendering the process unavailable to him. Ocasio Dep. 2 at 53, 55–60. Such contentions establish direct personal involvement in an alleged constitutional violation. Liberally construing Ocasio's complaint, he alleges that Hamel and Lapier promoted his unconstitutional conditions of confinement by prohibiting medical staff from checking on him and ensuring that his restricted diet was not physically harming him. *Id.* at 76–80. Lastly, Ocasio testified as to Armstrong's bias during the disciplinary hearing. *Id.* at 84–85.

Accordingly, defendants' motion on this ground as to Hamel, Lapier, Armstrong, and Daniel should be denied.

### D. Retaliation

Ocasio's complaint alleges that he was subjected to retaliation by Deluke, Beebe, Armstrong, and Murray. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *see also Lipton v. County of Orange,* 315 F.Supp.2d 434, 447–48 (S.D.N.Y.2004) (applying First Amendment retaliation factors to a pretrial detainee complaint). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim [s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

**\*12** In this case, Ocasio has failed to allege facts sufficient to support a retaliation claim. Ocasio claims that Deluke and Beebe subjected him to excessive force in retaliation for his filing grievances and having investigations commenced against them. Ocasio Dep. 1 at 49–56, 62. While filing grievances and lawsuits are actions protected by the First Amendment, Ocasio has failed to establish that the events of January 13th were precipitated by any specific grievance or investigation. Furthermore, while Ocasio states that Deluke generally attempted to intimate him by telling him that Deluke knew investigators who would believe him over Ocasio, such occurrences occurred four to six months prior to the alleged use of force. Ocasio presumably continued to have interactions with both officers during the time he remained, and they continued to patrol, the SHU facility. Therefore, with the passage of so many months Ocasio has failed to state how this continued to be a substantial factor which would motivate any adverse action against him. Accordingly, the requisite "temporal proximity between the [adverse action] ... and the alleged retaliation ...." does not to exist. *Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (citations omitted). Moreover, the claims are generally conclusory and unsupported and, thus, must be dismissed. *Jackson,* 713 at 214.

Ocasio also contends that, after the January 13th, Beebe continually placed his restraints on him too tightly in retaliation for the use of force. Ocasio Dep. 2 at 35. Ocasio's actions in response to corrections officers directing him into his cell, whether compliant or not, are not the type of activity protected by the constitution. Thus, even regarding Ocasio's contentions as true, such allegations cannot form the basis of a retaliation claim.

Ocasio further alleges that Armstrong and Murray retaliated against him by falsifying summaries from the use of force reports and prohibiting clear SHU surveillance tapes from being available for use in the disciplinary hearing. Ocasio has failed to state what constitutionally protected activity he engaged in which formed the basis of this claim. Presumably, he alleges that his numerous complaints and grievances were the source of this alleged adverse treatment. However, such claims lack specificity and are conclusory and unsupported.

Thus, they are insufficient to withstand a motion for summary judgment. *Jackson,* 713 at 214.

Accordingly, defendants' motion should be granted as to these claims.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

### 1. Medical Care

This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

**\*13** " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the

prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

In this case, Ocasio has failed to establish a serious medical need. A fractured metacarpal has previously been found insufficient to establish the objective prong of the Eighth Amendment analysis. *Ruiz v. Homerighouse,* No. 01–CV–266E(SR), 2003 WL 21382896, at \*3 (W.D.N.Y. Feb. 13, 2003) (citations omitted). Such a finding is also consistent with, findings that a broken finger is insufficient to state a serious medical need. *See Magee v. Childs,* No. 94–CV–1089 (GLS/RFT), 2006 WL 681223, at \*4 (N.D.N.Y. Feb. 27, 2006) (citing cases). Accordingly, Ocasio has failed to establish the objective prong of the Eighth Amendment assessment.

Moreover, even if a fractured metacarpal was a serious medical need, Harris and Dunning were not deliberately indifferent in treating it. Nurse Harris was initially called to Ocasio's cell after the use of force, but was ordered not to complete the medical examination because Ocasio failed to cooperate. Ocasio Dep. 2 at 94–95. Therefore, it was not Harris' decision to provide or deny treatment.

**\*14** Moreover, the objective medical evidence in the health records supports a conclusion that Ocasio's injury was not serious and did not require any type of care. Despite Ocasio's claims of blood and gore, none of those things were noted in the ambulatory health record, viewed on the SHU videotape, or seen in subsequent photos taken a few days later. The medical records, based upon the accounts of various medical staff indicate that Ocasio vaguely and inconsistently complained of pain and discomfort in his arms. Harris Decl. ¶ ¶ 10–21; Dkt. No. 129–6 at 13–23. Despite Ocasio's testimony about the pain

he suffered, his later testimony indicated that he was fully satisfied with his medical treatment. Ocasio Dep. 1 at 88–89, 110–11, 121, 126–38. Furthermore, observations of Ocasio's ability to dress and undress himself days after the use of force also belie claims that medical staff were aware of and deliberately indifferent to his hand. Dkt. No. 129–7 at 4; Dkt. No. 129–8 at 9.

Lastly, Dunning's interactions with Ocasio are far from evident of indifference or delay. Ocasio indicated to Dunning that he had pain in his hand and requested an x-ray. Dunning immediately scheduled Ocasio for a doctor's appointment. Harris Decl. ¶ 15; Ocasio Dep. 2 at 102–05; Dkt. No. 129–6 at 16; Dkt. No. 148 at 23, 62. A doctor's appointment was required to obtain a referral for diagnostic testing and, thus, Dunning immediately did as much as was in her power to provide Ocasio with a diagnosis and relief from his intermittent hand pain. Additionally, from the time that Ocasio requested the x-ray until it was performed, approximately one month passed. This does not constitute an inordinate amount of time for an injury that was not an apparent emergency as Ocasio testified he was still able to write and eat with his hand despite the pain he was feeling.

Accordingly, in the alternative, defendants' motion as to these claims should be granted on this ground.

## 2. Excessive Force

The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain ." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U .S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute [s] [an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9); *see also Wilkins v. Gaddy,* 130 S.Ct. 1175, 2010 WL 596513 (2010) ("The core judicial inquiry ... was

not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm ."). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de *minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*15** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant [;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

While a broken metacarpal was not categorized as a serious injury above, a serious injury need not be established in order for an excessive force claim to survive summary judgment. Construing the facts in the light most favorable to Ocasio and that he was compliant with the officers' orders when his handcuffs were being removed, there was no reason to use any force during the removal. Thus crediting Ocasio's testimony, the actions of Deluke and Beebe in restraining Ocasio's shoulder, pulling the retention strap, and grasping his hands appear to have been solely for the purposes of harming Ocasio, which represents a malicious use of force constituting a *per se* Eighth Amendment violation. *Blyden,* 186 F.3d at 263; *see also Wilkins,* 2010 WL 596513. Therefore, construing the facts in the light most favorable to Ocasio, he has established an Eighth Amendment claim against Deluke and Beebe for their malicious and intentional use of force

during the removal of his restraints solely for the purpose of causing Ocasio harm.

Accordingly, defendants' motion as to Deluke and Beebe on this claim should be denied.

### 3. Conditions of Confinement

The Eighth Amendment prohibition against cruel and unusual punishment extends to prison conditions. *Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998). "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer,* 511 U.S. at 832. As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted).

The objective prong can be satisfied by

> conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

**\*16** *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (*citing Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted). As to restrictive diets, no constitutional violation will be found unless the "diet was nutritionally inadequate, posed an imminent health

risk, or physically injured [the inmate]...." *McEachin v. McGuinnis,* 357 F.3d 197, 199–201 (2d Cir.2004) (citations omitted).

In this case, even liberally construing the complaint and viewing the facts in the light most favorable to Ocasio, he has failed to establish that placement on the restricted diet was a violation of his Eighth Amendment. Nothing in the record supports that the diet was inadequate, posed a health risk, or injured Ocasio. Thus, Ocasio has failed to satisfy the objective prong of the analysis. Furthermore, Ocasio's claims that Hamel and Lespier were deliberately indifferent to his placement on the diet are also meritless. First, as previously stated, the objective prong has not been satisfied. Second, even if the objective prong was satisfied, the record belies Ocasio's claims of deliberate indifference. The health records provided are replete with medical entries of Ocasio continuing to see the medical staff throughout 2006, multiple times per week. Dkt. No. 129–6 at 34–71. Thus, Ocasio's access to medical staff was neither impeded nor delayed.

Accordingly, defendants' motion on this ground should be granted.

### F. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). The Second Circuit has noted that where the period of segregated confinement exceeds thirty days, "refined fact-

finding is required to resolve defendants' claims under *Sandin. Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000).

**\*17** As Ocasio was never confined in SHU on the disciplinary charge here prior to the reversal on administrative appeal, (Ocasio Dep. 1 at 176–77), there are no questions of fact which exist as to the liberty interest asserted by him. Therefore, Ocasio's liberally construed claim that his procedural due process was violated during his disciplinary hearing is meritless as there has been no established accompanying liberty interest. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

Accordingly, in the alternative, defendants' motion as to the due process claim should also be granted on this ground. [11]

### G. Eleventh Amendment

While Ocasio's response indicate that he is not suing GMCF in any capacity (Dkt. No. 148 at 3), the complaint names it as a defendant. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

Therefore, Ocasio's claims against GMCF, to the extent that any exist, are expressly barred by the Eleventh Amendment. *See Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422, 425 (S.D.N.Y.2001) ("State agencies, such as DOCS, serve as an arm of the state and are, similarly, entitled to Eleventh Amendment immunity.") (citations omitted). Thus, the Eleventh Amendment bar applies and serves to prohibit Ocasio's claims against the correctional facility.

Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted as to GMCF.

### H. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights ... immunity might still be available as a bar to ... suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citations omitted).

**\*18** A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached as to all defendants except Deluke and Beebe because, as discussed *supra,* accepting all of Ocasio's allegations as true, he has not shown that any of these defendants violated his constitutional rights.

However, with respect to Ocasio's claims against Deluke and Beebe for their use or excessive force, the second

2010 WL 6001595

prong of the analysis need be considered. There is no question that it was well settled on January 7, 2008 that the Eighth Amendment required that inmates are to be provided "with ... reasonable safety [as i]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions," (*Helling,* 509 U.S. 33 (internal quotation marks and citations omitted)) whether that pertain to their medical care, conditions of confinement, or expectation for protection from corrections staff from dangerous situations. Thus, accepting Ocasio's allegations as true, qualified immunity should be granted to Deluke and Beebe for their allege use of excessive force.

Accordingly, it is recommended in the alternative that defendants' motion on this ground be denied as to Deluke and Beebe and granted as to all other defendants in all other respects.

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 129) be **GRANTED** as to all claims and all defendants. Pursuant to 28 U.S .C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S .C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 6001595

### III. Conclusion

**Footnotes**

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    When traveling throughout the correctional facility, inmates are handcuffed behind their backs pursuant to DOCS policy. Murray Decl. (Dkt. No. 129–8 at 1–5) ¶ 6. The inmate stands in front of his cell gate within reach of a slot in the cell door. *Id.* When the slot is opened, the inmate is ordered to place his hands through the slot and the restraints are applied. *Id.* The inmate then steps forward into the cell, withdrawing his hands from the slot, and the cell gate is opened so that the inmate may back into the hallway. *Id.*

3    Ocasio filed another lawsuit in the Northern District naming certain defendants named herein, concerning an excessive use of force and subsequent deliberate indifference to medical treatment regarding an altercation on January 13, 2006 with Deluke and Beebe. *See Ocasio v. Greene,* No. 08–CV–18 (TJM). The defendants' motion for summary judgment in that case was recently granted for failure to exhaust administrative remedies and a meritless Eighth Amendment claim. *Id.,* Dkt. No. 90. Citations to Ocasio's first deposition are those responses provided in connection with the *Greene* case. In the deposition, Ocasio stated that the difference between the two claims was that the present action is "a retaliatory complaint solely ... being denied [his Fourteenth] and First Amendment rights...." Ocasio Dep. 2 (Dkt. No. 129–3, Ex. B) at 9. However, the bulk of the complaint and related documentation relates to the alleged use of force, and Ocasio still contends that is an issue in the present complaint. Ocasio Dep. 2 at 10.

4    The process for removing restraints once an inmate is returned to his cell is essentially the reverse of that discussed above in note 3. Murray Decl. ¶ 7.

5    A retention strap is a 3# piece of nylon knotted in the center piece of the handcuffs and used to ensure that the officer maintains control of the restraints during the application and removal of the handcuffs and also prevents inmates from retaining the handcuffs and using them as weapons or tools to disable the cell gates. Murray Decl. ¶¶ 8–12. Ocasio is unsure whether he was restrained with a retention strap on the date in question; however, the video clearly displays an officer walking away from the cell after the alleged use of force with a strap in his hands.

6    Contrary to the noted medical entries, Ocasio contends that he knew his hand was fractured immediately and continuously asked medical staff for assistance and diagnostic testing. Ocasio Dep. 1 at 87–88.

7    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are

confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

8    A third letter apparently addressed to VanGuilder stated Ocasio's intent to have criminal charges filed against Deluke and Beebe for interfering with his religious meals and failing to provide him with the SHU videotape of the use of force incident on January 13. Dkt. No. 1–2 at 23. The remaining correspondence provided by Ocasio dated in 2007, solely pertains to his requests for documents, the appropriate procedure for receiving such documents, and the cost for the documents. Dkt. No. 1–3 at 12, 16–23.

9    While not argued by defendants, the record also shows that Ocasio failed to exhaust his administrative remedies with respect to his retaliation claims. Furthermore, liberally construing the complaint, Ocasio has also failed to exhaust any due process claims or Eighth Amendment claims regarding his placement on, or treatment during, his restricted diet. Accordingly, defendants' motion should be granted for those claims for Ocasio's failure to exhaust those claims as well.

10    Ocasio has included correspondence, and his testimony indicates, that one of his complaints against Selsky dealt with the general quality and reliability of the videotapes produced by the SHU surveillance cameras. There is no further evidence proffered by either party about these issues though, and it is undisputed that Ocasio received the SHU videotape from January 13 for use in the instant litigation. Therefore, this matter will not be further addressed.

11    It is unclear from Ocasio's testimony whether or not he lost any good time credits as a result of his SHU disposition and subsequent reversal. Ocasio Dep. 1 at 178–80. It appears that the credit was restored. However, even if it was not, this is the incorrect vehicle in which to request relief. Any claims for the loss of *"already-earned"* good time credit as a result of [the disciplinary disposition, should be addressed pursuant to a writ of habeas corpus as it i]s a prisoner's sole recourse in challenging the procedures used to deny him good-time credits." *Fifield v. Eaton,* 669 F.Supp.2d 294, 297 (W.D.N.Y.2009) (citations omitted) (emphasis in original).

---

**End of Document**        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 864898
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Omar OCASIO, Plaintiff,

v.

F. DELUKE, C.O., Great Meadow Correctional
Facility; P. Vanguilder, Deputy of Security, Great
Meadow Correctional Facility; Richard Roy,
Inspector General; D. Beebe, C.O; S. Hamel, C.O.;
T. Lespier, Sgt.; C. Murry, Sgt.; R. Armstrong, Lt.;
S. Rowe, Captain; Julie Daniels, Inmate Grievance
Coordinator; M. Harris, Nurse; Richard A. Dunning,
as Administrator of the Estate of Elaine Dunning;
Great Meadow Correctional Facility, Medical
Grievance Department; Lucien Leclaire, Jr.; Edward
McSweeney; and Donald Selsky, Defendants.

No. 9:08–cv–51 (GLS/DRH).
|
March 8, 2011.

**Attorneys and Law Firms**

Omar Ocasio, New York, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, James Seaman, Adam Silverman, Assistant
Attorneys General, of Counsel, Albany, NY, for the
Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

 **\*1** Pro se plaintiff Omar Ocasio, a former inmate at
Great Meadow Correctional Facility, brings this action
under 42 U.S.C. § 1983, alleging violations of his First,
Eighth, and Fourteenth Amendment rights. (*See* Compl.,
Dkt. No. 1.) On September 1, 2009, defendants moved
for summary judgment on Ocasio's claims. (Dkt. No.
129.) In a Report–Recommendation and Order (R &
R) filed September 3, 2010, Magistrate Judge David R.
Homer recommended that defendants' motion be granted

and that Ocasio's claims be dismissed. [1] (Dkt. No. 158.)
Pending are Ocasio's objections to the R & R. (Dkt. No.
162.) For the reasons that follow, the R & R is adopted
in its entirety.

Before entering final judgment, this court routinely
reviews all report and recommendation orders in cases it
has referred to a magistrate judge. If a party has objected
to specific elements of the magistrate judge's findings and
recommendations, this court reviews those findings and
recommendations de novo. *See Almonte v. N.Y. State
Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at *6–
7 (N.D.N.Y. Jan. 18, 2006). In those cases where no
party has filed an objection, or only a vague or general
objection has been filed, this court reviews the findings and
recommendations of a magistrate judge for clear error. *See
id.*

Without specifying the legal or factual basis for his
objections, Ocasio generally objects to Judge Homer's R
& R. (*See* Objections at 2–4, Dkt. No. 162.) In light
of Ocasio's nonspecific and vague objections, the court
has reviewed the R & R for clear error and finds none.
Accordingly, the court adopts Judge Homer's findings
and recommendations and grants defendants' motion for
summary judgment on Ocasio's claims.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David R. Homer's
Report–Recommendation and Order (Dkt. No. 158) is
**ADOPTED** and defendants' summary judgment motion
(Dkt. No. 129) is **GRANTED;** and it is further

**ORDERED** that Ocasio's complaint is **DISMISSED** in its
entirety; and it is further

**ORDERED** that the Clerk close this case and provide
a copy of this Memorandum–Decision and Order to the
parties by regular and certified mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 864898

Footnotes

2011 WL 864898

1    The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Beaman v. Unger, W.D.N.Y., October 12, 2011

2009 WL 3698382
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Omar OSACIO, Plaintiffs,
v.
Gary GREENE, Former Supt., Great Meadow
Correctional Facility; Lucien J. Leclaire, Dep.
Comm'r Nysdocs; Kenneth McLaughlin; Sgt.
C. Murry; CO F. Deluke; CO D. Beebe; Dr.
Albert Pauloano; Julie Daniels; Nurse K.
Bayer; Nurse S. Nichols; et al., Defendants.

No. 08–CV–0018.
|
Nov. 2, 2009.

**Attorneys and Law Firms**

Omar Ocasio, Auburn, NY, pro se.

James Seaman, New York State Department of Law,
Albany, NY, for Defendants.

*DECISION and ORDER*

THOMAS J. McAVOY, Senior District Judge.

*1 Plaintiff, Omar Osacio, brought the instant action
pro se pursuant to 42 U.S.C. § 1983 alleging that his
Eighth Amendment rights were violated though: (1)
the use of excessive force against him at the Great
Meadow Correctional Facility on January 13, 2006; and
(2) deliberate indifference to his medical condition, arising
from the January 13th incident. Defendants move for
summary judgment arguing that: (1) Plaintiff failed to
exhaust all available administrative remedies; (2) several
Defendants should be dismissed for lack of personal
involvement; (3) Defendants are entitled to qualified
immunity; (4) there was no excessive force in violation
of the Eighth Amendment; (5) Plaintiff's injury did not
constitute a serious medical need; and (6) there was no
deliberate indifference to Plaintiff's medical needs.

## I. FACTS

On January 13, 2006 Plaintiff was being returned to his
special housing unit (SHU) cell by Defendants Officer
Deluke and Officer Beebe. Plaintiff was handcuffed
behind his back. A retention strap was used to secure
the cuffs. Upon returning Plaintiff to his cell, Plaintiff
extended his handcuffed wrists through the feed up port
in order for Defendants to remove the handcuffs. The left
cuff was removed and Plaintiff turned to his right to see
the officers. Defendants ordered Plaintiff to put his arms
back out through the feed up port. Plaintiff testifies that,
at this point, Defendant Deluke pulled, shook, punched,
and scraped Plaintiff's arm against the bars. The retention
strap and handcuffs were removed and the incident ended.

Following the incident, a "use of force report" was
prepared which reported that Plaintiff resisted returning
the cuffs and Defendants took control of Plaintiff's
hands until the cuffs were removed by a third officer,
Defendant Murray. Control was maintained by pulling on
the retention straps with steady continuous tension until
the officers were able to grab Plaintiff's hands.

Following the documented use of force, a nurse was
directed to Plaintiff's cell to evaluate him. An officer was
directed to take photos of Plaintiff's injuries. Plaintiff
refused to be evaluated and turned out the lights so that no
pictures could be taken. Plaintiff stated that if there was
to be a medical exam and pictures taken, he wanted them
per his request and he wanted a full medical evaluation.

In the days following the incident, nurses made daily
sick call rounds. On January 13th Plaintiff did not
complain about any injury to his hand or arm. That
day he complained only of a rash on his forehead
and dental pain. The following day, Plaintiff made no
complaints. On January 15th and 16th, Plaintiff voiced
complaints of forearm pain, but the nurse observed
no abrasions, swelling, or redness. On January 17th,
Plaintiff saw Defendant Nurse Bayer. Plaintiff asked
only that a dental appointment be scheduled. Later that
day, Plaintiff was escorted to the medical unit for an
evaluation. Plaintiff reported right hand and left arm
pain. A nurse documented puffiness and bruising in
Plaintiff's right hand and two scratches on his left arm.
At this time photographs were taken. On January 18th
and 19th, Defendant Bayer again saw Plaintiff. He made
no complaints referable to his right hand. On January
23rd, Plaintiff again complained of right hand pain. The

nurse scheduled a doctor appointment for February 17, 2006. On January 26th, Plaintiff complained to Defendant Bayer of pain and numbness in his hand. She reported that there was no evidence of swelling or of decreased range of motion. Defendant Bayer referred Plaintiff to a physician assistant who saw Plaintiff on January 28th. On January 27th, the nurse on duty noted Plaintiff's complaint of right hand pain and that he was already scheduled to see a doctor. On February 4th, Defendant Nichols saw Plaintiff. He made no complaints of right hand pain. On February 14th, Plaintiff again saw Defendant Nichols. This time Plaintiff complained of right hand pain. On February 17th, Plaintiff was seen by a doctor who ordered an X-ray. The x-ray revealed a healing fracture to the 3rd metacarpal on the right hand. Another doctor appointment was scheduled for March 14th. On March 14th, Plaintiff's doctor reported slight tenderness on the 3rd metacarpal but reported normal range of motion, normal grip strength, and that the fracture was healing. After March 14th, there is no evidence that Plaintiff offered any complaint of pain or problems with his right hand.

**\*2** Defendants Greene, LeClaire, McLaughlin, Goord, and Daniel were not involved in the use of force or with Plaintiff's medical care. Defendant Pauloano never treated Plaintiff.

Plaintiff filed a grievance claiming he did not promptly receive his x-ray. There is no record of any other grievance or appeal by Plaintiff concerning the facts and circumstances of this lawsuit.

## II. STANDARD OF REVIEW

Summary judgment, pursuant to Fed.R.Civ.P. 56(c), is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon

the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ( "When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."). Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added]. It must be apparent that no rational finder of fact could find in favor of the non-moving party for a Court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

## III. DISCUSSION

### a. Exhaustion of Administrative Remedies

**\*3** The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other federal law, by a prisoner confined in any jail, prison,

Osacio v. Greene, Not Reported in F.Supp.2d (2009)
2009 WL 3698382
Case 9:16-cv-01284-TJM-DEP   Document 46   Filed 12/21/18   Page 74 of 91

or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a). The PLRA exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures. *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

> DOCS [New York's Department of Correctional Services] has available a well-established three-step grievance program: first an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

*Muniz v. Goord,* 04–CV–0479, 2007 WL 2027912, at *4 (N.D.N.Y. July 11, 2007) (citing *White v. The State of New York,* 00–CV–3434, 2002 U.S. Dist. LEXIS 18791, at *6, 2002 WL 31235713 (S.D.N.Y. Oct 3, 2002)) (citing N.Y. Comp.Codes R. & Ergs. Tit. 7, § 701.7).

"Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies." *Muniz,* 2007 WL 2027912 at *4; *see Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347–48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). However, the Second Circuit has held that a three-part inquiry is appropriate where a

defendant, as here, contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the Court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the Court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*4** In this case, there is no evidence that Plaintiff filed a grievance alleging the excessive use of force or deliberate indifference to medical needs. *See* Docket No. 75 # 33 ("There is no record in the facility's computer log that [Plaintiff] filed a grievance charging excessive use of force by officers in all of 2006 ."). Plaintiff did file a grievance dated February 22nd and filed March 8th concerning the x-rays taken on his hand. This grievance complains that Plaintiff was not taken for his x-rays as scheduled on February 21st. This grievance was upheld on the ground that Plaintiff did receive x-rays on February 23rd (two days later than originally scheduled) and shared with him on March 14th.

It is clear, based on the fact that Plaintiff did file a grievance regarding the x-ray follow up, as well as many other non-related grievances, that the grievance process was ready and available to the Plaintiff. *See* Docket No. 75 # 34. The Defendants have not forfeited this defense as they raise it in their memorandum of law in support of the motion for summary judgment. Furthermore, Plaintiff has made no allegations that Defendants prevented him from filing a grievance or alleged any special circumstances which would justify his failure to exhaust his administrative remedies. Therefore, pursuant

to PLRA, Plaintiff's complaint must be dismissed for failure to exhaust administrative remedies for either claim.

**b. A Broken Metacarpal Does Not Constitute a Serious Medical Condition**

Assuming Plaintiff properly exhausted his administrative remedies, Plaintiff's allegations do not support a violation of the Eighth Amendment for deliberate indifference to a serious medical condition. There are two elements to a claim of deliberate indifference to a serious medical condition, first the plaintiff "must show that she [or he] had a 'serious medical condition.' " *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009). Secondly, "the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

A serious medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Factors that have been considered in determining whether a condition is serious include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702 (citing *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)); accord *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997) (citing McGuckin and collecting cases from other circuits employing a similar standard). The "factors listed above, while not the only ones that might be considered, are without a doubt highly relevant to the inquiry into whether a given medical condition is a serious one." *Chance,* 143 F.3d at 702 (2d Cir.1998).

**\*5** The most serious injury that Plaintiff alleges is the fracture to his third metacarpal. Plaintiff's deliberate

indifference claim fails because a fractured metacarpal does not rise to the level of a serious medical condition. See *Sonds v. St. Barnabas Hospital Correctional Health Services,* 151 F.Supp. 303, 311 (S.D.N.Y.2001) ("Case law holds that the objective prong of the deliberate indifference test is not satisfied even where a finger is broken"); *Ruiz v. Homerighouse,* 01–CV–0266E, 2003 WL 21382896, at \*3 (W.D.N.Y. Feb.13, 2003) (claim dismissed as a matter of law because fractured metacarpal is not sufficiently serious medical condition to support a deliberate indifference claim); *Magee v. Childs,* CIV904CV1089–GLSRFT, 2006 WL 681223, at \*4 (N.D.N.Y. Feb.27, 2006) ("many courts have held that a broken finger does not constitute a serious injury"). Plaintiff has alleged insufficient facts from which it reasonably may be concluded that the injury to his finger was sufficiently serious. [1] Therefore, Plaintiff's claim of deliberate indifference to a serious medical need fails as a matter of law because Plaintiff fails to allege a serious medical condition.

Furthermore, returning to Plaintiff's grievance, Defendants' delay in performing an x-ray on Plaintiff's hand does not rise to the level of deliberate indifference to a serious medical condition because x-rays were completed within two days of Plaintiff's grievance and the delay did not cause any further harm or injury.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED IN ITS ENTIRETY.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3698382

Footnotes

1    Evidence shows that the fracture to Plaintiff's finger healed on its own with no resulting loss of motion or grip strength.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    4

Ramos v. New York State, Not Reported in Fed. Supp. (2017)

2017 WL 4326521

Case 9:16-cv-01284-TJM-DEP    Document 46    Filed 12/21/18    Page 76 of 91

2017 WL 4326521
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Paul RAMOS, Plaintiff,

v.

NEW YORK STATE, et al., Defendants.

9:17-CV-337 (LEK/TWD)
|
Signed 09/28/2017

**Attorneys and Law Firms**

Paul Ramos, Comstock, NY, pro se.

**DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

**\*1** Pro se plaintiff Paul Ramos commenced this civil rights action asserting claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision. Dkt. No. 1 ("Complaint"). By Decision and Order filed on May 19, 2017, Dkt. No. 9 ("May Order"), this Court granted Plaintiff's in forma pauperis application and reviewed the sufficiency of the Complaint in accordance with 28 U.S.C. §§ 1915(e) and 1915A. On the basis of that review, the Court dismissed the Complaint for failure to state a claim upon which relief could be granted. May Order at 10. In light of his pro se status, Plaintiff was afforded an opportunity to submit an amended complaint. Id. Presently before the Court is Plaintiff's amended complaint. Dkt. No. 13 ("Amended Complaint").

**II. BACKGROUND**

**A. May Order**

In the original Complaint, Plaintiff alleged that defendants New York State, Governor Andrew Cuomo, Inmate John Doe, and Mrs. Tynon, the Superintendent of Washington Correctional Facility ("Washington C.F."), were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. See Compl. Plaintiff sought monetary damages. Id. ¶ 9. In the May Order, the Court held that Plaintiff's claims against New York State

were barred by the Eleventh Amendment. May Order at 5–6, 10. The Court dismissed Plaintiff's claims against Inmate John Doe for failure to allege facts suggesting that he was an agent of the state. Id. at 6. Plaintiff's remaining claims against Cuomo and Tynon were dismissed for failure to allege facts suggesting that Cuomo and Tynon were involved in Plaintiff's medical treatment. Id. at 7–8.

**B. Summary of Amended Complaint**

In the Amended Complaint, Plaintiff adds as defendants Correction Officer John Roe and Nurse Jane Doe. [1] Am. Compl. at 1. The Amended Complaint does not include any claims against Inmate John Doe, Cuomo, or Tynon. [2] On February 1, 2017, Plaintiff was in the gymnasium at Washington C.F. Id. Roe was charged with "maintain[ing the gym] in a safe and secure manner." Id. Plaintiff's left middle finger was injured "by another dumbbell that was left haphazardly in the weight area." Id. Plaintiff reported his injury to Roe. Id. Plaintiff was sent to the Health Services Department and examined by Jane Doe. Id. Jane Doe wrapped Plaintiff's left middle finger but did not order x-rays of Plaintiff's hand or refer him to a physician. Id. at 1–2.

On February 10, 2017, Plaintiff's hand was x-rayed. Id. at 2. On February 24, 2017, Plaintiff was treated by Dr. Neil Trachtman, a physician at Washington C.F. Id. Trachtman reviewed the x-rays and advised Plaintiff that he sustained a fracture to his left middle finger. Id. Trachtman referred Plaintiff for treatment with a hand specialist. Id. On March 10, 2017, Plaintiff was sent to Sullivan Correctional Facility for treatment with a specialist. Id. at 2. The specialist "re-broke and reset" Plaintiff's finger. Id.

**\*2** Construed liberally, the Amended Complaint contains the following causes of action: (1) An Eighth Amendment claim related to failure to protect and conditions of confinement against John Roe; and (2) an Eighth Amendment claim related to deliberate indifference to serious medical needs against Jane Doe. See id. Plaintiff seeks monetary damages. Id. at 2.

**III. LEGAL STANDARD**

The legal standard governing the dismissal of a pleading for failure to state a claim pursuant to § 1915A(b) was discussed at length in the May Order and will not be

Case 9:16-cv-01284-TJM-DEP   Document 46   Filed 12/21/18   Page 77 of 91

Ramos v. New York State, Not Reported in Fed. Supp. (2017)

2017 WL 4326521

restated in this Decision and Order. May Order at 2–4. The Court will construe the allegations in Plaintiff's Amended Complaint with the utmost leniency. See, e.g., Haines v. Kerner, 404 U.S. 519, 520 (1972) (holding that a pro se litigant's complaint is held "to less stringent standards than formal pleadings drafted by lawyers").

## IV. DISCUSSION

### A. Claims Against New York State

In the Amended Complaint, Plaintiff states that Jane Doe's actions, "in her capacity as a State Official, have removed the Immunity from the State by her actions." Am. Compl. at 2. In the May Order, the Court dismissed Plaintiff's § 1983 claim for monetary damages against New York State, without leave to amend. May Order at 10. Accordingly, the claims against New York State in the Amended Complaint are not properly brought before this Court.

### B. Eighth Amendment Claims

#### 1. Conditions of Confinement and Failure to Protect

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. Wilson v. Seiter, 501 U.S. 294, 296–97 (1991); Estelle v. Gamble, 429 U.S. 97, 104 (1976). The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that "prisoners are entitled ... to adequate food, clothing, shelter, sanitation, medical care and personal safety." Lareau v. Manson, 651 F.2d 96, 106 (2d Cir. 1981). "To demonstrate that the conditions of his confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citation omitted). "To meet the objective element, the inmate must show that the conditions ... pose an unreasonable risk of serious damage to his health." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013). "To meet the subjective element, the [prisoner] must show that ... [t]he prison official ... [knew] of, and disregard[ed], an excessive risk to inmate health or safety." Id. See also Porter v. Young, No. 11-CV-848, 2013 WL 4080602, at *6 (N.D.N.Y. Aug. 13, 2013) (citation omitted) ("A plaintiff fails to state a valid Eighth Amendment claim when he does not allege that defendant was personally aware of a dangerous condition or that defendant was deliberately indifferent to the alleged conditions.").

Here, Plaintiff states that he sustained an injury due to the "haphazard" placement of a dumbbell in the Washington C.F. gym. Am. Compl. at 1. Even if Roe was responsible for supervising the gym, however, Plaintiff's allegations fail to establish that Roe was aware of the risk. See Spencer v. Sylvester, No. 96-CV-5491, 1999 WL 61644, at *9 (E.D.N.Y. Feb. 2, 1999) (dismissing an Eighth Amendment claim where plaintiff failed to allege that defendant was aware of spills on the stairs or that the spills existed at any time other than the day of the incident); see also Park v. City of New York, No. 10-CV-9627, 2011 WL 5865083, at *7, n.3 (S.D.N.Y. Nov. 22, 2011) (finding no Eighth Amendment violation where plaintiff failed to plead that defendant was aware of condition of basketball court prior to plaintiff's injury). As presently pleaded, the Amended Complaint fails to sufficiently allege Roe's knowledge or deliberate indifference. Thus, Plaintiff's Eighth Amendment claim against John Roe is dismissed for failure to state a claim.

#### 2. Deliberate Indifference to Serious Medical Needs

**\*3** Plaintiff claims that Nurse Jane Doe attempted to make a medical diagnosis that she was not qualified to render, delaying Plaintiff's receipt of specialized medical treatment. Am. Compl. at 2. To state an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Objectively, the deprivation must be "sufficiently serious," creating a risk of "death, degeneration, or extreme pain." Id. Moreover, the medical mistreatment must "involve[ ] culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). Finally, the Second Circuit has considered a delay in the provision of medical treatment to amount to deliberate indifference where, "for example, officials deliberately delayed care as a form of punishment, ... ignored a life-threatening and fast-degenerating condition for three days," or where the delay is so lengthy as to be "egregious." Demata v. New York State Corr. Dep't

Case 9:16-cv-01284-TJM-DEP   Document 46   Filed 12/21/18   Page 78 of 91

Ramos v. New York State, Not Reported in Fed. Supp. (2017)
2017 WL 4326521

of Health Servs., 198 F.3d 233 (2d Cir. 1999) (citation omitted).

Plaintiff fails to allege facts showing that Defendants possessed the requisite culpability to sustain an Eighth Amendment claim. First, even if Jane Doe failed to properly diagnose Plaintiff's broken finger, "a complaint that a physician has been negligent in diagnosing ... a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Hill v. Curcione, 657 F.3d 116, 123 (2d Cir. 2011) (quoting Estelle, 429 U.S. at 104). Plaintiff does not allege any facts that establish Jane Doe's "conscious disregard of a substantial risk of serious harm," which is required to state a claim under the Eighth Amendment.

Second, Plaintiff's alleged delay in receiving treatment does not establish deliberate indifference. Plaintiff's injury —a broken finger—was not "life-threatening and fast-degenerating." Moreover, Plaintiff does not allege that Defendants orchestrated these delays to punish him. Finally, the length of the delay—five weeks and two days —is far from "egregious," and insufficient to constitute deliberate indifference. Am. Compl. at 1–2. See Hathaway v. Coughlin, 841 F.2d 48, 50–51 (2d Cir. 1988) (over two-year delay in between hip injury and treatment constitutes deliberate indifference); Beaman v. Unger, 838 F. Supp. 2d 108, 110 (W.D.N.Y. 2011) (ten-week delay in between injury and treatment of a broken wrist and finger insufficient to state an Eighth Amendment claim); Aho v. Hughes, No. 03-CV-1552, 2005 WL 2452573, at *7 (D. Conn. Sept. 30, 2005) (two-month delay in between injury and treatment of broken hand insufficient to state an Eighth Amendment claim). For these reasons, Plaintiff's Eighth Amendment medical indifference claims against Nurse Jane Doe are dismissed for failure to state a claim upon which relief may be granted.

**C. Leave to Amend to Cure Deficiencies**
Ordinarily, a court should not dismiss a complaint filed by a pro se litigant without granting leave to amend

at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." Branum v. Clark, 927 F.2d 698, 704–05 (2d Cir. 1991); see also Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); see also Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend."). In this instance, Plaintiff has already been provided one opportunity to amend his Complaint. The Amended Complaint does not cure the substantive deficiencies of his original Complaint, identified by the Court in the May Order. Accordingly, the Court does not grant leave to amend again because it finds that any further amendment would be futile.

**V. CONCLUSION**
*4  Accordingly, it is hereby:

**ORDERED**, that Plaintiff's claims are **DISMISSED** pursuant to §§ 1915(e)(2)(B) and 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED**, that the Clerk of the Court enter judgment for the Defendants and close this case; and it is further

**ORDERED**, that the Clerk serve a copy of this Decision and Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4326521

---

Footnotes
1    The Clerk of the Court is instructed to revise the docket to reflect that John Roe and Jane Doe are defendants in this action.
2    The Clerk of the Court is instructed to revise the docket to reflect that John Doe, Governor Andrew Cuomo, and Mrs. Tynon are no longer defendants in this action.

**Ramos v. New York State, Not Reported in Fed. Supp. (2017)**

2017 WL 4326521

---

**End of Document**                                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

Rivera v. Johnson, Not Reported in F.Supp. (1996)

Case 9:16-cv-01284-TJM-DEP    Document 46    Filed 12/21/18    Page 80 of 91

KeyCite Yellow Flag - Negative Treatment
Distinguished by Carter v. Revine, D.Conn., October 6, 2015

1996 WL 549336
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Felix RIVERA, Plaintiff,

v.

S.B. JOHNSON, Superintendent, Dr. Shinia, Head
Doctor, Admin R.N. E. James, Administrative
Nurse, and R.N. J. Kent, Nurse, Defendants.

No. 95–CV–0845E(H).
|
Sept. 20, 1996.

**Attorneys and Law Firms**

Plaintiff Pro Se, Albion, NY.

Mary C. Baumgarten, Asst. Attorney General, Buffalo,
NY, for Defendant.

MEMORANDUM and ORDER

ELFVIN, District Judge.

 **\*1** The plaintiff—an inmate housed at New York's
Orleans Correctional Facility ("Orleans")—commenced
this action pursuant to 42 U.S.C. § 1983 alleging that
he had been denied adequate medical care in violation
of his right under the Eighth Amendment to the United
States Constitution to be free from cruel and unusual
punishment. Jurisdiction is bottomed upon 28 U.S.C. §§
1331 & 1343(a). The defendants move, pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure, to dismiss
the Complaint for its failure to state facts upon which
relief may be granted. The motion will be granted.

According to the plaintiff's Statement of Claim
("Complaint"), at approximately 4:30 p.m. on June 26,
1995 he injured his fourth finger on his right hand and
was taken to the clinic within Orleans where he was seen
by Joanne V. Kent, R.N. The plaintiff alleges that Kent
"refused to X-ray [his] hand and \* \* \* [w]rapped" his
finger and instructed him "to come back if the swelling
continues." Two days later the plaintiff "was taken to
a hospital \* \* \* at which time [his] finger was X-rayed

and a cast provided." The plaintiff alleges that Kent "was
negligent in not properly treating [his] broken finger,"
that Elizabeth James, R.N., "is directly responsible" in
her administrative position to furnish a capable medical
staff which can provide "the proper treatment to inmate[s]
during emergenc[ies]" and that she was "negligent by
staffing \* \* \* Kent," that Brij N. Shinha, M.D.—sued
herein as "Dr. Shinia"—"is the head doctor, and is directly
responsible for the negligence of his staff" and that
Superintendent Sally B. Johnson "is directly responsible"
to assure "that inmates with emergency needs will receive
adequate medical treatment and not be subjected to gross
negligence, wanton disregards [sic], or mistreated because
it is trying to save a few dollars." Finally, in his prayer
for relief, the plaintiff requests that this Court "find that
the medical dept. has acted negligent [sic] by displaying
a wanton disregard to severe medical emergency needs"
and that by subjecting him to "medical neglect during
an emergency situation [it] has created mental anguish,
gross negligence" and that he should be pecuniarily
compensated.

When evaluating a motion to dismiss for failure to state
a claim upon which relief can be granted this Court views
well-pleaded allegations in a light most favorable to the
plaintiff and such a motion will be denied unless they
present no set of facts on the basis of which the plaintiff
could be entitled to relief. Scheuer v. Rhodes, 416 U.S. 232,
236 (1974). This lenient standard is even more appropriate
when the plaintiff is representing himself. Sykes v. James,
13 F.3d 515, 518–519, (2nd Cir.1993), cert. denied, 512
U.S. 1240, 114 S.Ct. 2749 (1994).

A claim for damages based upon 42 U.S.C. § 1983
requires that the plaintiff allege facts which show that
he was deprived, by a person or persons acting under
state authority, of a right, privilege or immunity protected
under the Constitution or a federal statute. Sykes,
at 519. In order to recover damages under section
1983, the plaintiff must establish a defendant's personal
involvement in the alleged deprivation. Wright v. Smith,
21 F.3d 496, 501 (2nd Cir.1994). The plaintiff "must
state specific facts, not simply legal and constitutional
conclusions." Fee v. Herndon, 900 F.2d 804, 807 (5th
Cir.), cert. denied, 498 U.S. 908 (1990). Furthermore, the
doctrine of respondeat superior may not be invoked to
establish an individual's liability in a section 1983 claim.
Green v. Bauvi, 46 F.3d 189, 194 (2nd Cir.1995).

Rivera v. Johnson, Not Reported in F.Supp. (1996)

Case 9:16-cv-01284-TJM-DEP    Document 46    Filed 12/21/18    Page 81 of 91

**\*2** The Eighth Amendment to the United States Constitution prohibits the infliction of unnecessary and wanton pain on those convicted of crimes. *Hudson v. McMillian,* 503 U.S. 1, 5 (1992). If an inmate suffers from a sufficiently serious illness or injury or other medical condition, a deliberate indifference to such serious medical needs violates the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104–105 (1976). The inquiry has both objective and subjective elements. *Wilson v. Seiter,* 501 U.S. 294, 298 (1990). The objective component of the inquiry examines whether the deprivation was sufficiently serious, while the subjective component examines whether any defendant acted with a sufficiently culpable state of mind. *Ibid.* In examining the seriousness of the medical need, the constitutional "standard contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain' \* \* \*." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2nd Cir.1994), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). The subjective component requires the plaintiff to demonstrate that a defendant was both aware of facts from which the inference could have been drawn that a substantial risk of serious harm existed and that such defendant drew such inference. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1979 (1994).

Evaluating the Complaint, the plaintiff has failed to allege sufficient personal involvement on the part of James, Shinha and Johnson to state a claim for a constitutional violation for which monetary damages can be awarded. His allegations of negligent supervision or staffing rely on theories of negligence and vicarious liability, neither of which is available to establish liability in section 1983 actions. In the absence of allegations of direct personal involvement and sufficiently egregious and morally culpable conduct, the plaintiff's claims against James, Shinha and Johnson must be dismissed as a matter of law.

The gravamen of the complaint against Kent is that she "refused to X-ray" the plaintiff's finger or hand and that she "wrapped" his finger and that as a result of her conduct he unnecessarily endured pain for two days prior to being taken to a hospital, where his "finger was X-rayed and [placed in] a cast." The United States Supreme Court has specifically held that "[a] medical decision not to order an X-ray \* \* \* does not represent cruel and unusual punishment." *Estelle,* at 107. Furthermore, the plaintiff has failed to allege an objectively sufficiently serious medical condition meriting constitutional protection. Prison inmates suffering from ailments such as, *inter alia,* a toothache, a kidney stone and, most pertinently, a broken finger have all been held to fail to satisfy the constitutional serious-medical-need standard. *See Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995) and cases cited thereat. A broken finger, without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection. Additionally, the Complaint indicates that Kent attended to and treated his finger and instructed the plaintiff to return if swelling continued. Such does not imply any disregard on her part of an excessive risk to the plaintiff's health. There is no allegation that the two days which passed after Kent attended to the plaintiff's finger and until it was placed in a cast, even if viewed as a delay, escalated or contributed to any harm or adversely affected his prognosis given the type of injury. Negligent diagnosis or treatment of a medical condition at most states a claim for medical malpractice and does not state a valid claim of medical mistreatment of constitutional dimension. *Estelle,* at 106–107. Moreover, it has long been resolved that prisons need not provide a standard of medical care presumed to be administered at hospitals. *Archer v. Dutcher,* 733 F.2d 14, 17 (2nd Cir.1984). Having failed to allege a medical condition that is objectively sufficiently serious and having failed to allege facts which imply deliberate indifference to such, the plaintiff's legal and constitutional conclusions fail to state a claim upon which relief can granted.

**\*3** Accordingly, it is hereby *ORDERED* that the defendants' motion is granted and that the Complaint is dismissed and that this case shall be closed.

### All Citations

Not Reported in F.Supp., 1996 WL 549336

---

2007 WL 4246443
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jose RODRIGUEZ, Plaintiff,
v.
Glen S. GOORD, et al, Defendants.

No. 9:04-CV-0358 (FJS/GHL).
|
Nov. 27, 2007.

**Attorneys and Law Firms**

Jose Rodriguez, Willard, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of
New York, David L. Cochran, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

FREDERICK J. SCULLIN, Senior District Judge.

 **\*1** The above-captioned matter having been presented to
me by the Report-Recommendation of Magistrate Judge
George H. Lowe filed November 6, 2007, and the Court
having reviewed the Report-Recommendation and the
entire file in this matter, and no objections to said Report-
Recommendation having been filed, the Court hereby

**ORDERS,** that Magistrate Judge Lowe's November 6,
2007 Report-Recommendation is **ACCEPTED** in its
entirety for the reasons stated therein; and the Court
further

**ORDERS,** that Defendants' motion, pursuant to Local
Rule 41.2(b), to dismiss for Plaintiff's failure to provide
notice to the Court of a change of address, is **GRANTED;**
and the Court further

**ORDERS,** that the Clerk of the Court enter judgment in
favor of the Defendants and close this case.

### IT IS SO ORDERED.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, filed pursuant to
42 U.S.C. § 1983, has been referred to me for Report and
Recommendation by the Honorable Frederick J. Scullin,
Jr., Senior United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules
of Practice for this Court. Generally, Jose Rodriguez
("Plaintiff") alleges that, while he was an inmate at Oneida
Correctional Facility in 2003 and 2004, ten employees of
the New York State Department of Correctional Services
("Defendants") were deliberately indifferent to his serious
medical needs, and subjected him to cruel and unusual
prison conditions, in violation of the Eighth Amendment.
(Dkt. No. 27 [Plf .'s Am. Compl.].) Currently pending
is Defendants' motion to dismiss for failure to provide
notice to the Court of a change of address, pursuant to
Local Rule 41.2(b) of the Local Rules of Practice for this
Court. (Dkt. No. 86.) Plaintiff has not opposed the
motion, despite having been given more than six weeks in
which to do so. Under the circumstances, I recommend
that (1) Defendants' motion to dismiss be granted, and (2)
in the alternative, the Court exercise its inherent authority
to *sua sponte* dismiss Plaintiff's Amended Complaint for
failure to prosecute and/or failure to comply with an Order
of the Court.

### I. DEFENDANTS' MOTION TO DISMISS

Under the Local Rules of Practice for this Court, Plaintiff
has effectively "consented" to the granting of Defendants'
motion to dismiss, since (1) he failed to oppose the
motion, (2) the motion was properly filed, and (3)
Defendants have, through the motion, met their burden
of demonstrating entitlement to the relief requested in the
motion. L.R. 7.1(b)(3).

In particular, with regard to this last factor (i.e., that
Defendants have met their burden of demonstrating
entitlement to the relief requested), Defendants argue that
their motion to dismiss should be granted because (1)
Local Rule 41.2(b) provides that "[f]ailure to notify the
Court of a change of address in accordance with [Local
Rule] 10.1(b) may result in the dismissal of any pending
action," (2) on April 15, 2004, Plaintiff was specifically
advised of this rule when (through Dkt. No. 5, at 4)
the Court advised Plaintiff that "his failure to [promptly

notify the Clerk's Office and all parties or their counsel of any change in his address] will result in the dismissal of his action," (3) on May 22, 2007, Plaintiff was released from the Willard Drug Treatment Center, (4) since that time, Plaintiff has failed to provide notice to the Court (or Defendants) of his new address, as required by Local Rule 10.1(b)(2), and (5) as a result of this failure, Defendants have been prejudiced in that they have been unable to contact Plaintiff in connection with this litigation (e.g., in order to depose him, as authorized by the Court on May 4, 2007). (Dkt. No. 86, Part 4, at 1-2 [Defs.' Mem. of Law].)

**\*2** Authority exists suggesting that an inquiry into the third factor (i.e., whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1[b][3] ) is a more limited endeavor than a review of a contested motion to dismiss. [1] Specifically, under such an analysis, the movant's burden of persuasion is lightened such that, in order to succeed, his motion need only be "facially meritorious." [2] Given that Defendants accurately cite the law and facts in their memorandum of law, I find that they have met their lightened burden on their unopposed motion. Moreover, I am confident that I would reach the same conclusion even if their motion were contested.

For these reasons, I recommend that the Court grant Defendants' motion to dismiss.

## II. *SUA SPONTE* DISMISSAL

Even if Defendants have not met their burden on their motion to dismiss, the Court possesses the inherent authority to dismiss Plaintiff's Amended Complaint *sua sponte* under the circumstances. Rule 41 of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a proceeding for (1) failure to prosecute the action and/or (2) failure to comply with the Federal Rules of Civil Procedure or an Order of the Court. Fed.R.Civ.P. 41(b). [3] However, it has long been recognized that, despite Rule 41 (which speaks only of a *motion* to dismiss on the referenced grounds, and not a *sua sponte* order of dismissal on those grounds), courts retain the "inherent power" to *sua sponte* "clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." Link v. Wabash R.R. Co., 370 U.S. 626, 630, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *see also Saylor v. Bastedo,* 623 F.2d 230, 238 (2d Cir.1980); *Theilmann v. Rutland Hospital, Inc.,* 455

F.2d 853, 855 (2d Cir.1972). Indeed, Local Rule 41.2(a) not only recognizes this authority but *requires* that it be exercised in appropriate circumstances. *See* N.D.N.Y. L.R. 41.2(a) ("Whenever it appears that the plaintiff has failed to prosecute an action or proceeding diligently, the assigned judge *shall* order it dismissed.") [emphasis added].

### A. Failure to Prosecute

With regard to the first ground for dismissal (a failure to prosecute the action), it is within the trial judge's sound discretion to dismiss for want of prosecution. [4] The Second Circuit has identified five factors that it considers when reviewing a district court's order to dismiss an action for failure to prosecute:

> [1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard and [5] whether the judge has adequately assessed the efficacy of lesser sanctions. [5]

**\*3** As a general rule, no single one of these five factors is dispositive. [6] However, I note that, with regard to the first factor, Rule 41.2 of the Local Rules of Practice for this Court provides that a "plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution." N.D.N.Y. L.R. 41.2(a). In addition, I note that a party's failure to keep the Clerk's Office apprised of his or her current address may also constitute grounds for dismissal under Rule 41(b) of the Federal Rules of Civil Procedure. [7]

Here, I find that, under the circumstances, the above-described factors weigh in favor of dismissal. The duration of Plaintiff's failure is some six-and-a-half months, i.e., since April 22, 2007, the date of the last document that Plaintiff attempted to file with the Court (Dkt. No. 85). Plaintiff received adequate notice (e.g., through the Court's above-referenced Order of April 15, 2004, and Defendants' motion to dismiss) that his failure to litigate this action (e.g., through providing a current address) would result in dismissal. Defendants are likely to be prejudiced by further delays in this proceeding, since

they have been waiting to take Plaintiff's deposition since May 4, 2007. (Dkt. No. 84.) I find that the need to alleviate congestion on the Court's docket outweighs Plaintiff's right to receive a further chance to be heard in this action. [8] Finally, I have considered all less-drastic sanctions and rejected them, largely because they would be futile under the circumstances (e.g., an Order warning or chastising Plaintiff may very well not reach him, due to his failure to provide a current address).

### B. Failure to Comply with Order of Court

With regard to the second ground for dismissal (a failure to comply with an Order of the Court), the legal standard governing such a dismissal is very similar to the legal standard governing a dismissal for failure to prosecute. "Dismissal ... for failure to comply with an order of the court is a matter committed to the discretion of the district court." [9] The correctness of a dismissal for failure to comply with an order of the court is determined in light of five factors:

> (1) the duration of the plaintiff's failure to comply with the court order, (2) whether plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal. [10]

Here, I find that, under the circumstances, the above-described factors weigh in favor of dismissal for the same reasons as described above in Part II.A. of this Report-Recommendation. I note that the Order that Plaintiff has violated is the Court's Order of April 15, 2004, wherein the Court ordered Plaintiff, *inter alia,* to keep the Clerk's Office apprised of his current address. (Dkt. No. 5, at 4.) Specifically, the Court advised plaintiff that *"[p]laintiff*

*is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do same will result in the dismissal of this action."* (*Id.*) I note also that, on numerous previous occasions in this action, Plaintiff violated this Order, resulting in delays in the action. (*See* Dkt. Nos. 47, 48, 49, 50, 54, 59, 72, 78, 79 & Dkt. Entry for 12/15/06 [indicating that mail from the Court to Plaintiff was returned as undeliverable].)

**\*4** As a result, I recommend that, should the Court decide to deny Defendants' motion to dismiss, the Court exercise its authority to dismiss Plaintiff's Amended Complaint *sua sponte* for failure to prosecute and/or failure to comply with an Order of the Court.

**ACCORDINGLY,** for the reasons stated above, it is

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 86) be *GRANTED%;* and it is further

**RECOMMENDED** that, in the alternative, the Court exercise its inherent authority to *SUA SPONTE DISMISS* Plaintiff's Amended Complaint for failure to prosecute and/or failure to comply with an Order of the Court.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e)..

### All Citations

Not Reported in F.Supp.2d, 2007 WL 4246443

### Footnotes

1    *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003)* (Sharpe, M.J.) (before an unopposed motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious* ") [emphasis added; citations omitted]; *Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-10 (N.D.N.Y.2003)* (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *see also Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M .J.) (applying prior version of Rule 7.1 [b][3], but recommending dismissal because of plaintiff's failure to

respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-0989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

2    *See, e.g., Hernandez,* 2003 U.S. Dist. LEXIS 1625 at *8.

3    Fed.R.Civ.P. 41(b) (providing, in pertinent part, that "[f]or failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant").

4    *See Merker v. Rice,* 649 F.2d 171, 173 (2d Cir.1981).

5    *See Shannon v. GE Co.,* 186 F.3d 186, 193 (2d Cir.1999) (affirming Rule 41[b] dismissal of plaintiff's claims by U.S. District Court for Northern District of New York based on plaintiff's failure to prosecute the action) [citation and internal quotation marks omitted].

6    *See Nita v. Conn. Dep't of Env. Protection,* 16 F.3d 482 (2d Cir.1994).

7    *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 U.S. Dist. LEXIS 13929, at *2-3, 1997 WL 567961 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); *see also* N.D.N.Y. L.R. 41.2(b) ("Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

8    It is cases like this one that delay the resolution of other cases, and that contribute to the Second Circuit's dubious distinction as having (among the twelve circuits, including the D.C. Circuit) the longest median time to disposition for prisoner civil rights cases, between 2000 and 2005 (9.8 months, as compared to a national average of 5.7 months). Simply stated, I am unable to afford Plaintiff with further special solicitude without impermissibly burdening the Court and unfairly tipping the scales of justice against Defendant.

9    *Alvarez v. Simmons Market Research Bureau, Inc.,* 839 F.2d 930, 932 (2d Cir.1988) [citations omitted].

10   *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996) [citations omitted].

---

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 21382896
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Victor RUIZ, # 00-R-2475, Plaintiff,

v.

Charles HOMERIGHOUSE,[1] Dept. Supt. of
Security, Carol A. Preiss, Dept. of Administration
and Dr. B. Sinha, Facility Health Service Director,
in their individual capacities, Defendants.

No. 01-CV-0266E(SR).
|
Feb. 13, 2003.

**Synopsis**

Inmate sued deputy supervisor of administration, deputy
supervisor of security, and health service director
of prison, claiming that officials displayed deliberate
indifference to his fractured metacarpal, in violation of
Eighth Amendment. Defendants moved for summary
judgment. The District Court, Elfvin, J., held that:
(1) administrative officials did not violate Eighth
Amendment as result of one week delay in appointment
with specialist, and (2) health service director did not
violate Eighth Amendment by refusing to refer inmate for
surgery.

Judgment for defendants.

West Headnotes (2)

**[1]    Prisons**
👉 Particular Conditions and Treatments

**Sentencing and Punishment**
👉 Medical Care and Treatment

Deputy supervisor of administration and
deputy supervisor of security for prison
did not violate Eighth Amendment, through
showing of deliberate indifference to inmate's
metacarpal fracture, when appointment with
outside orthopedist was delayed one week due
to unavailability of security vehicle; fracture
was insufficiently severe medical condition for

Eighth Amendment purposes, earlier contact
with orthopedist would not have avoided
pain and disfigurement claimed by inmate,
and prompt treatment with splint and pain
medication precluded showing of necessary
hostility on part of prison staff. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[2]    Prisons**
👉 Particular Conditions and Treatments

**Sentencing and Punishment**
👉 Medical Care and Treatment

Prison health service director did not
show deliberate indifference to inmate's
fractured metacarpal, in violation of Eighth
Amendment, when he declined to refer inmate
for surgery; refusal was exercise of medical
judgment not constituting indifference, which
was further refuted by prompt treatment
consisting of splinting and provision of pain
medication. U.S.C.A. Const.Amend. 8; 42
U.S.C.A. § 1983.

8 Cases that cite this headnote

MEMORANDUM and ORDER[2]

ELFVIN, J.

**\*1** Ruiz - an inmate at the Orleans Correctional Facility
("Orleans") -filed a Complaint on April 11, 2001 asserting
claims under 42 U.S.C. § 1983 for defendants' alleged
deliberate indifference to his medical needs in violation of
the Eighth Amendment to the United States Constitution.
Ruiz filed an Amended Complaint October 2, 2001. On
May 13, 2002 defendants filed a motion seeking summary
judgment of dismissal. Ruiz filed opposing papers June 25,
2002. For the reasons set forth below, defendants' motion
for summary judgment will be granted.

Ruiz alleges the following. Ruiz fractured his right hand
November 24, 2000 and he received medical attention
at the Medina Memorial Hospital ("Medina") later that
day. Medina staff applied a splint and ace bandage

to Ruiz's hand, prescribed Ibuprofen and directed Ruiz to see a specialist. Ruiz was scheduled to consult a specialist at Erie County Medical Center ("ECMC") on December 7, 2000. This appointment was cancelled by security personnel because no vehicle was available that day to transport Ruiz to ECMC. Consequently, Ruiz's appointment at ECMC was rescheduled for December 14, 2000. Ruiz claims that the one-week delay caused his hand to partially heal - thus prohibiting the ECMC specialist from being able to properly set Ruiz's hand. Ruiz further claims that such delay - which he attributes as having been caused by defendants Homrighouse and Preiss [3] - resulted in pain and permanent disfigurement. ECMC staff applied a splint and ace bandage to Ruiz's hand.

Ruiz returned to "the hospital" [4] January 4, 2001 with complaints of persistent pain. He claims, however, to have been denied pain medication other than Ibuprofen. Ruiz was directed to undergo physical therapy. Moreover, Dr. Sinha [5] allegedly failed to refer Ruiz for surgery - despite Medina's direction that treatment and follow-up were needed.

On February 1, 2001 ECMC staff removed Ruiz's splint and discharged him from their care. Ruiz alleges that his hand is disabled and deformed and he claims that the physical therapy caused him additional pain and suffering. He claims that his injuries resulted from defendants' deliberate indifference to his medical needs and their failure to provide transportation on December 7, 2000. Accordingly, he claims that the defendants violated their duty to provide adequate medical treatment.

Ruiz's allegations are largely consistent with defendants' Statement of Undisputed Facts ("defendants' Statement"). [6] Although Ruiz filed a responding statement pursuant to Rule 7.1(e) of this Court's Local Rules of Civil Procedure, such merely reasserted plaintiff's contention that his Eighth Amendment rights had been violated. Nonetheless, the relevant facts are straightforward and relatively undisputed.

Rule 56(c) of the Federal Rules of Civil Procedure ("FRCvP") states that summary judgment may be granted only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In other words, after discovery and upon a motion, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is thus appropriate where there is "no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). [7]

**\*2** With respect to the first prong of *Anderson,* a genuine issue of material fact exists if the evidence in the record "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* at 248. [8] Stated another way, there is "no genuine issue as to any material fact" where there is a "complete failure of proof concerning an essential element of the nonmoving party's case." *Celotex,* at 323. Under the second prong of *Anderson,* the disputed fact must be material, which is to say that it "might affect the outcome of the suit under the governing law * * *." *Anderson,* at 248.

Furthermore, "[i]n assessing the record to determine whether there is a genuine issue as to any material fact, the district court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000) (citing *Anderson,* at 255). Nonetheless, mere conclusions, conjecture, unsubstantiated allegations or surmise on the part of the non-moving party are insufficient to defeat a well-grounded motion for summary judgment. *Goenaga,* at 18. [9] Furthermore, inasmuch as Ruiz is proceeding *pro se* this Court will "read his supporting papers liberally, and * * * interpret them to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). "Nonetheless, proceeding *pro se* does not relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions, unsupported by evidence, are insufficient to overcome" a properly supported motion for summary judgment. *Rodriguez v. Ames,* 224 F.Supp.2d 555, 558 (W.D.N.Y.2002) (quoting *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 348 (S.D.N.Y.2002)).

Inadequate medical care violates the Eighth Amendment's proscription against cruel and unusual punishment

where a defendant acts with "deliberate indifference to [a prisoner's] serious medical needs." *Harrison v. Barkley,* 219 F.3d 132, 136 (2000) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Accordingly, Ruiz's section 1983 claim [10] must involve " 'deliberate indifference' to his *'serious'* medical needs." *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (emphasis added). [11] This "deliberate indifference" inquiry has both objective and subjective factors. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The objective factor examines whether the deprivation was sufficiently serious, whereas the subjective factor examines whether any defendant acted with a sufficiently culpable state of mind. *Ibid.* In examining the seriousness of the medical need, Ruiz must have "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002). The subjective factor requires Ruiz to demonstrate that defendants were (1) aware of facts from which the inference could have been drawn that a substantial risk of serious harm existed and (2) that defendants in fact drew such an inference. *Ibid.* [12] Moreover, "[b]ecause the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter,* 316 F.3d 178, 2003 WL 115223, at *4 (2d Cir.2003) (citing *Estelle,* at 105-106).

**\*3  [1]**  With respect to Homrighouse and Preiss, Ruiz alleges that they are responsible for the one-week delay of his visit with an orthopedic specialist at ECMC. Ruiz's section 1983 claims against Homrighouse and Preiss will be dismissed for several reasons. First, with respect to the objective prong, Ruiz's fractured metacarpal was not sufficiently serious. *See Rivera v. Johnson,* 1996 WL 549336, at *2 (W.D.N.Y.1996). [13] In *Rivera,* this Court dismissed an inmate's section 1983 claim predicated upon alleged "deliberate indifference" as to medical treatment because a "broken finger, without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection." *Ibid.* Likewise, in *Henderson v. Doe,* 1999 WL 378333, at *2-3 (S.D.N.Y.1999), it was held that a broken finger was not sufficiently serious to warrant constitutional protection. Accordingly, Ruiz's section 1983 claims against Homrighouse and Preiss will be

dismissed because he fails as a matter of law to allege a sufficiently serious medical condition.

Second, even if Ruiz's condition had been sufficiently serious, the alleged "indifference" - a one-week delay in Ruiz's consultation with an orthopedist -did not constitute deliberate indifference to his medical needs. [14] Indeed, it is undisputed that Ruiz was afforded immediate medical attention -to wit, he was taken to Medina's emergency room on the day he broke his hand, he was treated with a splint and an ace bandage, Ibuprofen was provided and he was scheduled to see an orthopedic specialist at ECMC. Consequently, Ruiz received necessary and appropriate medical treatment. [15] Indeed, the "Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves * * * [t]he essential test is one of medical necessity and not one simply of desirability." *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). [16] Moreover, Ruiz's *unsubstantiated* claim that the one-week delay caused a degeneration in his condition is inadequate to bar summary judgment. Indeed, Ruiz presents no evidence whatsoever to refute the expert opinion of Dr. Donald J. Nenno, II -an orthopedist who examined Ruiz on January 24, 2002 - that the one-week delay did not affect Ruiz's injuries. Dr. Nenno stated that

"[t]he delay in follow-up from 2 to 3 weeks for his fractured metacarpal has no impact on his current state of disability. It is my feeling that no treatment or intervention was required at that time or at this time." Decl. of Peter B. Sullivan, Esq., Ex. C.

Accordingly, inasmuch as it was not medically necessary for Ruiz to consult an orthopedist within two weeks of his injury (as opposed to three weeks), [17] the rescheduling of his appointment with an orthopedist was not deliberate indifference to his medicals needs. [18] *See Henderson,* at *2-3 (finding that failure to refer inmate with a broken finger to a specialist did not constitute deliberate indifference where he was provided prompt and appropriate treatment including a splint and pain relief). Ruiz's section 1983 claims will therefore be dismissed. [19]

**\*4**  Third, Ruiz fails to establish the requisite subjective factor as required under *Wilson.* Ruiz presents no evidence whatsoever that any defendant made the decision to cancel his scheduled departure on December 7, 2000 - thus

prohibiting him from consulting a specialist at ECMC until December 14, 2000. [20] Indeed, the evidence in the record indicates that neither Homrighouse nor Preiss was aware of Ruiz's condition on December 7, 2000, let alone personally involved in the decision to cancel his trip to ECMC. [21] Accordingly, Ruiz's section 1983 claims fail because neither Homrighouse nor Preiss was personally involved in canceling the ECMC appointment initially scheduled for December 7, 2000. [22]

 [2]  Ruiz's section 1983 claim against Dr. Sinha is based on (1) Dr. Sinha's alleged failure to refer Ruiz for surgery - despite an alleged direction from the medical staff at Medina to do so - and (2) an alleged refusal to provide pain medication. Ruiz's section 1983 claims against Dr. Sinha for alleged deliberate indifference must be dismissed for several reasons. [23] First, as noted above, Ruiz's condition was not sufficiently serious - and thus his deliberate indifference claim fails as a matter of law. Second, Ruiz's contention that he should have been referred for surgery is merely a difference of opinion with respect to a course of treatment, which is not actionable under section 1983. [24] Finally, Dr. Sinha was not deliberately indifferent to Ruiz inasmuch as Dr. Sinha and the Orleans medical staff provided medical treatment to Ruiz including, *inter alia,* a splint and ace bandage, same-day referral to the emergency room, pain medication, [25] physical therapy and referral to an orthopedist. [26] Such treatment does not constitute deliberate indifference. [27]

Having found that Ruiz has failed to establish that (1) his medical condition was objectively sufficiently serious or (2) any defendant was deliberately indifferent to such condition - the lack of either of which is fatal to plaintiff's section 1983 claims -, this Court finds that there is no genuine issue of material fact whether defendants acted with deliberate indifference towards Ruiz's medical condition. Accordingly, plaintiff's section 1983 claims will be dismissed.

Accordingly, it is hereby *ORDERED* that defendants' motion for summary judgment is granted, that all of plaintiff's claims are dismissed and that the Clerk of the Court shall close this case. Moreover, this Court declines to issue a certificate of appealability and certifies that any appeal would not be taken in good faith pursuant to 28 U.S.C. § 1915 because plaintiff has not made a substantial showing of the denial of a constitutional right.

### All Citations

Not Reported in F.Supp.2d, 2003 WL 21382896

### Footnotes

1   Charles Homrighouse, sued as Charles Homerighouse.

2   This decision may be cited in whole or in any part.

3   During the relevant period, Carol A. Preiss was the Deputy Superintendent for Administration at Orleans and Charles Homrighouse was Deputy Superintendent of Security at Orleans.

4   It is not clear whether Ruiz is referring to Medina or ECMC. Based on defendants' Statement of Undisputed Facts, however, it appears that Ruiz is referring to ECMC.

5   Dr. Sinha is the supervisor of the infirmary at Orleans.

6   Defendants' Statement appears erroneous in that it states that Ruiz "was housed in the Orleans Correctional Facility's hospital from December 2*7*, 2000, to December 2*4*, 2000 * * *." Moreover, defendants' Statement does not cite to the record - which is unhelpful to this Court.

7   Of course, the moving party bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). If the moving party makes such a showing, the non-moving party must then come forward with evidence of specific facts sufficient to support a jury verdict in order to survive the summary judgment motion. *Ibid.;* FRCvP 56(e).

8   *See also Anderson,* at 252 ("The mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant].")

9   *See* footnote 7.

10  A section 1983 claim requires the plaintiff to demonstrate that he was deprived, by a person or persons acting under state authority, of a right, privilege or immunity protected under the Constitution or a federal statute. *See Snider v.*

Ruiz v. Homerighouse, Not Reported in F.Supp.2d (2003)
Case 9:16-cv-01284-TJM-DEP   Document 46   Filed 12/21/18   Page 90 of 91
2003 WL 21382896

*Dylag,* 188 F.3d 51, 53 (2d Cir.1999). Deliberate indifference claims are predicated upon the Eighth and Fourteenth Amendments to the United States Constitution. *Ibid.* The Eighth Amendment - made applicable to defendants by the Fourteenth Amendment - prohibits the infliction of unnecessary and wanton pain on those convicted of crimes. *Hudson v. McMillian,* 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

11  Indeed, "allegations of 'inadvertent failure to provide adequate medical care,' or of a 'negligent * * * diagnos[is],' simply fail to establish the requisite culpable state of mind." *Wilson,* at 297 (citations omitted).

12  Citing *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), and *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995).

13  *See also Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (finding that broken toe was not sufficiently serious - as would be required for a finding of deliberate indifference under the Eighth Amendment - because such condition was not "urgent, degenerative or produc [ing] extreme pain"); *Jermosen v. Coughlin,* 1995 WL 780975, at *4 (W.D.N.Y.1995) (finding inmate's alleged orthopedic condition involving his feet and back - which allegedly caused "severe pain" - not sufficiently serious); *Malsh v. Austin,* 901 F.Supp. 757, 762 (S.D.N.Y.1995) (finding that delay of non-emergent dental appointment for three weeks was not a sufficiently serious deprivation).

14  *See Rodriguez,* at 563. *Rodriguez* is very similar to the present case. Like Rodriguez, Ruiz had injured his hand in an altercation with another inmate. *Ibid.* Rodriguez had been sent to the emergency room 15 days after he had injured his distal right 4th metacarpal. *Ibid.* Ruiz, on the other hand, was sent to the emergency room the same day that he injured his mid-distal right 5th metacarpal. Rodriguez claimed that the 15-day delay caused the bone to heal improperly and rendered him disfigured. *Ibid.* Likewise, Ruiz claims that the 7-day delay caused the bone to heal improperly and rendered him disfigured. In *Rodriguez,* Judge Larimer held that defendants' 15-day delay was not deliberate indifference because the medical staff had sent Rodriguez to the emergency room as soon as they had an X-ray report showing the fracture to his hand. *Ibid.* Likewise, the 7-day delay caused by the need to reschedule Ruiz's appointment - regardless of who canceled the December 7 appointment - was not deliberate indifference because the rescheduling was necessitated by a lack of available transportation on that day and Ruiz was provided with adequate interim treatment.

15  *See Henderson,* at *2 (finding that inmate with broken finger received constitutionally adequate treatment where he was examined the day he was injured and was provided an X-ray, a splint and pain medication); *Rodriguez,* at 561-563 (finding that neither a one-week delay in scheduling an appointment to see a specialist nor a 15-day delay in sending inmate to the emergency room for treatment of a broken hand constituted medical indifference); *Dempsey v. Ruggiero,* 1995 WL 591300, at *2-4 (E.D.N.Y.1995) (finding that three-month delay in sending inmate to neurologist for inmate's alleged head injuries was not deliberately indifferent where delay was caused by inmate's transfer to another facility and where inmate was provided interim treatment). Likewise, the one-week delay experienced by Ruiz in consulting an orthopedist did not constitute actionable medical indifference. Moreover, Ruiz ignores the prompt treatment that he did receive. *Muhammad v. Unger,* 2002 WL 450010, at *3 (W.D.N.Y.2002) (noting that inmate's characterization of "delay" in treatment ignored the fact that he was provided "extensive medical treatment from the onset of his symptoms"); *Jermosen,* at *4 (finding no indifference - let alone "deliberate indifference" - where an inmate was promptly treated while he waited several months to see an orthopedist). Finally, as discussed below, the undisputed evidence indicates that Ruiz's condition did not warrant an immediate consultation with an orthopedist.

16  Quoting from *Ruiz v. Estelle,* 679 F.2d 1115, 1123 (5th Cir.1982). " 'The Constitution does not mandate comfortable prisons,' and, for plaintiff to succeed in this action, he must show that 'he [was] incarcerated under conditions posing a substantial risk of serious harm' and that prison officials were deliberately indifferent to his health or safety." *LaCroix v. Williams,* 2000 WL 1375737, at *3 (W.D.N.Y.2000) (citing *Farmer* - see footnote 12 -, at 834). Moreover, so "long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Henderson,* at *2 (citing *Dean,* at 215).

17  Ruiz testified that the staff at ECMC informed him that there would have been no difference *even if* he had kept his appointment on December 7, 2000. Ruiz Dep., at 33 ("[ECMC] said they couldn't do anything, *even if I would have gone two weeks after,* it was already too late being it was three weeks already since the incident.")(emphasis added). Subsequent deposition elicited the following exchange:

"Q. You said something a moment ago, somebody told you that even by December 7[th] it was healed?

"A. Yes, it would have been too late already.

"Q. Too late for what?

"A. Too late for them to do anything.

"Q. Who said that?

"A. Dr. Carter at ECMC.

"Q. He told you-I'm not trying to put words in your mouth. Correct me if I am wrong. Basically, it didn't matter, they couldn't do anything further for you on the fourteenth and wouldn't have been able to do anything else for you on the seventh?

"A. Yeah, exactly, because of the two weeks it was healed." Ruiz Dep., at 34-35.

Accordingly, Ruiz's testimony undermines his contention that the one-week delay caused his injuries. Furthermore, to the extent that Ruiz claims that the fact that he had to wait three weeks to see an orthopedist, such is nonetheless not actionable under section 1983 for the reasons set forth above - namely, that a broken metacarpal bone is not sufficiently serious to warrant constitutional protection.

18    *See Rodriguez,* at 561-563 (finding no deliberate indifference where an inmate waited (1) 15 days to go to the emergency room for treatment of a broken hand, (2) one week to see a gastrointestinal specialist and (3) 4 weeks for a colonoscopy). Notably, in *Rodriguez,* the inmate's appointment for a colonoscopy was rescheduled because there was no available security escort available on the day his appointment was scheduled. *Id.* at 561.

19    *See Amaker v. Coombe,* 2002 WL 523388, at *8 (S.D.N.Y.2002) (dismissing section 1983 claim for alleged deliberate indifference because plaintiff produced no evidence refuting medical experts' affidavits opining that plaintiff had received adequate care). Moreover, Ruiz essentially claims that defendants failed to get him to an orthopedist sooner. Such, however, "is at most a claim of medical malpractice and not a constitutional violation actionable under section 1983." *Dempsey, supra* note 15, at *4 (dismissing inmate's section 1983 medical indifference claim predicated upon three-month delay in obtaining consultation with a neurologist).

20    *See* Homrighouse Decl., at ¶¶ 3, 10; Preiss Decl., at ¶¶ 3-5; Sinha Decl., at ¶ 6; *Hendricks v. Coughlin,* 114 F.3d 390, 394 (2d Cir.1997) (holding that section 1983 liability requires "personal involvement" by the defendant in the alleged constitutional violation).

21    *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (holding that "personal involvement of a supervisory defendant may be shown by evidence that (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring."). Ruiz does not show that any defendant was "personally involved" in the cancellation of his appointment within the meaning of *Colon. See* Ruiz Dep., at 43-46. Moreover, defendants' supervisory positions are "not enough to generate liability, insofar as '[t]here is no *respondeat superior* liability in § 1983 cases.' " *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir.1995). Indeed, Ruiz "must specifically demonstrate how the personal involvement of these defendants supports his claims of liability." *LaCroix, supra* note 16, at *4 (citing *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). This he has failed to do.

22    *See Rodriguez,* at 560 (dismissing inmate's section 1983/medical indifference claim because he failed to show that the defendant "knew of and disregarded the plaintiff's serious medical needs").

23    To the extent that Ruiz predicates his section 1983 claim against Dr. Sinha for the one-week delay, such will be dismissed for the same reasons that Ruiz's section 1983 claims will be dismissed against Homrighouse and Preiss.

24    Indeed, allegations that the treatment rendered "was inconsistent with the doctor's orders is insufficient to show a [section 1983] violation" for deliberate indifference. *See Muhammad,* at *3 (citing *Ross v. Kelly,* 784 F.Supp. 35, 46 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992)).

25    Although Ruiz disputes having been given Ibuprofen, such is irrelevant in light of this Court's finding that Ruiz's medical condition was not sufficiently serious.

26    *See* Dr. Sinha Decl., at ¶¶ 10-12 (discussing Ruiz's treatment); Ruiz Dep., at 17-23, 25-28, 37-39 (same).

27    *See* Dr. Sinha Decl., at ¶¶ 4-5 (noting that Dr. Sutton was primarily responsible for Ruiz's treatment), ¶¶ 8-9 (stating that Dr. Sinha was not aware of any recommendation of surgery from the Medina medical staff); *Cardin v. Erway,* 2001 WL 1188167, at *4 (W.D.N.Y.2001) (dismissing section 1983 claim because the doctor was not deliberately indifferent when he treated inmate until there was no further treatment to be provided).

**End of Document**                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.